## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CITY OF EUGENE, OREGON,
   Petitioner,

          v.

FEDERAL COMMUNICATIONS
   COMMISSION

and

UNITED STATES OF AMERICA,
   Respondents.

NO. 19-_____

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, Rule 15(a) of the Federal Rules of Appellate Procedure, and Ninth Circuit Rule 15-1, the City of Eugene, Oregon (the "City"), petitions this Court for review of an order of the Federal Communications Commission ("FCC") captioned *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Third Report and Order, MB Docket No. 05-311, FCC 19-80, 84 Fed. Reg. 44725 (August 27, 2019) ("*Order*"). A copy of the *Order* is attached as Exhibit A to this Petition.

Venue is proper in this Court pursuant to 28 U.S.C. § 2343.

The City submitted comments and actively participated in the underlying proceeding before the FCC that led to the *Order*, and is aggrieved by the *Order* within the meaning of 28 U.S.C. § 2344.

The City seeks review of the *Order* on the grounds that it is arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; violates federal law, including, but not limited to, the U.S. Constitution, the Communications Act of 1934, as amended, and FCC regulations promulgated thereunder; and is otherwise contrary to law.

The City respectfully requests that the Court grant this Petition, hold unlawful, vacate, enjoin, and set aside the *Order*, and provide such additional relief as the Court may deem proper.

Respectfully submitted,

*s/ Tillman L. Lay*
Tillman L. Lay
Jeffrey M. Bayne
Spiegel & McDiarmid LLP
1875 Eye Street, NW
Suite 700
Washington, DC  20006
(202) 879-4000

*Attorneys for City of Eugene, Oregon*

August 30, 2019

2

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| CITY OF EUGENE, OREGON,<br>    Petitioner,<br><br>                    v.<br><br>FEDERAL COMMUNICATIONS<br>    COMMISSION<br><br>and<br><br>UNITED STATES OF AMERICA,<br>    Respondents | NO. 19-_____ |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, the City of Eugene, Oregon, states that it is a governmental agency and therefore exempt from Rule 26.1.

Respectfully submitted,

*s/ Tillman L. Lay*

Tillman L. Lay
Jeffrey M. Bayne
Spiegel & McDiarmid LLP
1875 Eye Street, NW
Suite 700
Washington, DC  20006
(202) 879-4000

*Attorneys for City of Eugene, Oregon*

August 30, 2019

# EXHIBIT A

**Federal Communications Commission**  FCC 19-80

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Implementation of Section 621(a)(1) of the Cable | ) | MB Docket No. 05-311 |
| Communications Policy Act of 1984 as Amended | ) | |
| by the Cable Television Consumer Protection and | ) | |
| Competition Act of 1992 | ) | |

**THIRD REPORT AND ORDER**

**Adopted:  August 1, 2019**  **Released:  August 2, 2019**

By the Commission: Chairman Pai and Commissioners O'Rielly and Carr issuing separate statements; Commissioners Rosenworcel and Starks dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading  Paragraph #

I.   INTRODUCTION ..............................................................................................................................1
II.  BACKGROUND ...............................................................................................................................2
III. DISCUSSION ....................................................................................................................................7
     A. In-Kind Contributions ...............................................................................................................8
        1. Interpretation of Cable-Related, In-Kind Contributions Under Section 622 ...........................9
        2. Specific Types of Cable-Related, In-Kind Contributions Under Section 622 .......................25
           a. Free and Discounted Cable Service to Public Buildings ...................................................26
           b. PEG Access Facilities .......................................................................................................27
              (i)  The Franchise Fee Definition Generally Includes Contributions for PEG
                   Access Facilities ...................................................................................................28
              (ii) Scope of Specific Franchise Fee Exclusions Related to PEG Access Facilities ........31
              (iii)Policy Concerns and the Impact on PEG Programming ............................................50
           c. I-Nets...................................................................................................................................55
           d. Build-Out and Customer Service Requirements................................................................57
        3. Valuation of In-Kind Contributions and Application to Existing Franchises .........................59
     B. Mixed-Use Rule .......................................................................................................................64
     C. Preemption of Other Conflicting State and Local Regulation ..................................................80
     D. State Franchising Regulations.................................................................................................111
IV. PROCEDURAL MATTERS............................................................................................................120
V.  ORDERING CLAUSES..................................................................................................................124
APPENDIX A—Final Rules
APPENDIX B—Final Regulatory Flexibility Analysis

# I.   INTRODUCTION

1.      In this *Third Report and Order* (*Third Order*), we interpret sections of the Communications Act of 1934, as amended (the Act) that govern how local franchising authorities (LFAs) may regulate cable operators and cable television services, with specific focus on issues remanded from the United States Court of Appeals for the Sixth Circuit (Sixth Circuit) in *Montgomery County, Md. et al.*

*v. FCC*.[1]  First, we conclude that cable-related, "in-kind" contributions required by a cable franchise agreement are franchise fees subject to the statutory five percent cap on franchise fees set forth in section 622 of the Act, with limited exceptions, including an exemption for certain capital costs related to public, educational, and governmental access (PEG) channels.[2]  Second, we find that under the Act, LFAs may not regulate the provision of most non-cable services,[3] including broadband Internet access service, offered over a cable system by an incumbent cable operator.  Third, we find that the Act preempts any state or local regulation of a cable operator's non-cable services that would impose obligations on franchised cable operators beyond what Title VI of the Act allows.  Finally, we conclude that Commission requirements that concern LFA regulation of cable operators should apply to state-level franchising actions and state regulations that impose requirements on local franchising.

## II.    BACKGROUND

2.    Every LFA as well as every "cable operator"[4] that offers "cable service"[5] must comply with the cable franchising provisions of Title VI of the Act.[6]  Section 621(b)(1) prohibits a cable operator from providing cable service without first obtaining a cable franchise,[7] while section 621(a)(1) circumscribes the power of LFAs to award or deny such franchises.[8]  In addition, section 622 allows LFAs to charge franchise fees and sets the upper boundaries of those fees.  Notably, section 622 caps the fee at five percent of a "cable operator's gross revenues derived . . . from the operation of the cable system to provide cable service."[9]  When Congress initially adopted these sections in 1984, it explained that it was setting forth a federal policy to "define and limit the authority that a franchising authority may exercise through the franchise process."[10]  Congress also expressly preempted any state or local laws or actions that conflict with those definitions and limits.[11]

3.    As summarized in detail in the *Second FNPRM*, the Commission has an extensive history of rulemakings and litigation interpreting sections 621 and 622.[12]  In short, the Commission in 2007 released a *First Report and Order* to provide guidance about terms and conditions in local franchise

---

[1] *Montgomery County, Md. et al. v. FCC*, 863 F.3d 485 (6th Cir. 2017) (*Montgomery County*).

[2] 47 U.S.C. § 542.

[3] *See infra* note 257 (defining "non-cable service").

[4] *Id*. § 502(5) ("the term 'cable operator' means any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system.").

[5] *Id*. § 502(6) ("the term 'cable service' means— (A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service.").

[6] *Id*. §§ 521-573.

[7] *Id*. § 541(b)(1).

[8] *Id*. § 541(a)(1).

[9] *Id*. § 542.

[10] H.R. Rep. No. 98-934, at 19 (1984).

[11] 47 U.S.C. § 556(c).  *See, e.g.*, *Comcast v. City of Plano*, 315 S.W.3d 673, 678-80 (Tex. Ct. App. 2010) (discussing historical development of federal regulatory scheme); *City of Chicago v. Comcast Cable Holdings, L.L.C.*, 231 Ill.2d 399, 405-07 (2008).

[12] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Second Further Notice of Proposed Rulemaking, 33 FCC Rcd 8952, 8953-59, paras. 3-14 (2018) (*Second FNPRM*).

**Federal Communications Commission** **FCC 19-80**

agreements that are unreasonable under section 621 of the Act with respect to new entrants' franchise agreements.[13] Two major conclusions that the Commission adopted are that (1) non-cash, "in-kind" contributions from cable operators to franchise authorities are franchise fees that count toward the statutory cap of five percent of cable operator revenue,[14] and (2) franchising authorities may not use their cable franchising authority to regulate non-cable services (like telephone and broadband services) that the new entrants deliver over their mixed-use networks (*i.e.*, networks that carry broadband services, voice services, and other non-cable services, in addition to video programming services).[15] The Commission also sought comment on whether to extend those conclusions to agreements that LFAs have with incumbent cable operators,[16] and ultimately decided in a *Second Report and Order*[17] and an *Order on Reconsideration*[18] that those conclusions should apply to incumbent cable operators.

4. In *Montgomery County*, the Sixth Circuit addressed challenges by LFAs to the *Second Report and Order* and the *Order on Reconsideration*.[19] The court agreed that in-kind (*i.e.*, non-cash) contributions are franchise fees as defined by section 622(g)(1), noting that section 622(g)(1) defines "franchise fee" to include "*any* tax, fee, or assessment *of any kind*" and that the terms "tax" and "assessment" can include nonmonetary exactions.[20] The court found, however, that the fact that the term franchise fee *can* include in-kind contributions "does not mean that it necessarily does include every one of them."[21] The court concluded that the Commission failed to offer any explanation in the *Second Report and Order* or in the *Order on Reconsideration* as to why section 622(g)(1) allows it to treat cable-related, "in-kind" exactions—such as free or discounted cable services or obligations related to PEG channels—as franchise fees.[22] LFAs had claimed that the Commission's interpretation would limit LFAs' ability to enforce their statutory authority to require cable operators to dedicate channel capacity for PEG use and to impose build-out obligations in low-income areas,[23] and the court noted that the Commission's orders did not reflect any consideration of this concern.[24] The court also stated that the Commission failed to define what "in-kind" means.[25] The court therefore vacated as arbitrary and capricious the *Second Report and Order* and the *Order on Reconsideration* to the extent that they treat cable-related, in-

---

[13] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 5101 (2007) (*First Report and Order*), *aff'd sub nom. Alliance for Community Media et al. v. FCC*, 529 F.3d 763 (6th Cir. 2008) (*Alliance*), *cert. denied*, 557 U.S. 904 (2009). The term "new entrants" as used in the *First Report and Order* refers to entities that choose to offer "cable service" over a "cable system" utilizing public rights-of-way and thus are deemed under the Act to be "cable operator[s]" that must obtain a franchise. *First Report and Order*, 22 FCC Rcd at 5106 n.24. Such new entrants largely were telecommunications carriers subject to Title II of the Act that were seeking to enter the cable services market.

[14] *First Report and Order*, 22 FCC Rcd at 5149-50, paras. 105-08.

[15] *Id*. at 5155-56, paras. 121-24.

[16] *Id*. at 5164-65, paras. 139-40.

[17] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Second Report and Order, 22 FCC Rcd 19633, 19637-38, 19640-41, paras. 11, 17 (2007) (*Second Report and Order*).

[18] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Order on Reconsideration, 30 FCC Rcd 810, 814-17, paras. 11-15 (2015) (*Order on Reconsideration*).

[19] *Montgomery County*, 863 F.3d at 487.

[20] *Id*. at 490-91.

[21] *Id*. at 491.

[22] *Id*. In the *First Report and Order*, the Commission ruled that "any requests made by LFAs that are unrelated to the provision of cable services by a new competitive entrant are subject to the statutory 5 percent franchise fee cap."

(continued….)

kind exactions as franchise fees under section 622(g)(1).[26]  The court directed the Commission to determine and explain on remand to what extent cable-related, in-kind contributions are franchise fees under the Act.[27]

5.      The court in *Montgomery County* also agreed with LFAs that neither the *Second Report and Order* nor the *Order on Reconsideration* offered a valid statutory basis for the Commission's application of its prior "mixed-use ruling" to incumbent cable operators.[28]  Under the mixed-use rule, "LFAs' jurisdiction applies only to the provision of cable services over cable systems" and "an LFA may not use its video franchising authority to attempt to regulate a LEC's entire network beyond the provision of cable services."[29]  The court stated that the Commission's decision in the *First Report and Order* to apply the mixed-use rule to new entrants had been defensible because section 602(7)(C) of the Act expressly states that LFAs may regulate Title II carriers only to the extent that they provide cable services and the Commission found that new entrants generally are Title II carriers.[30]  The court observed that in extending the mixed-use rule to incumbent cable operators in the *Second Report and Order*, the Commission merely relied on the *First Report and Order*'s interpretation of section 602(7)(C), noting that section 602(7)(C) "does not distinguish between incumbent providers and new entrants."[31]  The court found, however, that this reasoning is not an affirmative basis for the Commission's decision in the *Second Report and Order* to apply the mixed-use rule to incumbent cable operators because section 602(7)(C) by its terms applies only to Title II carriers and "many incumbent cable operators are not Title II carriers."[32]  The court further found that the *Order on Reconsideration* did not offer any statutory basis for the Commission's decision to extend the mixed-use rule to incumbent cable operators.[33]  Accordingly, the court concluded that the Commission's extension of the mixed-use rule to incumbent cable operators that are not common carriers was arbitrary and capricious.[34]  The court vacated the mixed-use rule as applied to those incumbent cable operators and remanded for the Commission "to set forth a valid

---

(Continued from previous page) ──────────────

*First Report and Order*, 22 FCC Rcd at 5149, para. 105.  This ruling was upheld by the Sixth Circuit in *Alliance*. 529 F.3d at 782-83.  The Commission later relied on the *First Report and Order* to conclude that "in-kind payments involving both cable and non-cable services" count toward the franchise fee cap.  *Order on Reconsideration*, 30 FCC Rcd at 816, para. 13.  The court found that the *Order on Reconsideration* incorrectly asserted that the *First Report and Order* had already treated "in-kind" cable-related exactions as franchise fees and that the Sixth Circuit had approved such treatment in *Alliance*.  *Montgomery County*, 863 F.3d at 490.  The court also found that the *First Report and Order* did not make clear that cable-related exactions are franchise fees under section 622(g)(1).  *Id*.  In this regard, the court pointed out that the Commission specifically told the Sixth Circuit in *Alliance* that the *First Report and Order*'s "analysis of in-kind payments was expressly limited to payments that do not involve the provision of cable service."  *Id*.

[23] 47 U.S.C. § 531.

[24] *Montgomery County*, 863 F.3d at 491.

[25] *Id*.

[26] *Id*. at 491-92.

[27] *Id*. at 492.

[28] *Id*. at 493.  The court noted that LFAs' primary concern with the mixed-use ruling is that it would prevent them from regulating "institutional networks" or "I-Nets"—communication networks that are constructed or operated by the cable operator and are generally available only to subscribers who are not residential customers—even though the Act makes clear that LFAs may regulate I-Nets.  *Id*. at 492; *see* 47 U.S.C. §§ 531(b) (authorizing franchising authorities to require as part of a franchise or franchise renewal that channel capacity on institutional networks be designated for educational or governmental use), 541(b)(3)(D) ("Except as otherwise permitted by sections 611 and

(continued….)

statutory basis, if there is one, for the rule as so applied."[35]

6.       The Commission in September 2018 issued the *Second FNPRM* to address the issues raised by the remand from the Sixth Circuit in *Montgomery County*.  In the *Second FNPRM*, the Commission tentatively concluded that:  (1) it should treat cable-related, in-kind contributions required by LFAs from cable operators as a condition or requirement of a franchise agreement as franchise fees subject to the statutory five percent cap on franchise fees set forth in section 622 of the Act, with certain exceptions;[36] and (2) it should apply its mixed-use rule to incumbent cable operators.[37]  The Commission sought comment on these tentative conclusions.[38]  The Commission also sought comment on whether other statutory provisions limit LFAs' authority to regulate non-cable services offered over a cable system by an incumbent cable operator or the facilities and equipment used to provide such services.[39]  Finally, the Commission invited comment on whether it should apply its proposals and tentative conclusions in the *Second FNPRM*, and its prior decisions governing regulation of cable operators by local franchising authorities, to franchising actions taken at the state level and state regulations that impose requirements on local franchising.[40]

## III.   DISCUSSION

7.       We largely adopt our tentative conclusions in the *Second FNPRM*.[41]  First, we conclude that cable-related, in-kind contributions required by LFAs from cable operators as a condition or requirement of a franchise agreement are franchise fees subject to the statutory five percent cap on

---

(Continued from previous page) ─────────────────

612, a franchising authority may not require a cable operator to provide any telecommunications service or facilities, other than institutional networks, as a condition of the initial grant of a franchise, a franchise renewal, or a transfer of a franchise").  *See also id*. § 531(f) (defining "institutional networks").  The court observed, however, that the Commission acknowledged that its mixed-use rule was not meant to prevent LFAs from regulating I-Nets.  *Montgomery County*, 863 F.3d at 492.

[29] *First Report and Order*, 22 FCC Rcd at 5155, paras. 121-22.

[30] *Montgomery County*, 863 F.3d at 492-93.

[31] *Id*. at 493.

[32] *Id*.

[33] *Id*.

[34] *Id*.

[35] *Id*.

[36] *Second FNPRM*, 33 FCC Rcd at 8960-64, paras. 16-24.  The Commission proposed to apply this treatment of cable-related, in-kind contributions to both incumbent cable operators and new entrants.  *Id*. at 8963-64, para. 22.

[37] *Second FNPRM*, 33 FCC Rcd at 8964-65, para. 25.  In particular, the Commission tentatively concluded that the mixed-use rule prohibits LFAs from regulating the provision of any services other than cable services offered over the cable systems of incumbent cable operators that are common carriers, or from regulating facilities and equipment used in the provision of such non-cable services, with the exception of I-Nets.  *Id*. at 8965-66, para. 26.  Similarly, the Commission tentatively concluded that LFAs are prohibited from regulating the provision of non-cable services provided by incumbent cable operators that are not common carriers, or the facilities and equipment used to provide such services.  *Id*. at 8966-68, paras. 27-28.

[38] *Id*. at 8952, para. 1.

[39] *Id*. at 8969-71, para. 31.

[40] *Id*. at 8971-72, para. 32.

[41] As discussed below, we define "cable related, in-kind contributions" slightly differently than proposed, and our reasoning for not applying build-out costs is different than what we proposed.  *Compare infra* paras. 25 and 57 *with Second FNPRM*, 33 FCC Rcd at 8963-64, paras. 21 and 24.

franchise fees set forth in section 622 of the Act. We find that the Act exempts capital contributions associated with the acquisition or improvement of a PEG facility from this definition and remind LFAs that under the Act they may only require "adequate" PEG access channel capacity, facilities, or financial support. Second, we find that our mixed-use rule applies to incumbent cable operators. Third, we find that the Act preempts any state or local regulation of a cable operator's non-cable services that would impose obligations on franchised cable operators beyond what Title VI of the Act allows. Finally, we decide that our guidance related to the local franchising process in this docket also will apply to state-level franchising actions and state regulations that impose requirements on local franchising.

## A. In-Kind Contributions

8. Section 622 of the Act contains a broad definition of franchise fees. For the reasons provided below, we find that most cable-related, in-kind contributions are encompassed within this definition and thus must be included for purposes of calculating the statutory five percent cap on such fees. In this section, we first explain our interpretation of section 622 and why the definition of franchise fees includes most cable-related, in-kind contributions. We then explain how our interpretation applies to certain common franchise agreement terms. Lastly, we explain the process that LFAs and cable operators should use to amend their franchise agreements to conform to this Order.

### 1. Interpretation of Cable-Related, In-Kind Contributions Under Section 622

9. Addressing the first issue raised by the remand from the Sixth Circuit in *Montgomery County*, we adopt our tentative conclusion that we should treat cable-related, in-kind contributions[42] required by LFAs from cable operators as a condition or requirement of a franchise agreement as franchise fees subject to the statutory five percent cap set forth in section 622 of the Act, with limited exceptions as described herein.[43] We also adopt our tentative conclusion that this treatment of cable-related, in-kind contributions should be applied to both new entrants and incumbent cable operators.[44] As explained below, we find that this interpretation is consistent with the statutory language and legislative history.

10. Section 622 of Title VI, entitled "Franchise fees," governs cable operator obligations with respect to franchise fees.[45] Specifically, section 622(a) states that any cable operator may be required under the terms of any franchise agreement to pay a franchise fee, and section 622(b) sets forth the limitation that "[f]or any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services."[46] Notably, section 622(g) defines the term "franchise fee" for purposes of this section.[47]

11. To understand what types of contributions from cable operators are franchise fees subject to the five percent statutory cap, the key provision is the section 622(g) definition, which states that "the term 'franchise fee' includes *any tax, fee, or assessment of any kind* imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as

---

[42] We define this term *infra* para. 25, to include "any non-monetary contributions related to the provision of cable services provided by cable operators as a condition or requirement of a local franchise, including but not limited to free or discounted cable service to public buildings, non-capital costs in support of PEG access, and costs attributable to the construction of I-Nets. It does not include the costs of complying with build-out and customer service requirements."

[43] *Second FNPRM*, 33 FCC Rcd at 8960, para. 16.

[44] *Id*. at 8963, para. 22.

[45] 47 U.S.C. § 542.

[46] *Id*. § 542(a), (b).

[47] *Id*. § 542(g).

**Federal Communications Commission** FCC 19-80

such," subject to certain enumerated exceptions.[48]  Specifically, according to the definition, the term "franchise fee" does not include the following:  (1) any tax, fee, or assessment of general applicability;[49] (2) in the case of any franchise in effect on October 30, 1984, payments which are required by the franchise to be made by the cable operator during the term of such franchise for, or in support of the use of, PEG access facilities;[50] (3) in the case of any franchise granted after October 30, 1984, capital costs which are required by the franchise to be incurred by the cable operator for PEG access facilities;[51] (4) requirements or charges incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages;[52] or (5) any fee imposed under Title 17.[53]  Because Congress spoke directly to the issue of what constitutes a franchise fee in section 622(g), our analysis of whether cable-related, in-kind exactions are included in the franchise fee is appropriately focused on this statutory language.

12.     As a preliminary matter, we note our prior finding, which was upheld by the Sixth Circuit in *Montgomery County*, that the franchise fee definition in section 622(g) can encompass both monetary payments imposed by a franchising authority or other governmental entity on a cable operator, as well as "in-kind" payments – *i.e.*, payments consisting of something other than money, such as goods and services[54] – that are so imposed.[55]  The definition of "franchise fee" in section 622(g)(1) broadly covers "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator . . . solely because of [its] status as such."[56]  Because the statute does not define the terms "tax," "fee," or "assessment," we look to the ordinary meaning of such terms.[57]  As the court explained in *Montgomery County*, the definitions of the terms "tax" and "assessment," in particular, "can include noncash exactions."[58]  Further, as the court observed, section 622(g)(1) "more specifically defines 'franchise fee' to include '*any* tax, fee, or assessment *of any kind*[,]' . . . which requires us to give those terms maximum breadth."[59]  Thus, consistent with the court's conclusion on this issue, the term franchise fee in section 622(g)(1) includes non-monetary payments.[60]  We, therefore, reject arguments that it should

---

[48] *Id.* § 542(g)(1) (emphasis added).

[49] *Id.* § 542(g)(2)(A).  In the *Second FNPRM*, we noted that, by definition, a tax, fee, or assessment of general applicability does not cover cable-related, in-kind contributions, and therefore we tentatively concluded that this exclusion is not applicable to such contributions.  *Second FNPRM*, 33 FCC Rcd at 8961, para. 18.  *See also* H.R. Rep. No. 934, 98th Cong., 2nd Sess. 1984 at 64 ("This would include such payments as a general sales tax, an entertainment tax imposed on other entertainment businesses as well as the cable operator, and utility taxes or utility user taxes which, while they may differentiate the rates charged to different types of utilities, do not unduly discriminate against the cable operator so as to effectively constitute a tax directed at the cable system.").  No commenter disputes this analysis, and we affirm it here.

[50] 47 U.S.C. § 542(g)(2)(B).  *See infra* Section III.A.2.b (discussing PEG costs).

[51] *Id.* § 542(g)(2)(C).  *See infra* Section III.A.2.b (discussing PEG costs).

[52] *Id.* § 542(g)(2)(D).  In the *First Report and Order*, the Commission found that the term "incidental" in this section should be limited to the list of incidentals in the statutory provision, as well as certain other minor expenses, and the court in *Alliance* upheld this determination.  *First Report and Order*, 22 FCC Rcd at 5148, para. 103; *Alliance*, 539 F.3d at 782-83.  The Commission also emphasized that non-incidental costs should be counted toward the five percent cap on franchise fees, and listed various examples including attorney fees and consultant fees, application or processing fees that exceed the reasonable cost of processing the application, acceptance fees, free or discounted services provided to an LFA, and in-kind services unrelated to the provision of cable services.  *First Report and Order*, 22 FCC Rcd at 5149, para. 104.  In the *Second FNPRM*, we explained that, although the statute does not define the term "incidental," based on the interpretive canon of *noscitur a sociis*, the exemplary list delineated in the text of the provision as well as the applicable legislative history suggests that the term refers to costs or requirements related to assuring that a cable operator is financially and legally qualified to operate a cable system, not to cable-related, in-kind contributions.  *Second FNPRM*, 33 FCC Rcd at 8961-62, para. 18 (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).  *See also* H.R. Rep. No. 934, 98th Cong., 2nd Sess. 1984 at 64 ("[F]ranchise fee is defined
(continued….)

be construed to cover only monetary payments.[61]

13.    As the court noted in *Montgomery County*, "that the term 'franchise fee' can include noncash exactions, of course, does not mean that it necessarily *does* include every one of them."[62]  As such, the next step in our analysis is to evaluate specifically whether *cable-related*, in-kind contributions[63] are included within the franchise fees.  The Commission previously determined that in-kind contributions unrelated to the provision of cable service are franchise fees subject to the statutory five percent cap, and the court's decision in *Montgomery County* upheld this interpretation.[64]  In making this determination, the Commission pointed to examples in the record where LFAs demanded in-kind contributions unrelated to the provision of cable services in the context of franchise negotiations, and it explained that such requests do not fall within any of the exempted categories in section 622(g)(2) and thus should be considered a franchise fee under section 622(g)(1).[65]

14.    We find that there is no basis in the statute for exempting all cable-related, in-kind contributions for purposes of the five percent franchise fee cap or for distinguishing between cable-related, in-kind contributions and in-kind contributions unrelated to the provision of cable services.  As noted above, the section 622(g)(1) franchise fee definition broadly covers "any tax, fee, or assessment of any kind,"[66] and we conclude that cable-related, in-kind contributions fall within this definition.  There is nothing in this language that limits in-kind contributions included in the franchise fee.[67]  In fact, Congress specified that the definition covers "*any*" tax, fee, or assessment "*of any kind*," which means those terms should be interpreted expansively and given "maximum breadth."[68]

15.    Further, there is no general exemption for cable-related, in-kind contributions in the five excluded categories listed in section 622(g)(2).[69]  Only two of the exclusions encompass two very specific kinds of cable-related, in-kind contributions, but not all such contributions generally.  In particular, section 622(g)(2)(B) excludes payments required by the franchise to be made by the cable operator for, or in support of the use of, PEG access facilities (for franchises in effect on October 30, 1984), and section

---

(Continued from previous page)

so as not to include any bonds, security funds, or other incidental requirements or costs necessary to the enforcement of the franchise.").  Consistent with this analysis and precedent, we find that cable-related, in-kind contributions demanded by an LFA do not qualify as "incidental" charges excluded in section 622(g)(2)(D).  *See id*.  No commenter disputes our interpretation of this particular exclusion.

[53] 47 U.S.C. § 542(g)(2)(E).  In the *Second FNPRM*, we explained that this section excludes from the definition of franchise fees any fees imposed under the Copyright Act under Title 17, United States Code, and thus does not appear to apply to cable-related, in-kind contributions.  *Second FNPRM*, 33 FCC Rcd at 8961, para. 18.  *See also* H.R. Rep. No. 934, 98th Cong., 2nd Sess. 1984 at 64 ("Any fee imposed under the Copyright Act would not be considered a franchise fee.").  No commenter disputes this analysis, and we affirm it here.

[54] *See* Merriam-Webster, Definition of "In-Kind," *available at* https://www.merriam-webster.com/dictionary/in-kind (defining "in-kind" as "consisting of something (such as goods or commodities) other than money").  According to the record, LFAs in some cases require a grant or other monetary contribution earmarked for cable-related services, such as PEG and I-Net support.  *See, e.g.*, Altice May 9, 2019 *Ex Parte* at 7-8 (describing Altice's payment of "PEG grants" to LFAs).  While we focus here on whether cable-related, *in-kind* (non-monetary) contributions are subject to the five percent cap on franchise fees, we note that these monetary contributions are subject to the franchise fee cap, unless otherwise excluded under section 622(g)(2).  *See infra* note 61.

[55] *See First Report and Order*, 22 FCC Rcd at 5149, paras. 104-05; *Second FNPRM*, 33 FCC Rcd at 8960, para. 17.  We reject the argument that franchise considerations are not "imposed" by a franchising authority because they are negotiated in an arms-length transaction between the parties and "are not established by force."  *See* Comments of the Association of Washington Cities *et al.*, at 10 (Nov. 14, 2018) (AWC *et al.* Comments); Comments of the City of Philadelphia, *et al.*, at 21-23 (Nov. 14, 2018) (City of Philadelphia *et al.* Comments); Reply Comments of the City of Philadelphia, *et al.*, at 6-7 (Dec. 14, 2018) (City of Philadelphia *et al.* Reply); NATOA *et al.* July 24, 2019 *Ex Parte* at 2.  The definition of the term "impose" is not limited to "established as if by force," but can also mean "to establish or apply by authority."  *See* Merriam-Webster, Definition of "Impose," *available at* https://www.merriam-webster.com/dictionary/impose.  *See also* Reply Comments of Free State Foundation, at 11-12 (Dec. 14, 2018) (Free State Foundation Reply) ("Nor should the Commission accept the contention that in-kind

(continued….)

622(g)(2)(C) excludes capital costs which are required by the franchise to be incurred by the cable operator for PEG access facilities (for franchises granted after October 30, 1984).[70]  We agree with ACA that the structure of the relevant statutory provision is "straightforward," providing a broad definition of franchise fee, "then expressly provid[ing] a limited number of exceptions to this definition, none of which is so broad as to include all cable-related, in-kind contributions."[71]

16.     Moreover, the fact that Congress carved out specific exceptions to the franchise fee definition for certain PEG-related contributions bolsters the conclusion that Congress did not intend to establish a general exemption for all cable-related, in-kind contributions from treatment as franchise fees.[72]  Because support for PEG access facilities and PEG capital costs fall within the broader category of cable-related, in-kind contributions, Congress would not have needed to craft these narrow exceptions if all cable-related, in-kind contributions generally were exempted.[73]  We disagree with the contention that the specific exceptions in section 622(g)(2) were intended to address only "payments that otherwise might be considered franchise fees," and that "[o]ther cable-related obligations were not considered 'fees' to begin with, let alone payments that required a specific exemption."[74]  This argument erroneously constricts the definition of franchise fees to apply only to "fees," while the statute more broadly includes "any tax, fee, or assessment of any kind."  Further, we believe it is more consistent with the statutory text and structure to construe the exceptions as carve-outs from a broader definition that sweeps in all cable-related, in-kind contributions.[75]

17.     While the statutory text is alone sufficient to support our conclusion, we also find that the legislative history supports our position that cable-related, in-kind contributions are franchise fees subject to the five percent cap.[76]  As we observed in the *Second FNPRM*, we see no basis in the legislative history for distinguishing between in-kind contributions unrelated to the provision of cable services and cable-related, in-kind contributions for purposes of the five percent franchise fee cap.[77]  Further, we see no basis

---

(Continued from previous page)

contributions are purely voluntary and therefore ought not be restricted by the Commission's proposal.  Sections 621 and 622 reflect the understanding that LFAs are not ordinary private market participants but governing authorities with significant power and policy setting concerns.").  Further, under this narrow interpretation of the term, no monetary or in-kind payments could be construed as a franchise fee if they are negotiated by the parties as terms of the franchise agreement.  As NCTA points out, "[b]y this standard, even a franchise agreement containing a requirement that the cable operator pay five percent of gross revenues to the franchising authority would not contain a franchise fee, since the five percent fee was included in a negotiated document and was not imposed by government fiat."  Reply Comments of NCTA – The Internet & Television Association, at 5, n.13 (Dec. 14, 2018) (NCTA Reply).

[56] 47 U.S.C. § 542(g)(1) (emphasis added).

[57] *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, 132 S. Ct. 1997, 2002, 182 L. Ed. 2d 903 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").  *See* Merriam-Webster, Definition of "Tax," *available at* https://www.merriam-webster.com/dictionary/tax (defining "tax" as "a charge usually of money imposed by authority on persons or property for public purposes; a sum levied on members of an organization to defray expenses"); Black's Law Dictionary (7th ed. 1999), Definition of "Tax," (noting that "[m]ost broadly, the term embraces all governmental impositions on the person, property, privileges, occupations, and enjoyment of the people. . . .  Although a tax is often thought of as being pecuniary in nature, *it is not necessarily payable in money*" (emphasis added)); Merriam-Webster, Definition of "Fee," *available at* https://www.merriam-webster.com/dictionary/fee (defining "fee" as "a fixed charge; a sum paid or charged for a service"); Black's Law Dictionary (7th ed. 1999), Definition of "Fee," (defining "fee" as "[a] charge for labor or services"); Merriam-Webster, Definition of "Assessment," *available at* https://www.merriam-webster.com/dictionary/assessment (defining "assessment" as "the amount assessed: an amount that a person is officially required to pay especially as a

(continued….)

**Federal Communications Commission**　　　　　　　　　　　**FCC 19-80**

in the legislative history to treat in-kind payments differently from monetary payments for purposes of determining what is a franchise fee. The legislative history, in discussing what constitutes a franchise fee, refers to the definition in section 622(g)(1), which "include[s] any tax, fee, or assessment imposed on a cable operator or subscribers solely because of their status as such," and it makes no distinction between cable-related contributions and those unrelated to cable services, nor between monetary and non-monetary payments.[78] The legislative history then elaborates on the specific exemptions in Section 622(g)(2) and, in particular, notes that "[s]pecific exemptions from the franchise fee limitations are included for certain payments related to public, educational and governmental access."[79] It specifies that, "[f]or existing franchises, a city may enforce requirements that additional payments be made above the 5 percent cap to defray the cost of providing public, educational and governmental access, including requirements related to channels, facilities and support necessary for PEG use."[80] Because Congress limited this exception to then-existing franchises, this provision elucidates Congress' intent that contributions in support of PEG access – which are cable-related, in-kind contributions – are subject to the five percent cap for franchises granted after the 1984 Cable Act.[81]

18.　　We disagree with commenters who cite to a portion of the legislative history as evidence of Congress' intent that franchise fees include only monetary payments made by cable operators. Specifically, LFA commenters cite a statement in the discussion of subsection 622(g)(2)(C), which excludes certain PEG-related capital costs from the franchise fee definition, that "[i]n general, this section defines as a franchise fee only monetary payments made by the cable operator, and does not include as a 'fee' any franchise requirements for the provision of services, facilities or equipment."[82] LFA commenters' reading of this statement is inconsistent with the overall text and structure of section 622(g).[83] Section 622(g)(1) "specifically defines 'franchise fee' to include '*any* tax, fee, or assessment *of any kind*[,]'" subject to certain enumerated exclusions, and the court in *Montgomery County* was clear that this statutory language "requires us to give those terms maximum breadth."[84] The Commission has

---

(Continued from previous page) ————————————

tax"); Black's Law Dictionary (7th ed. 1999), Definition of "Assessment," (defining "assessment" as the "[i]mposition of something, such as a tax or fine, according to an established rate"). *See also Montgomery County*, 863 F.3d at 490 (noting that the term "assessment" has been defined as "[a]n enforced contribution of money *or other property* . . . [or] *any contribution* imposed by government upon individual, for the use and service of the state," and observing that Justice Scalia has recognized that assessments need not be monetary by referring to "in-kind assessments") (emphasis in original) (citations omitted). We disagree with NATOA *et al.*'s contention that the Commission "nowhere analyzes or explains why [certain] franchise requirements are 'assessments' or 'exactions.'" *See* NATOA *et al.* July 24, 2019 *Ex Parte* at 2. *See also* Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 8 (arguing that the Commission does not "offer[] a basis in established law for the idea that any imposition of costs is presumptively a tax, fee, or assessment"). Rather, we find that an "assessment," the term used in the statute, includes any contribution imposed by government, based on its ordinary meaning.

[58] *See Montgomery County*, 863 F.3d at 490-91.

[59] *Id.*

[60] *Id. See also* NCTA Reply at 4-5; Comments of Verizon, at 5 (Nov. 14, 2018) (Verizon Comments); Reply Comments of Altice USA, Inc., at 19 (Dec. 14, 2018) (Altice Reply); ICLE July 18, 2019 *Ex Parte* at 3-13.

[61] *See* City of Philadelphia *et al*. Comments at 22 (arguing that "[b]ased on the ordinary meanings of the terms, there is nothing unclear about what is included as a franchise fee" and that all of the terms used in the definition "are referring to unilateral monetary charges by a unit of government"); Comments of Charles County, Maryland, at 7 (Nov. 14, 2018) (Charles County Comments) (arguing that "the words tax, fee, and assessment are terms of art and have precise meaning established by lengthy precedent" and that "Congress chose not to draft the statutory language to include other forms of value transfer, such as grants, external costs, or charges, in the statutory definition of franchise fees"); Reply Comments of Anne Arundel County, Maryland *et al*., at 6 (Dec. 14, 2018) (Anne Arundel

(continued....)

**Federal Communications Commission**        **FCC 19-80**

already concluded, and the Sixth Circuit has twice upheld, that non-monetary payments can be franchise fees. Further, this reading would render section 622(g)(2)(C) superfluous because there would not need to be an exemption for PEG-related in-kind contributions if non-monetary contributions were not franchise fees in the first place.[85]

19.     Because we believe that the pertinent statutory provision in section 622(g) supports our conclusion that cable-related, in-kind contributions are franchise fees, we reject arguments raised by franchise authorities that other Title VI provisions should be read to exclude costs that are clearly included by the franchise fee definition. Instead of focusing on the key definition of "franchise fee" as "any tax, fee, or assessment of any kind" subject to certain enumerated exceptions, LFA commenters cite to other parts of the statute which, they argue, evince Congress' intent to exclude cable-related, in-kind contributions from the statutory cap on franchise fees.[86]  We reject each of these arguments in turn below.

20.     First, we affirm our tentative conclusion that treating cable-related, in-kind contributions as franchise fees would not undermine the provisions in the Act that authorize or require LFAs to impose cable-related obligations on franchisees.[87]  For example, section 611(b) of the Act permits LFAs to require that channel capacity be designated for PEG use and that channel capacity on I-Nets be designated for educational and governmental use.[88]  Anne Arundel County *et al.* argue that the Commission errs by not acknowledging that the Cable Act "authorize[s] LFAs to both impose cable franchise obligations [in section 611] *and* collect franchise fees [in section 622]—they do not offset each other."[89]  However, as we observed in the *Second FNPRM*, the fact that the Act authorizes LFAs to impose such obligations does not mean that the value of these obligations should be excluded from the five percent cap on franchise fees.[90]  We agree with NCTA and ACA that there is no basis in the statutory text for concluding that the authority provided in section 611(b) affects the definition of franchise fee in section 622(g).[91]  As explained above, section 622(g) is the key provision that defines what is included in the franchise fee, and section 622(g)(2) carves out only limited exclusions for PEG-related costs and makes no mention of an I-

(Continued from previous page) ────────────────────────

County *et al.* Reply) ("The Act is clearly structured to consider as franchise fees only *monetary payments*, and to treat other, cable-related non-monetary services and facilities requirements *differently*. . . ."). Contrary to these arguments, the terms used in the statute are not limited to monetary payments. *See supra* note 57 and accompanying text. Moreover, these arguments ignore Congress' specification that the franchise fee includes "*any* tax, fee, or assessment *of any kind*," essentially reading this expansive language out of the statute. For example, although Anne Arundel County *et al.* argue "that generally, taxes, fees, and assessments are monetary, but that in exceptional circumstances (such as forfeitures) non-monetary obligations may also qualify," there is nothing in the statute— which specifically applies to a tax, fee, or assessment *of any kind*—or in the definition of these terms that supports this statement.  *See* Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 7.

[62] *Montgomery County*, 863 F.3d at 491.

[63] *See supra* note 42 (defining and providing examples of "cable-related, in-kind contributions").

[64] *See Second FNPRM*, 33 FCC Rcd at 8960, para. 17 (citing *Montgomery County*, 863 F.3d at 490-91; *First Report and Order*, 22 FCC Rcd at 5149, para. 105).  *See also* NCTA Reply at 5-6.  *But see* Comments of the National Association of Telecommunications Officers and Advisors *et al.*, at 8 (Nov. 14, 2018) (NATOA *et al.* Comments). Contrary to the contention of NATOA *et al.*, the Commission's finding in the *First Report and Order* that in-kind contributions unrelated to the provision of cable services are franchise fees subject to the statutory five percent cap was undisturbed by subsequent court decisions in *Alliance* and *Montgomery County*.  The court in *Montgomery County* vacated the orders to the extent they treat *cable-related*, in-kind exactions as franchise fees, and thus the Commission's finding with regard to in-kind contributions unrelated to the provision of cable services still stands.

[65] *See First Report and Order*, 22 FCC Rcd at 5149-50, paras. 105-08.  In the *First Report and Order*, the Commission cited examples of in-kind contributions unrelated to the provision of cable services from the record, including requests for traffic light control systems, scholarships, and video hookups for a holiday celebration.  *See First Report and Order*, 22 FCC Rcd at 5149-50, paras. 106-07.

[66] 47 U.S.C. § 542(g)(1).

[67] *See* Comments of the American Cable Association, at 4 (Nov. 14, 2018) (ACA Comments); Comments of NCTA

(continued….)

**Federal Communications Commission**                    **FCC 19-80**

Net-related exclusion. Since Congress enacted the PEG and I-Net provisions at the same time it added the franchise fee provisions, it could have explicitly excluded all costs related to PEG and I-Nets if it had intended they not count toward the cap.[92] Instead, they just excluded a subset of those costs. Further, if we were to interpret the statute such that all costs related to PEG, I-Nets, or other requirements imposed in section 611 are excluded from treatment as franchise fees because section 611(b) contemplates that such costs be incurred, the specific exemption for PEG capital costs in section 622(g)(2)(D) would be superfluous.[93] While we acknowledge that PEG channels and I-Nets provide benefits to consumers,[94] such benefits cannot override the statutory framework, which carves out only limited exclusions from franchise fees.

21.    Next, we do not find persuasive the argument that section 626 of the Act "reflects the fact that cable-related franchise requirements are not franchise fees."[95] Section 626 directs franchising authorities to consider, among other things, whether a cable operator's franchise renewal proposal "is reasonable to meet the future cable-related community needs and interests, taking into account the cost of meeting such needs and interests."[96] NATOA *et al*. contend that if cable-related, in-kind requirements are included as franchise fees, "it would be the LFA who pays for them, rendering the cost consideration in this Section obsolete."[97] We disagree with this reasoning.[98] As NCTA explains, "[t]he cost/benefit analysis required under this provision underscores that Congress intended franchising authorities to balance the desire for any in-kind exactions requested by parties in the renewal process against the overall franchise fee burdens on cable operators and subscribers."[99] The section 626 assessment does not lose its purpose if cable-related, in-kind contributions are counted as franchise fees; as part of this assessment, for example, a franchising authority could determine that cable-related community needs and interests can be met at a lower cost to cable subscribers than the full five percent franchise fee.[100] Moreover, the community needs assessment in section 626 also accounts for items that are not in-kind contributions subject to the franchise fee cap, such as build-out requirements.[101]

---

(Continued from previous page) ——————————————
– The Internet & Television Association, at 41-42 (Nov. 14, 2018) (NCTA Comments).

[68] *See supra* note 59 and accompanying text. *But see* Comments of Anne Arundel County, Maryland *et al*., at 20 (Nov. 14, 2018) (Anne Arundel County *et al*. Comments). Anne Arundel County *et al*. make the conclusory statement that "[r]egulatory obligations are clearly not a tax or fee," without citing a definition of these terms or including the term "assessment," and they make no mention of the court's own conclusion in *Montgomery County* that the term franchise fee "can include noncash exactions." *See Montgomery County*, 863 F.3d at 490-91.

[69] *See* ACA Comments at 5-6.

[70] *See supra* notes 50-51. We analyze and interpret these two PEG-related exclusions in Section III.A.2.b, *infra*.

[71] *See* Reply Comments of the American Cable Association, at 14 (Dec. 14, 2018) (ACA Reply). According to Anne Arundel County *et al*., the Commission incorrectly implies that "unless something falls within an exception, it must be a tax, fee, or assessment." *See* Anne Arundel County *et al*. Comments at 19. However, this is inconsistent with our analysis, in which we first evaluate whether a type of contribution meets the definition of franchise fee in section 622(g)(1) and, if so, then determine whether it falls within a specified exception in section 622(g)(2). It is also inconsistent with our conclusion herein that certain requirements, such as customer service and build-out requirements, are not covered by the definition of franchise fee. *See infra* Section III.A.2.d.

[72] *See* ACA Comments at 5.

[73] *See id*.

[74] *See* NATOA *et al*. Comments at 5; Reply Comments of the National Association of Telecommunications Officers and Advisors *et al*., at 3 (Dec. 14, 2018) (NATOA *et al*. Reply); Anne Arundel County *et al*. July 24, 2019 *Ex Parte* at 12. *See also* Anne Arundel County *et al*. Comments at 17-18 ("The subsections in 622(g)(2) are designed to *permit* collection of additional fees that otherwise might be misinterpreted to fall within the cap. The exceptions to

(continued….)

22.     Finally, we disagree with commenters that cite a provision in section 622 that relates to itemization on customer bills as evidence that Congress did not intend PEG-related franchise obligations to be included in franchise fees.  In particular, LFA commenters point to section 622(c)(1), which specifies that cable operators may identify as a separate line item on each subscriber bill each of the following:  (1) the amount of the total bill assessed as a franchise fee and the identity of the franchising authority to which the fee is paid; (2) the amount of the total bill assessed to satisfy any requirements imposed on the cable operator by the franchise agreement to support PEG channels or the use of such channels; and (3) the amount of any other fee, tax, assessment, or charge of any kind imposed by any governmental authority on the transaction between the operator and the subscriber.[102]  LFA commenters argue that "[t]hrough this language, Congress clearly outlined a separation between franchise fees and cable-related, in-kind fees."[103]  On the contrary, "the fact that Section 622(c) allows cable operators to itemize certain charges on subscriber bills has no bearing on which charges meet the definition of franchise fees under Section 622(g)."[104]  While section 622(g) was adopted as part of the 1984 Cable Act, Congress adopted section 622(c) years later in 1992 to promote transparency by allowing cable operators to inform subscribers about how much of their total bill is made of charges imposed by local governments through the franchising process.[105]  By differentiating the types of charges that can be itemized on subscriber bills, there is no indication that Congress intended to exclude certain charges from the franchise fee.[106]

23.     Having established our interpretation of section 622(g), we adopt our tentative conclusion that this treatment of cable-related, in-kind contributions should be applied to both new entrants and incumbent cable operators.[107]  As the Commission has previously observed, section 622 "does not distinguish between incumbent providers and new entrants."[108]  We affirm our belief that applying the same treatment of cable-related, in-kind contributions to both new entrants and incumbent cable operators will ensure a more level playing field and that the Commission should not place its thumb on the scale to give a regulatory advantage to any competitor.[109]

---

(Continued from previous page) ————————————

the definition of franchise fee are expansions of LFA authority, and do not narrow the definition of franchise fees."); Comments of the City of New York, at 9-10 (Nov. 14, 2018) (City of New York Comments); Reply Comments of the State of Hawaii, at 2 (Dec. 14, 2018) (Hawaii Reply).

[75] For example, under section 622(g)(2)(B), payments required by the franchise to be made by the cable operator for, or in support of the use of, PEG access facilities are included in the franchise fee only for franchises granted after October 30, 1984.

[76] *See* ACA Comments at 8.

[77] *Second FNPRM*, 33 FCC Rcd at 8960, para. 17.  According to NCTA, the legislative history shows that Congress' intent generally was to *limit* the total financial obligations that franchising authorities may impose on cable operators.  *See* NCTA Reply at 7 ("But Congress adopted the five percent cap as a *limit* 'to prevent local governments from taxing private cable operators to death as a means of raising local revenues for other concerns.'") (citing 129 Cong. Rec. S8254 (1983), statement of Sen. Goldwater).  *See also* NCTA Comments at 39-40.  We find that allowing LFAs to circumvent the statutory five percent cap by not counting cable-related, in-kind contributions that clearly fall within the statutory definition of franchise fees would be contrary to Congress' intent as reflected in the broad definition of franchise fee in the statute.  *See Second FNPRM*, 33 FCC Rcd at 8961, para. 17.

[78] *Second FNPRM*, 33 FCC Rcd at 8960, para. 17 (citing H.R. Rep. No. 934, 98th Cong., 2nd Sess. 1984 at 64, *reprinted in* 1984 U.S.C.C.A.N. 4655, 4701).

[79] H.R. Rep. No. 934, 98th Cong., 2nd Sess. 1984 at 64-65.

[80] *Id*. at 65.

[81] Although the City of New York opines that the examples of franchise fees in the legislative history are all "services that do not use the cable operator's cable system or other communications facilities ('CF') or call on the core competencies ('CC') of the cable operator," this reading overlooks the fact that certain PEG-related costs are

(continued….)

**Federal Communications Commission**                                    **FCC 19-80**

24.    We disagree with the contention that our interpretation of the franchise fee definition in section 622(g) is impermissible under *Chevron*.[110]  Charles County, Maryland posits that "[b]ecause Congress has directly addressed the questions at issue by employing precise, unambiguous statutory language in Section 622 of the Act, the FCC's proposed rules re-imagining . . . what constitutes a 'franchise fee' are impermissible," as "[o]nly Congress may alter or amend federal law."[111]  Charles County does not offer an explanation for why the statutory language is unambiguous beyond arguing that the words "tax, fee, or assessment" in the definition are terms of art.[112]  But regardless of whether these are terms of art, they can include non-monetary contributions, as the Sixth Circuit observed.[113]  And we believe that our interpretation of this language using traditional tools of statutory construction is a reasonable and permissible construction of the statute that effectuates Congressional intent for the reasons set forth above.[114]  Indeed, it is the interpretation that is most consistent with the plain meaning of the statutory definition of franchise fee.

---

(Continued from previous page) ———————————————

included as franchise fees, and it creates a distinction that is not apparent from either the statute or the legislative history.  *See* City of New York Comments at 4.

[82] *Id.  See* Comments of the Alliance for Communications Democracy *et al.*, at 6 (Nov. 14, 2018) (CAPA Comments); Comments of The City Coalition, at 13-14 (Nov. 14, 2018) (City Coalition Comments); Comments of the State of Hawaii, at 3-4 (Nov. 14, 2018) (Hawaii Comments); NATOA *et al.* Comments at 5; City of New York Comments at 3; Anne Arundel County *et al.* Reply at 6; Reply Comments of Free Press, at 4-5 (Dec. 14, 2018) (Free Press Reply); Hawaii Reply at 4-5; NATOA *et al.* Reply at 3.  We discuss further in Section III.A.2.b below the extent to which certain PEG-related requirements are exempted from the statutory definition of franchise fees.

[83] *See also* NCTA Reply at 5, n.12 (stating that "[a]s the context makes clear, this language is meant only to elaborate on what Congress considers a 'fee' under the definition of franchise fee, and not what constitutes an 'assessment,' the latter of which Congress understood to include in-kind exactions").  For the same reason, we are not persuaded by Anne Arundel County *et al.*'s reliance on a letter from the Commission's Cable Services Bureau that quotes the legislative history.  *See* Anne Arundel County *et al.* Comments at 23-24 (citing *City of Bowie*, 14 FCC Rcd 9596 (Cable Services Bureau, 1999); Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 12; Letter from Sen. Chris Van Hollen to Chairman Ajit Pai, FCC at 2 (June 12, 2019).  First, this Bureau-level letter does not bind the Commission.  *See Comcast v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (an agency is not bound by the actions of its staff if the agency has not endorsed those actions)  Second, to the extent that the Bureau's guidance 20 years ago conflicts with the conclusions in this rulemaking, it is reversed and superseded.  We note that the letter merely cites the statute and legislative history, without analysis.

[84] *See Montgomery County*, 863 F.3d at 490-91.

[85] *See, e.g., Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–539 (1955))).

[86] *See, e.g.*, Comments of the City of Arlington, Texas, at 6-7 (Nov. 14, 2018) (City of Arlington Comments); Comments of the City of Austin, Texas, at 7-8 (Nov. 14, 2018) (City of Austin Comments).

[87] *See Second FNPRM*, 33 FCC Rcd at 8962, para. 20.

[88] 47 U.S.C. § 531(b) ("A franchising authority may in its request for proposals require as part of a franchise, and may require as part of a cable operator's proposal for a franchise renewal, . . . that channel capacity be designated

(continued....)

14

### 2.    Specific Types of Cable-Related, In-Kind Contributions Under Section 622

25.    In this section, we analyze whether specific types of cable-related, in-kind contributions are franchise fees subject to the five percent statutory cap under section 622.  First, we find that costs attributable to franchise terms that require free or discounted cable service to public buildings are franchise fees, consistent with our tentative conclusion that treating all cable-related, in-kind contributions as franchise fees unless expressly excluded would best effectuate the statutory purpose.  Next, we adopt our tentative conclusion that costs in support of PEG access are franchise fees, with the exception of capital costs as defined below.  Similarly, we find that costs attributable to construction of I-Nets are franchise fees.  Finally, we conclude that build-out and customer service requirements do not fall within the statutory definition of franchise fee.[115]  Based on these conclusions with respect to specific types of costs, we adopt a definition of "in-kind, cable-related contributions" to include "any non-monetary contributions related to the provision of cable services provided by cable operators as a condition or requirement of a local franchise, including but not limited to free or discounted cable service to public buildings, costs in support of PEG access other than capital costs, and costs attributable to the construction of I-Nets.  It does not include the costs of complying with build-out and customer service requirements."[116]

### a.    Free and Discounted Cable Service to Public Buildings

26.    We find that costs attributable to franchise terms that require a cable operator to provide free or discounted cable service to public buildings, including buildings leased by or under control of the franchise authority, are cable-related, in-kind contributions that fall within the five percent cap on franchise fees.  The record includes examples of cable operators providing cable service to public buildings as part of a franchise agreement.[117]  Consistent with our statutory interpretation above, providing free or discounted cable service to public buildings is an in-kind (*i.e.*, non-monetary) contribution imposed on a cable operator by a franchise authority, and is not included in one of the enumerated exceptions from the franchise fee in section 622(g)(2).[118]  Although certain commenters

---

(Continued from previous page)

for public, educational, or governmental use, and channel capacity on institutional networks designated for educational or governmental use. . . ."). *See also* 47 U.S.C. § 541(b)(3)(D) ("Except as otherwise permitted by sections 531 and 532 of this title, a franchising authority may not require a cable operator to provide any telecommunications service or facilities, other than institutional networks, as a condition of the initial grant of the franchise, a franchise renewal, or a transfer of a franchise.").

[89] Anne Arundel County *et al*. Comments at 15-16.  *See also* AWC *et al*. Comments at 6-8; CAPA Comments at 3-4; Comments of the Illinois Municipal League, at 1-2 (Nov. 7, 2018); Comments of the International Municipal Lawyers Association, at 2 (Nov. 13, 2018) (IMLA Comments); Reply Comments of Media Alliance, at 4 (Nov. 19, 2018).

[90] *Second FNPRM*, 33 FCC Rcd at 8963, para. 20.

[91] *See* ACA Comments at 6; NCTA Reply at 7-8.

[92] We disagree with the Cable Act Preservation Alliance (CAPA) that "it is equally true that Congress could have explicitly noted the franchise fee limitation in 47 U.S.C. Section 531(b) if it had intended to include these PEG-related costs as franchise fees."  CAPA Comments at 8.  There was no need for Congress to specify which PEG-related costs are franchise fees in section 611 when the statute sets forth a standalone provision, section 622, that defines what is included in the franchise fee and specifically addresses PEG-related costs.  *See* NCTA Reply at 14 ("Congress was not required to reiterate the limitations imposed by the five percent cap at every mention of permissible in-kind assessments in other provisions.").  NATOA *et al*. argue that the Commission "ignores that build-out and customer service obligations also were enacted by Congress at the same time it added the franchise fee provisions and were not explicitly excluded from the cap, yet . . . finds these are not 'franchise fees.'"  NATOA *et al*. July 24, 2019 *Ex Parte* at 3.  However, we explain herein that Congress expressly stated that cable operators are responsible for the cost of constructing cable systems.  *See infra* Section III.A.2.d.  We also find herein that federally mandated customer service standards are not a "tax, fee, or assessment" and, thus, there was no need for Congress to exclude them from the franchise fee.  *See id*.

emphasize that free and discounted cable services have been considered franchise considerations that are not subject to the five percent cap on franchise fees in past franchise agreements,[119] we find that our reading that free and discounted services count towards the franchise fee cap is a reasonable interpretation and best effectuates Congressional intent given that the statute defines franchise fee broadly, carving out only limited exclusions. If LFAs could circumvent the five percent cap by requiring unlimited free or discounted cable services for public buildings, in addition to a five percent franchise fee, this result would be contrary to Congress's intent as reflected in the broad definition of "franchise fee" in the statute.[120] We find that the Act does not provide any basis for treating the value attributable to free or discounted services in a different manner than other in-kind services which must be included in the franchise fee. Although we acknowledge that the provision of free or discounted cable service to public buildings, such as schools or libraries, can benefit the public, such benefits cannot override the statutory framework. Further, there are policy rationales for limiting free services, given that, in a competitive market, such contributions may raise the costs of the cable operator's service, reduce resources available for other services, and result in market inefficiency.[121]

### b.    PEG Access Facilities

27.    We conclude in this section that in-kind contributions related to PEG access facilities are cable-related, in-kind contributions, and are therefore included within the statutory definition of "franchise fees" under section 622(g)(1).[122] We next conclude that the term "capital cost" in section 622(g)(2)(C) should be given its ordinary meaning, which is a cost incurred in acquiring or improving a capital asset. Applying that interpretation, we conclude that the exclusion for capital costs under section 622(g)(2)(C) could include equipment that satisfies this definition, regardless of whether such equipment is purchased in connection with the construction of a PEG access facility. We then conclude that the record is insufficiently developed for the Commission to determine whether the provision of PEG channel capacity is included within section 622(g)(2)(C)'s exclusion for capital costs. We also find that the

---

(Continued from previous page) ———————————————————

[93] *See* ACA Comments at 6-7.

[94] *See infra* Sections III.A.2.b (PEG), III.A.2.c (I-Nets).

[95] NATOA *et al.* Comments at 7.

[96] 47 U.S.C. § 546(c)(1)(D).

[97] NATOA *et al.* Comments at 7-8.

[98] *See* CAPA Comments at 8-9; Charles County Comments at 10-11; City of New York Comments at 5-6; City of Philadelphia *et al.* Comments at 30; Comments of the Telecommunications Board of Northern Kentucky, at 9-10 (Nov. 14, 2018) (TBNK Comments); Reply Comments of the Alliance for Communications Democracy *et al.*, at 6-7 (Dec. 24, 2018) (CAPA Reply); Reply Comments of the City of Hagerstown, Maryland, at 8-9 (Dec. 13, 2018) (City of Hagerstown Reply); Reply Comments of the City of Newton, Massachusetts, at 9-10 (Dec. 14, 2018).

[99] NCTA Reply at 10-11.

[100] *See id.* at 11. *See also* Reply Comments of NTCA—The Rural Broadband Association, at 3 (Dec. 14, 2018) ("The Commission's tentative conclusion in no way restricts the 'in-kind' contributions franchising authorities can impose on cable operators, provided such contributions are cable-related and limited in value to the overall level of the cap. As a result, franchise authorities can continue to condition cable operators' franchise authority upon fulfilling certain community needs; they may just have to be more tailored and precise in value than is currently the practice."). As Congress noted when it adopted the five percent cap, the Commission capped franchise fees at three percent of a cable operator's revenue. H.R. Rep. 98-934, 1984 U.S.C.C.A.N. at 4663; *see* 47 CFR § 76.31 (1984).

[101] Build-out requirements are subject to section 626's directive to assess reasonableness while taking into account the cost of such requirements, and a build-out requirement requested by an LFA could be challenged under section 626. *See* NCTA Comments at 51.

[102] 47 U.S.C. § 622(c).

installation of PEG transport facilities are capital costs that are exempt from the five percent franchise fee cap,[123] and that maintenance of those facilities are operating costs that count toward the cap. Finally, we address policy arguments regarding the impact of these conclusions on the provision of PEG programming.

### (i)     The Franchise Fee Definition Generally Includes Contributions for PEG Access Facilities

28.     Consistent with our tentative conclusion in the *Second FNPRM*,[124] we find that the definition of franchise fee in section 622(g)(1) encompasses PEG-related contributions. Like other taxes, fees, or assessments imposed by LFAs, we find that contributions related to PEG access facilities imposed by an LFA are subject to the five percent cap on franchise fees, unless they fall within one of the five exclusions set forth in section 622(g)(2). Consistent with the statutory analysis above, we conclude that the provision of equipment, services, and similar contributions for PEG access facilities are cable-related, in-kind contributions that meet the definition of franchise fee.[125] Such PEG-related contributions are not exempt under section 622(g)(2) of the Act unless they fall under the limited exceptions for capital costs and costs incurred by franchises existing at the time of the Cable Act's adoption in 1984.[126] As explained above, our starting point for analyzing cable operator contributions to LFAs is that the Act defines "franchise fee" broadly and has limited, narrow exceptions. Thus, we believe that including in the franchise fee cap any costs that are not specifically exempt is consistent with the statute and reasonably effectuates Congressional intent.

29.     Further, including contributions for PEG access facilities within the franchise fee definition is consistent with the overall structure of section 622. For "any franchise in effect on October 30, 1984," section 622(g)(2)(B) excludes from the definition of "franchise fee" "payments which are required by the franchise to be made by the cable operator during the term of such franchise for, or in support of the use of [PEG] access facilities."[127] There would have been no reason for Congress to

---

(Continued from previous page)

[103] City of Arlington Comments at 9. *See also* City of Austin Comments at 10; CAPA Comments at 10; NATOA *et al*. Comments at 5-6; TBNK Comments at 5-6.

[104] NCTA Reply at 12.

[105] *Id*. at 12-13 (citing *Implementation of Sections of The Cable Television Consumer Protection and Competition Act of 1992; Rate Regulation*, Report and Order and Further Notice of Proposed Rulemaking, 8 FCC Rcd 5631, 5967, para. 545 (1993)).

[106] Moreover, as NCTA observes, "[t]he fallacy that Section 622(c) distinguishes franchise fees from other exactions, as NATOA and others claim, is underscored by the fact that subsection (c)(3) repeats virtually *verbatim* Section 622(g)(1)'s broad definition of a franchise fee. Yet, by NATOA's logic, the itemization of a cost under subsection (c)(3) would control its treatment for franchise fee purposes, *removing* it from the very definition that Congress established for such fees in Section 622(g)(1) . . . ." *Id*. at 14, n.52.

[107] *See Second FNPRM*, 33 FCC Rcd at 8963-64, para. 22. *See also* NCTA Comments at 50.

[108] *Second Report and Order*, 22 FCC Rcd at 19637, para. 11. *See* Verizon Comments at 5; Altice Reply at 20.

[109] *See* Verizon Comments at 5-6. *See also* Reply Comments of Frontier Communications Corporation, at 3 (Dec. 14, 2018).

[110] Review of the FCC's interpretation of the statutes it administers is governed by *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

[111] Charles City Comments at 5-8. *See also* IMLA Comments at 3; City of Philadelphia *et al*. Comments at 19-20; City of Hagerstown Reply at 7-8.

[112] *See* Charles City Comments at 5-8.

grandfather in these PEG-related contributions for existing franchises if such payments were not otherwise included within the definition of "franchise fees." In effect, excluding PEG-related contributions would read "in the case of any franchise in effect on October 30, 1984" out of section 622(g)(2)(B), extending this grandfathered exclusion to all franchises.

30.     Some commenters claim that other sections of Title VI, including the section authorizing LFAs to require the designation of PEG channel capacity in section 611, override section 622's definition of "franchise fee."[128]  As discussed above, we find these arguments unpersuasive.[129]  We also reject arguments that provisions of the Act unrelated to cable franchising demonstrate that PEG-related fees are not franchise fees.[130]  For example, section 623 of the Act, which governs the regulation of cable rates, instructs the Commission to take the following two factors (among others) into account when prescribing rate regulations:

> (v) the reasonably and properly allocable portion of any amount assessed as a franchise fee, tax, or charge of any kind imposed by any State or local authority on the transactions between cable operators and cable subscribers or any other fee, tax, or assessment of general applicability imposed by a governmental entity applied against cable operators or cable subscribers;

> (vi) any amount required [  ] to satisfy franchise requirements to support public, educational, or governmental channels or the use of such channels or any other services required under the franchise . . . .[131]

Commenters argue that the separate listing of franchise fees (in v) and the costs of PEG franchise requirements (in vi) is evidence that franchise fees do not include PEG-related costs.[132]  We disagree.  We note that that the question of which factors the Commission should consider in setting rate regulations is

---

(Continued from previous page) ────────────────────────

[113] *See Montgomery County*, 863 F.3d at 490-91.

[114] Where a "statute is silent or ambiguous" with respect to a specific issue, "the question" for the court is whether the agency has adopted "a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  *See also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  *See* Free State Foundation Reply at 11.

[115] *See infra* Section III.A.2.d.

[116] *See Second FNPRM*, 33 FCC Rcd at 8964, para. 24.  We modify the definition slightly from what was proposed in the *Second FNPRM* to reflect the conclusions adopted herein.

[117] *See, e.g.*, Comments of the City of Newton, Massachusetts, at 19 (Nov. 14, 2018) (City of Newton Comments).

[118] *See* 47 U.S.C. § 542(g)(2); *supra* para. 11.

[119] *See, e.g.*, AWC *et al*. Comments at 7 (arguing that "[t]he Commission has acknowledged local authority to include additional franchise considerations within the franchise," and that requiring LFAs to pay for these negotiated franchise considerations is inconsistent with precedent and decades of franchise agreements).  AWC cites a Bureau-level order in which the Cable Services Bureau found that where the LFA and cable operator agreed to establish franchise provisions regarding the eligibility standards for a senior citizen discount rate and the formula for adjusting that rate, these terms were not preempted by federal law.  *See City of Antioch, California*, Memorandum Opinion and Order, CSR-5239-R, 14 FCC Rcd 2285 (CSB 1999).  While this decision is about the inclusion of discounted services in the franchise terms, it does not address whether discounted services should be included in the franchise fee and, thus, is not inconsistent with our findings herein.

[120] *See Second FNPRM*, 33 FCC Rcd at 8961, para. 17.

[121] *See* NCTA Comments at 50 ("[I]f products and services are available to a franchising authority without charge, or at a below-market rate, the franchising authority will not be required to evaluate a 'need' in light of its market cost, and as a result will tend to over-consume at the cable operator's buffet, resulting in market inefficiency.").

[122] PEG channels provide third-party access to cable systems through channels dedicated for use by the public, including local governments, schools, and non-profit and community groups.  H.R. Rep. No. 98–934, at 30.  The Act

(continued….)

**Federal Communications Commission** **FCC 19-80**

both legally and analytically distinct from the question of which costs are included as a franchise fee under section 622. Even if it were not, the separate listing of franchise fees and PEG-related exactions in section 623 does not indicate that Congress understood these categories to be mutually exclusive. In general, section 623(b) directs the Commission to consider several factors relating to cable operators' costs, revenue, and profits to ensure that the Commission sets "reasonable" rates.[133] Ensuring that a rate is "reasonable" requires a full consideration of the costs borne by cable operators. Listing only franchise fees would fail to account for some of these costs, even under the interpretation adopted in this Order: Franchise fees and PEG costs only partially overlap, given that section 622(g)(2) excludes certain PEG-related exactions from the definition of franchise fee.[134] We therefore find nothing inconsistent about the separate listing of franchise fees and PEG-related costs in section 623 and the interpretation of section 622(g) adopted in this Order. The same analysis applies to the bill-itemization requirements in section 622(c), which permits the separate itemization of franchise fees and PEG-related assessments in subscriber bills.[135]

### (ii) Scope of Specific Franchise Fee Exclusions Related to PEG Access Facilities

31. Consistent with our tentative conclusions in the *Second FNPRM*,[136] we conclude (1) that PEG support payments for any franchise in effect on October 30, 1984 and (2) PEG capital costs for any franchise granted after October 30, 1984 are exempt from the definition of franchise fee. As discussed above, two provisions of section 622(g)(2) exclude certain costs associated with PEG access facilities from the definition of "franchise fee" in section 622(g)(1): First, section 622(g)(2)(B) excludes PEG support payments, but only with respect to franchises granted prior to 1984.[137] To the extent that any such franchises are still in effect, we affirm that under section 622(g)(2)(B), PEG support payments made pursuant to such franchises are excluded from the five percent franchise fee cap. Consistent with the statutory language and legislative history, we find this exclusion is broad in scope, and commenters did not dispute this interpretation in the record.[138]

---

(Continued from previous page) ————————————————

provides for the creation and support of PEG channels in various ways, including by authorizing LFAs to require franchisees to designate channel capacity for PEG, and by excluding certain costs associated with PEG access facilities from the definition of franchise fees under section 622(g)(2). *See* 47 U.S.C. §§ 522(16), 531, 542(g).

[123] As explained below, "PEG transport facilities" are facilities that LFAs use to deliver PEG services from studios or other locations where the programming is produced to the cable headend. *See infra* para. 49.

[124] *Second FNPRM*, 33 FCC Rcd at 8960, para. 16.

[125] In some cases, LFAs require a grant or other *monetary* contribution earmarked for PEG-related costs. *See*, *e.g.*, Altice May 9, 2019 *Ex Parte* at 7-8 (describing Altice's payment of "PEG grants" to LFAs). These monetary contributions are likewise subject to the five percent cap on franchise fees, unless otherwise excluded under section 622(g)(2). *See supra* note 54. Section 622 exempts only the items delineated in (g)(2), and Congress did not distinguish between in-kind and monetary contributions, nor did it exempt monetary contributions earmarked for a purpose that would otherwise not be excluded under section 622(g)(2). Thus, we make clear that monetary contributions—like in-kind contributions—must be counted toward the franchise fee cap unless expressly exempt under section 622(g)(2).

[126] *See* 47 U.S.C. § 542(g)(2); *supra* para. 11.

[127] 47 U.S.C. § 542(g)(2)(B).

[128] 47 U.S.C. § 531(b). *See*, *e.g.*, Reply Comments of Charles County, Maryland, at 7 (Dec. 14, 2018) (Charles County Reply); Reply Comments of Massachusetts Community Media, Inc., at 8 (Dec. 14, 2018) (MassAccess Reply) ("Cable operators cannot classify as 'in-kind' an obligation which they are legally bound to fulfill.").

[129] *See supra* paras. 20-22.

[130] *See* CAPA Comments at 11. *See also* City of Newton Apr. 10, 2019 *Ex Parte* at 2.

**Federal Communications Commission**                                    **FCC 19-80**

32.     Second, for any franchise granted after 1984, section 622(g)(2)(C) contains a narrower exclusion covering only PEG "capital costs which are required by the franchise to be incurred by the cable operator for [PEG] access facilities."[139]  The Cable Act does not define "capital costs".  We address the scope of this exclusion below by first clarifying the definition of "capital costs" and concluding that it can apply to contributions for both construction-related and non-construction-related contributions to PEG access facilities.  We then determine that the record is insufficient to determine whether costs associated with providing PEG channel capacity are subject to this exclusion, and we discuss the application of the exclusion to PEG transport.

33.     *Definition of "capital costs."*  Although the Commission previously asserted with respect to section 622(g)(2)(C) that "[c]apital costs refer to those costs incurred in or associated with the construction of PEG access facilities," we now revisit that interpretation and provide additional clarity on the definition of this term.[140]  As described below, we find that the term "capital costs" is not limited to construction-related costs; rather, it generally encompasses costs incurred in acquiring or improving capital assets for PEG access facilities.[141]  The Commission's previous reading of the phrase "capital costs" was based in part on section 622(g)'s legislative history, which states that the Cable Act excludes from the franchise fee cap "the capital costs associated with the construction of [PEG] access facilities."[142]  The Sixth Circuit affirmed the Commission's prior reading in *Alliance*, where, rejecting a challenge to the Commission's construction of the term "capital costs" in the *First Report and Order*, the court held that:

> [t]o determine the permissibility of the Commission's construction of Section 622(g)(2)(C), we start by consulting the legislative history.  During the enactment of this provision, Congress made clear that it intended Section 622(g)(2)(C) to reach "capital costs *associated with the construction* of [PEG] access facilities."  H.R.Rep. No. 98–934, at 26 (emphasis added).  Against this legislative pronouncement, the FCC's limitation of "capital costs" to those "incurred in or associated with the construction of PEG access

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[131] *See* 47 U.S.C. § 543(b)(2).

[132] CAPA Comments at 11 ("If Congress had intended that the amounts required to satisfy franchise requirements be subject to, and included in, the five percent franchise fee cap, Congress's direction that the Commission consider these [factors in Section 623(b)(2)(C)] as separate factors makes no sense.").

[133] 47 U.S.C. § 542(b)(1).

[134] *Id.* § 542(g)(2)(C).

[135] *Id.* § 542(c).  Several commenters raised section 622(c) as evidence that franchise fees do not include PEG-related assessments.  *See, e.g.,* Anne Arundel County *et al.* Comments at 11; NATOA *et al.* Comments at 6; Hawaii Reply at 2.  We note that section 622(c) was adopted years after section 622(g) was enacted.  *See generally* NCTA Reply at 12-13 (discussing the legislative history of section 622(c)); Cable Television Consumer Protection and Competition Act, Pub. L. No. 102–385, §§ 3, 9, 14, 106 Stat. 1460 (1992).

[136] *Second FNPRM,* 33 FCC Rcd at 8962, para. 19.

[137] 47 U.S.C. § 542(g)(2)(B) (excluding, "in the case of any franchise in effect on [October 30, 1984], payments which are required by the franchise to be made by the cable operator during the term of such franchise for, or in support of the use of, public, educational, or governmental access facilities").

[138] *See Second FNPRM,* 33 FCC Rcd at 8962, para. 19.  The legislative history further supports this interpretation. H.R. Rep. No. 98-934, at 65 (1984) ("For existing franchises, a city may enforce requirements that additional payments be made above the 5 percent cap to defray the cost of providing public, educational and governmental access, including requirements related to channels, facilities and support necessary for PEG use.").

[139] 47 U.S.C. § 542(g)(2)(C) (excluding, "in the case of any franchise granted after [October 30, 1984], capital costs which are required by the franchise to be incurred by the cable operator for public, educational, or governmental access facilities").

**Federal Communications Commission** **FCC 19-80**

facilities" represents an eminently reasonable construction of Section 622(g)(2)(C).[143]

34.    We asked for additional comment on the definition of "capital costs" under section 622(g)(2)(C) in the *Second FNPRM*.[144]   Arguably, the Commission's previous construction left unsettled the extent to which the "capital costs" exclusion encompassed PEG equipment—such as vans, studios, or cameras.   In *Alliance*, the Sixth Circuit observed that the Commission's definition of capital costs could encompass the costs of such equipment, but only insofar as the equipment costs were "relate[d] to the construction of PEG facilities."[145]   But neither the *First Report and Order* nor the legislative history from which it borrowed expressly *limited* capital costs to *construction-related* capital costs.   Both statements are silent—or, at most, unclear—about the treatment of *non-construction-related* capital costs.

35.    Based on the arguments in the record and our further consideration of the statutory text and legislative history we now conclude that the Commission's earlier statement regarding the definition of "capital costs" was overly narrow.   As commenters note, many local governments receive payments from cable operators that are not simply for the construction of PEG studios, but also for, among other things, the acquisition of equipment needed to produce PEG access programming.[146]   LFAs argue for a broader definition of "capital costs" that would include PEG channel capacity and certain equipment costs associated with PEG access facilities.[147]   By contrast, cable companies have urged the Commission to reaffirm, based on its previous statement, that "capital costs" are limited to costs associated with the *construction* of PEG access facilities (and thus do not include channel capacity and equipment such as cameras, or other equipment necessary to run a PEG access facility).[148]

36.    In general, when a term is undefined in a statute, courts look to that term's "ordinary meaning."[149]   While there is no general definition of the precise term "capital costs," *Black's Law Dictionary* defines a similar term,[150] "capital expenditure," as "[a]n outlay of funds to acquire or improve a fixed asset," and defines a "fixed asset," or "capital asset" as "[a] long-term asset used in the operation

---

(Continued from previous page)

[140] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992,* First Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 5101, 5150-51, para. 109 (2007).

[141] *See infra* paras. 33-41.

[142] *See* H.R. Rep. No. 98–934, at 26 (making clear that Congress intended section 622(g)(2)(C) to reach "capital costs associated with the construction of [PEG] access facilities.").

[143] *All. for Cmty. Media v. FCC*, 529 F.3d 763, 784 (6th Cir. 2008).

[144] The *Second FNPRM* noted that "capital costs which are required by the franchise to be incurred by the cable operator for [PEG] access facilities" are excluded from the definition of franchise fee, and sought comment on treating the costs of studio equipment as capital costs for the purpose of this exemption from the franchise fee cap. *See Second FNPRM,* 33 FCC Rcd at 8962, para. 19 & n.95.

[145] *All. for Cmty. Media v. FCC*, 529 F.3d 763, 784 (6th Cir. 2008) ("Instead, the Commission underscores that the central test for determining whether an expense is a capital cost is whether it is 'incurred in or associated with the construction of PEG access facilities.' (*Id.*) This definition could potentially encompass the cost of purchasing equipment, as long as that equipment relates to the construction of actual facilities.").

[146] *See, e.g.*, NCTA Reply, Appendix (*Examples of Franchising Authority Overreach*) at 7 & n.2 (noting that New York City provides that public-access-related exactions may be designated for, among other things, "studio and portable production equipment, editing equipment and program playback equipment, cameras, [and] office equipment").

[147] *See, e.g.*, CAPA Comments at 15-16 ("The costs of acquiring studio equipment clearly are capital costs.   Studio equipment has a useful life of several years, and the cost of acquiring such equipment is capitalized.   And these costs

(continued….)

**Federal Communications Commission**                    **FCC 19-80**

of a business or used to produce goods or services, such as equipment, land, or an industrial plant."[151] *Merriam-Webster* similarly defines "capital expenditure" as "costs that are incurred in the acquisition or improvement of property (as capital assets) or that are otherwise chargeable to a capital account," and defines "capital assets" as "long-term assets either tangible or intangible (as land, buildings, patents, or franchises)."[152] An accounting textbook provides yet another similar definition:

> Expenditures for the purchase or expansion of plant assets are called capital expenditures and are recorded in asset accounts. . . . In brief, any material expenditure that will benefit several accounting periods is considered a *capital expenditure*. Any expenditure that will benefit only the current period or that is not material in amount is treated as a *revenue expenditure*.[153]

We also note that *capital* costs are distinct from *operating* costs (or operating expenses), which are generally defined as expenses "incurred in running a business and producing output."[154] Reflecting this distinction, the Commission has distinguished between costs incurred in *building* of PEG facilities, which are capital costs, and costs incurred in *using* those facilities, which are not.[155]

37.    While we may also look to legislative history or other context in ascertaining a statute's meaning,[156] none of these sources here compels a narrower definition than that set forth above. The legislative history is ambiguous: The passage relied on by the Commission in the *First Report and Order*, from a summary in the House Report, notes that "capital costs associated with the construction of [PEG] access facilities are excluded from the definition of a franchise fee."[157] But section 622(g)(2)(C) does not itself restrict capital costs to costs that are construction related, nor does this passage in the legislative history expressly say that the capital costs exclusion is *limited* to such costs. And, as some commenters recognize, not all capital costs related to PEG access facilities are related to construction: studio equipment, vans, and cameras, often have useful lives of several years, and the costs of acquiring such equipment are often capitalized.[158] Such costs therefore often fall within the ordinary meaning of

---

(Continued from previous page)
are equally clearly for PEG access facilities."); Anne Arundel County *et al.* Reply at 13-14 (noting that capital expenditures commonly include, for example, "everything from repairing a roof, to building, to purchasing a piece of equipment, or building a brand new factory"). Similarly, several commenters argue that section 611's grant of authority to require PEG channels suggests that the cost of such channels cannot count toward the five percent franchise fee cap. Charles County Comments at 15 ("Section 611 of the Act is unambiguous that PEG channels and PEG capacity are PEG capital costs, not franchise fees subject to the statutory five percent cap."); CAPA Comments at 8 (noting that "Congress could have explicitly noted the franchise fee limitation in 47 U.S.C. Section 531(b) if it had intended to *include* these PEG-related costs as franchise fees."). We disagree with the notion that the Act's grant of authority to require designation for PEG use necessarily excludes the costs of PEG from the definition of franchise fees. As we note above, the fact that the Act authorizes LFAs to impose such obligations does not mean that the value of these obligations should be excluded from the five percent cap on franchise fees. *See supra* para. 20. Section 622 governs "Franchise Fees" and makes clear that any items *not* expressly excluded from that section's broad definition of franchise fees are included against the statutory cap. Section 622 excludes some—but not all— PEG-related costs.

[148] NCTA Comments at 47-48 ("Accordingly, the Commission should confirm that PEG capital costs include only construction of PEG facilities (not cameras, playback devices and other equipment), including construction costs incurred in or associated with a PEG return line from the PEG studio to the operator's facility, and that any additional asks (including transport costs) are not part of the statutory exemption and must count towards the franchise fee cap.").

[149] *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."); *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 228 (D.C. Cir. 2018) ("Because § 225 does not define 'efficient,' we give the term its ordinary meaning." (citing *Taniguchi*)).

[150] Costs and expenditures are related, but not identical, concepts. *Black's Law Dictionary* defines "cost" as "the
(continued….)

capital costs. Had Congress wished to exclude such costs, it could have done so by narrowing the definition of "capital costs" in the statute.

38.     Consistent with our analysis above, we find that the phrase "capital costs" in section 622(g)(2)(C) should be interpreted in a manner consistent with its ordinary meaning. Based on the definitions discussed above, the term "capital cost" generally would be understood to mean a cost incurred in acquiring or improving a capital asset. Because the ordinary meaning of this term is not limited to construction-related costs, we now find that the definition of "capital costs" as used in section 622(g)(2)(C) is not limited to costs "incurred in or associated with the construction of PEG access facilities."[159] We conclude that while capital costs *include* costs associated with the construction of PEG access facilities, they are not *limited* to such costs.[160]

39.     The ordinary meaning of "capital costs" could encompass the acquisition of a non-construction-related capital asset—such as a van or a camera. Section 622(g)(2)(C) only excludes certain capital costs—those "which are required by the franchise to be incurred by the cable operator for [PEG] access facilities."[161] Section 602(16) defines PEG access facilities as "channel capacity . . . and facilities *and equipment* for the use of such channel capacity." [162] In the legislative history, Congress explains that "[t]his may include vans, studios, cameras, or other equipment relating to the use of public, educational, or governmental channel capacity."[163] Based on this statutory language and legislative history as well as the current record, we believe at the present time that the definition of "capital costs" in section 622(g)(2)(C) includes equipment purchased in connection with PEG access facilities, even if it is not purchased in conjunction with the construction of such facilities.[164] But, as both sections 622(g)(2)(c) and 602(16) make clear, the capital costs of such equipment may be excluded only insofar as they are for the use of PEG channel capacity.[165]

(Continued from previous page)

amount paid or charged for something; price or expenditure." Black's Law Dictionary (10th ed. 2014). *Black's* relevantly defines "expenditure" as "a sum paid out." *Id*. While we recognize that "cost" and "expenditure" have distinct meanings in the accounting context, for the purposes of our interpretation of section 622(g)(2)(C), we find that the meanings of these terms are highly analogous—*i.e.*, both pertain to expending resources to acquire a capital asset. *See also Rosebud Enterprises, Inc. v. Idaho Pub. Utilities Comm'n,* 128 Idaho 624, 628, 917 P.2d 781, 785 (1996) ("Capital costs include costs of constructing and installing generating equipment and facilities and the financial carrying costs associated with the utility's investment in the facility. Once incurred, these investment costs are assumed to be "fixed" and will not vary with changes in the actual amount of generation."); 42 CFR § 412.302 (defining "capital costs" to mean, in the Medicare context, "allowable capital-related costs for land and depreciable assets" including depreciation and capital-related interest expense).

[151] Black's Law Dictionary (10th ed. 2014). *Cf.* Collins English Dictionary, https://www.collinsdictionary.com/us/dictionary/english/capital-cost (last accessed May 6, 2019) (defining "capital cost" as "a cost incurred on the purchase of land, buildings, construction and equipment to be used in the production of goods or the rendering of services").

[152] Merriam-Webster, Definition of "Capital Expenditure," www.merriam-webster.com (accessed Apr. 15, 2019).

[153] Williams *et al.*, Financial & Managerial Accounting: The Basis for Business Decisions 396-97 (14th ed. 2008).

[154] Black's Law Dictionary (10th ed. 2014) (operating expense).

[155] *First Report and Order*, 22 FCC Rcd at 5150-51, para. 109.

[156] *See, e.g., AT&T Corp. v. Ameritech Corp.*, Memorandum Opinion & Order, 13 FCC Rcd 21438, para. 28 (1998) ("Accordingly, using the traditional tools of statutory construction, we look next to the context in which the term is

(continued….)

**Federal Communications Commission**  FCC 19-80

40.     This interpretation seems most faithful to the text of section 622(g)(2)(C), which does not restrict capital costs to those that are related to construction.  We recognize that this interpretation reflects a broader sense of capital costs than described in the *First Report and Order*.  To the extent that our interpretation today is inconsistent with the Commission's earlier statements about the capital cost exclusion, we find that the interpretation in this Order better comports with the Act's language, structure, and policy objectives.[166]

41.     We disagree with NCTA's assertion that there would have been "no good reason" to grandfather PEG equipment—such as vans and cameras—if such equipment were "subject to the permanent exception from franchise fees under section 622(g)(2)(C)."[167]  The statute itself *fully* excludes PEG obligations for franchises in effect on October 30, 1984, but excludes only PEG-related *capital costs* for franchises granted after that date.[168]  The broader exclusion for existing franchises in section 622(g)(2)(B) reflects the legislative intent to grandfather the provisions of existing PEG franchises.[169]  Section 622(g)(2)(C) provides a narrower exclusion for new franchises than the broad exclusion enjoyed by grandfathered existing franchises; one would therefore expect these two exclusions to overlap, but not be coextensive.  Even under our interpretation of section 622(g)(2)(C), section 622(g)(2)(B) remains a much broader exclusion than section 622(g)(2)(C):  a number of costs—most notably, operating expenses—would still be excluded by section 622(g)(2)(B), but not by section 622(g)(2)(C).[170]

42.     *PEG channel capacity.*  While we find that the costs associated with the provision of PEG channel capacity are cable-related, in-kind costs that fall within the definition of "franchise fee," we find that the record is insufficiently developed to determine whether such costs should be excluded from the franchise fee as a capital cost under the exemption in section 622(g)(2)(C).  The *Second FNPRM* stated that, while the Act authorizes LFAs to require that channel capacity be designated for PEG use, this authorization does not necessarily remove the costs of such obligations from the five percent cap on franchise fees.[171]  In the record in this proceeding, cable operators generally agreed with this statement,[172] and LFAs generally disagreed.[173]  As discussed above, the Act's authorization of a franchise obligation

---

(Continued from previous page) ————————————————

used and any relevant legislative history to determine a reasonable meaning."); *In the Matter of Enf't of Section 275(a)(2) of the Commc'ns Act of 1934, As Amended by the Telecommunications Act of 1996, Against Ameritech Corp.*, 13 FCC Rcd 19046, para. 11 (1998) ("When the meaning of a statute is ambiguous, it is appropriate to turn to legislative history for guidance.").

[157] *See* H.R. Rep. No. 98-934, at 19 (1984), as reprinted in 1984 U.S.C.C.A.N. 4655, 4656.

[158] *See, e.g.*, CAPA Comments at 15 ("The costs of acquiring studio equipment clearly are capital costs.  Studio equipment has a useful life of several years, and the cost of acquiring such equipment is capitalized.  And these costs are equally clearly for PEG access facilities.").

[159] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992*, First Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 5101, 5150-51, para. 109 (2007).

[160] We agree with NATOA that franchising authorities should be given an opportunity to show that franchise fees are being spent on PEG capital costs if a cable operator requests an offset against franchise fees for non-monetary, cable-related franchise provisions.  Letter from Nancy Werner, General Counsel, NATOA, to Marlene H. Dortch, Secretary, FCC at 2 (July 24, 2019) (NATOA July 24, 2019 *Ex Parte*).

[161] 47 U.S.C. § 542(g)(2)(C) (excluding, "in the case of any franchise granted after [October 30, 1984], capital costs which are required by the franchise to be incurred by the cable operator for public, educational, or governmental access facilities").

[162] *See id.* § 522(16) (emphasis added).

[163] H.R. Rep. No. 98–934, at 45.

[164] We note that this view was affirmed by the Sixth Circuit in *Alliance*.  529 F.3d at 785 (finding that "the

(continued….)

(*e.g.*, one related to PEG access facilities or I-Nets) does not remove that obligation from the five percent cap on franchise fees.[174] It follows, then, that the costs associated with providing PEG channel capacity fall within this cap as a cable-related, in-kind contribution unless they are otherwise excluded under section 622(g)(2).[175]

43. LFAs claim that the costs of providing PEG channel capacity do fall within section 622(g)(2)(C)'s exclusion for PEG-related capital costs. In support, they point out that the Act defines "[PEG] access facilities" as "(A) channel capacity designated for public, educational, or governmental use; and (B) facilities and equipment for the use of such channel capacity."[176] Thus, they assert, because section 622(g)(2)(C) expressly applies to costs incurred by a cable operator for "[PEG] access facilities," it necessarily applies to costs associated with PEG channel capacity.[177] But, as the cable operators state, the Act's inclusion of channel capacity in the definition of "[PEG] access facilities" does not settle the question of whether channel capacity costs fall under section 622(g)(2)(C). This is because section 622(g)(2)(C) excludes only a particular subset of PEG access facility costs—capital costs—from the definition of franchise fees subject to the five percent cap, and cable operators claim that PEG channel capacity is not a capital cost.[178] Moreover, even assuming that PEG channel capacity is not a capital cost and is therefore subject to the five percent cap, the record reveals serious difficulties regarding how to calculate the value of PEG channel capacity to account for this cost.[179]

44. Given this, we find that the questions raised by channel capacity are complex, and that the record is not developed enough to allow us to answer them. We therefore defer this issue for further consideration.[180] In the meantime, we find that the status quo should be maintained, and that channel capacity costs should not be offset against the franchise fee cap. This approach will minimize disruption and provide predictability to both local franchise authorities and cable operators.

45. *Limits on LFA Authority to Establish PEG Requirements.* While we do not reach a conclusion with respect to the treatment of PEG channel capacity, we reiterate here that sections 611(a)

(Continued from previous page) ─────────────────

unambiguous expression of Congress confirms that 'PEG access capacity' extends not only to facilities but to related equipment as well").

[165] *See* 47 U.S.C. § 542(g)(2)(C) (excluding only capital costs "*for* public, educational, or governmental access facilities" (emphasis added)); *id.* § 522(16) (defining PEG access facilities as "channel capacity . . . and facilities and equipment *for the use of such channel capacity*" (emphasis added)).

[166] NCTA requests that we "make clear that cable operators have the right to audit a franchising authority's use of the contributions and that a franchising authority must provide reasonable supporting documentation during an audit that such funds are, or were, being used for PEG capital expenses." NCTA Comments at 49. We decline to do so. We find nothing in the Act that precludes a cable operator from auditing an LFA's use of PEG capital funds, nor do we find anything that gives a cable operator an audit right. We note that under section 635(b) of the Act, a court may award a cable operator the right to audit if the court finds that relief appropriate. 47 U.S.C. § 555(b).

[167] NCTA Mar. 11, 2019 *Ex Parte* at 3.

[168] *Compare* 47 U.S.C. § 542(g)(2)(B) *with id.* § 542(g)(2)(C).

[169] H.R. Rep. No. 98-934 at *45 (1984). *See also id.* at *46 ("[P]rovisions of existing franchises covering PEG channel capacity and its use as well as services, facilities and equipment (such as studios, cameras, and vans) related thereto, are fully grandfathered.").

[170] Salaries and training are two examples of operating costs excluded by section 622(g)(2)(B), but not by section 622(g)(2)(C). *See First Report and Order*, 22 FCC Rcd at 5151, para. 109 ("[Capital] costs are distinct from payments in support of the use of PEG access facilities. PEG support payments may include, but are not limited to, salaries and training.").

[171] *See Second FNPRM*, 33 FCC Rcd at 8962-63, para. 20.

[172] *See, e.g.*, ACA Comments at 6 ("[T]he fact that subsection 611(b) authorizes LFAs to require franchisees to designate channel capacity on institutional networks ('I-Nets') for governmental use does not exempt the costs

(continued….)

**Federal Communications Commission**                                    **FCC 19-80**

and 621(a)(4)(B) of the Act restrict the authority of LFAs to establish PEG channel capacity requirements.[181]  We discussed the limits imposed by section 611(a) in the *First Report and Order*.[182]  We noted that, while section 611(b) does not place a limit on the amount of channel capacity that a franchising authority may require, section 621(a)(4)(b) provides that a franchising authority may require "adequate assurance" that the cable operator will provide "adequate" PEG access channel capacity, facilities, or financial support.[183]  We determined that "adequate," as used in the statute, should be given its ordinary meaning—"satisfactory or sufficient."[184]

46.    In the *Second FNPRM*, the Commission again discussed the limits on franchising authority requirements for PEG channels under section 611(b), identifying PEG channel capacity as an in-kind contribution and seeking comment on the effects on cable operators and cable subscribers of "allowing LFAs to seek unlimited" PEG operating support and other cable-related, in-kind contributions.[185]  In response, commenters submitted examples of what they claim are LFA requirements for excessive numbers of PEG channels.[186]  LFAs responded with comments defending such requirements, as well as requirements for associated PEG support.[187]

47.    We note that many states have attempted to strike a balance between the costs of PEG channels to cable operators and the benefits of PEG channels to the public by imposing reasonable limits on PEG channel capacity.  For example, some states have limited the number of PEG channels—typically to two or three.[188]  Others have required that PEG channels be returned if they are not substantially used.[189]  States have also tied the number of appropriate PEG channels to the size of the population served.[190]

48.    We decline the invitation by cable operators to establish fixed rules as to what constitutes "adequate" PEG channel capacity under section 621(a)(4)(B).[191]  We recognize that the number of channels necessary to further the goals of the Cable Act might vary depending on, among other things, the number of subscribers within a franchise, the area covered by a franchise, the number of cable

---

(Continued from previous page)

incurred to provide that capacity from treatment as franchise fees.").

[173] *See* Charles County Reply at 7; MassAccess Reply at 8 ("Cable operators cannot classify as 'in-kind' an obligation which they are legally bound to fulfill.").

[174] *See supra* para. 20.

[175] One commenter notes that California law requires "all video service providers"—a category broader than just cable providers—to "designate a sufficient amount of capacity" for the provision of PEG channels.  *See* Comments of the City and County of San Francisco, California Comments, at 8-9 (Nov. 14, 2018) (City and County of San Francisco Comments) (quoting Cal. Pub. Util. Code § 5870(a)).  Because this requirement applies to more than just cable operators, commenters argue, it is a fee of "general applicability" excluded under section 622(g)(2)(A) from the definition of franchise fee.  *See id.*  The Eastern District of California recently held that a CPUC fee under the same California law was a fee of general applicability on these grounds.  *Comcast of Sacramento I, LLC v. Sacramento Metropolitan Cable Television Commission*, 250 F. Supp. 3d 616 (E.D. Cal. 2017).  The Ninth Circuit recently vacated and remanded this ruling on other grounds.  *Comcast of Sacramento I, LLC v. Sacramento Metro. Cable Television Comm'n*, 923 F.3d 1163 (9th Cir. 2019).  An assessment aimed only at cable or cable-like services would not fall within section 622(g)(2)(A)'s exclusion as a "tax, fee, or assessment of general applicability."  The text of section 622(g)(2)(A) of the Cable Act identifies a "tax, fee, or assessment imposed on *both* utilities and cable operators or their services" as a paradigmatic example of an assessment of "general applicability."  47 U.S.C. § 542(g)(2)(A) (emphasis added).  The legislative history further explains that an assessment of "general applicability" "could include such payments as a general sales tax, an entertainment tax imposed on other entertainment business as well as the cable operator, and utility taxes or utility user taxes which, while they may differentiate the rates charged to different types of utilities, do not unduly discriminate against the cable operator as to *effectively constitute a tax directed at the cable system*."  H.R. Rep. No. 98-934, at 64 (1984) (emphasis added).  Here, the provision of PEG capacity appears to be an obligation specific to cable operators—the California law itself references the provision of PEG capacity by "cable operator[s]."  Cal. Pub. Util. Code § 5870(a).  We also note that the PEG authority provided in section 611 only applies to cable service, and that there are no PEG requirements under federal law for other video providers, like Direct Broadcast Service (DBS) or over-the-top streaming services.

26

(continued….)

operators within a franchise, the area's population and geography, the cable-related community needs and interests, and whether PEG channel capacity is substantially used.[192] In general, each of these factors is relevant in determining whether an LFA has exceeded its authority under section 621(a)(4)(B) by demanding more than "adequate" capacity.[193] We note that LFA demands for PEG capacity requirements that are more than "adequate" are subject to judicial challenge under section 635 of the Act, as well as other forms of relief.[194] We also reserve the right to establish fixed rules in the future should there be widespread evidence of LFAs requiring more than adequate PEG channel capacity.

49. *PEG transport.* We find that the installation of transport facilities dedicated for long-term use by a PEG provider for the transmittal of recurring programming to a cable headend or other point in the cable system—PEG transport—does not count toward the five percent franchise fee cap. For the reasons explained above, we find that exempting capital costs from the five percent cap is consistent with the Act. The expenditure for the installation of a system that carries PEG programming from a PEG studio to a cable operator's headend facility is a capital expenditure because it is a long-term asset meant to deliver the programming.[195] The ongoing costs associated with the maintenance or operation of that facility would not qualify as a capital expenditure, however, as these are operating costs that are necessary to run the business and produce output.[196] NCTA requests that we declare PEG transport costs beyond "a single PEG transport return line [that] is dedicated to connecting the PEG studio to the cable network or headend" to count toward the five percent cap.[197] Although we agree that the costs associated with the use of transport lines for "episodic" or "short-term" PEG programming is an operating cost that is subject to the franchise fee cap,[198] we decline to establish a fixed quantity of PEG transport return lines that is "adequate" under section 621(a)(4)(B).[199] Like the number of PEG channels on a system, the number of adequate return lines in a franchise area might vary according to particular circumstances like the number of subscribers in the franchise area, the area covered by the franchise and the number of cable operators in the franchise. The number also might vary depending on the number of PEG channels provided in a franchise area and the types of programming offered over them. Nevertheless, any LFA requests for

(Continued from previous page) ────────────────

In any case, we need not settle the question whether a specific state law is of general applicability to determine whether the provision of PEG capacity, in general, falls within the definition of "franchise fee." Accordingly, we decline to do so here. *See infra* para. 94.

[176] *See* 47 U.S.C. § 522(16). *See also* NATOA *et al.* Reply at 6-7 ("Thus, by its very terms, the Cable Act excludes from franchise fees the costs of "facilities and equipment" that facilitate use of PEG channel capacity.").

[177] *See, e.g.*, Anne Arundel County *et al.* Comments at 16-17.

[178] *See, e.g.*, NCTA Mar. 11, 2019 *Ex Parte* at 2 (making this argument, and noting that "the structure of Section 622(g)(2)(B)-(C) makes clear that not all costs related to PEG access facilities are capital costs").

[179] NCTA proposes valuing channel capacity at market cost; anything less, NCTA argues, would be an additional subsidy beyond the cost of the service itself. *See* NCTA Comments at 51, 54 ("If in-kind exactions are valued only at incremental costs to the cable operator, the provider is still subsidizing them – a result that is contrary to Congress's goals of limiting the overall amount a provider is required to give to the community and that works against the Commission's goals of ensuring that providers can put funds to their highest and best use, including for broadband deployment."). LFAs raise a host of problems with using the fair market value approach to value channel capacity. *See, e.g.*, MassAccess Reply at 11 ("The 'fair market value' of PEG channels and PEG capacity, however, is zero dollars."); Charles County Comments at 21 & n.74 ("Since PEG capacity has no commercial value, the only cost to the cable operator for providing such capacity is the capital cost of provisioning PEG channels."); AWC *et al.* Comments at 14 (noting that assessing fair market value to PEG channel capacity would leave LFAs without objective and sufficient guidelines for valuation).

[180] *See U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 86 (D.C. Cir. 2001) ("[A]gencies need not address all problems in one fell swoop." (citations and internal quotation marks omitted)). We encourage parties to supplement the record on the channel capacity issue. To the extent that we are provided sufficient information to answer the complex questions raised by channel capacity, we intend to resolve them in the next twelve months.

[181] 47 U.S.C. §§ 531(a), 541(a)(4)(b).

multiple transport connections dedicated for long-term PEG use that the cable operator considers to be more than "adequate" are subject to judicial challenge under section 635 of the Act.[200]

### (iii)     Policy Concerns and the Impact on PEG Programming

50.     We acknowledge the benefits of PEG programming and find that our interpretations adopted above are faithful to the policy objectives of the Cable Act. A significant number of comments in the record stressed these benefits, which include providing access to the legislative process of the local governments, reporting on local issues, providing a forum for local candidates for office, and providing a platform for local communities—including minority communities.[201] Of course, Congress itself similarly recognized the importance of PEG programming by authorizing LFAs to require the provision of PEG channel capacity in the Cable Act,[202] and by carving out certain costs of such programming from the five percent cap on franchise fees.[203] Nothing in this proceeding disturbs the Commission's longstanding view that PEG programming serves an important role in local communities.[204]

51.     At the same time, the Cable Act seeks to encourage deployment and competition by limiting the franchise fees that LFAs may collect.[205] These include limitations on imposing costs associated with the provision of PEG programming.[206] A number of cable operators express concern with excessive LFA requirements for PEG channel capacity, support, and in-kind contributions.[207] Altice, for example, notes that "PEG operational contributions . . . are common and routinely treated as separate from the 5 percent franchise fee."[208] Commenters likewise suggest that these excessive PEG-related demands can hinder competition and deployment.[209]

52.     The Cable Act itself, as interpreted in this Order, balances these costs and benefits. By excluding PEG-related capital costs from the five percent cap on franchise fees, but leaving other PEG-related exactions subject to that cap, the Cable Act divides the financial burden of supporting PEG programming between LFAs and cable operators.[210] By counting a portion of these costs against the

---

(Continued from previous page) ——————————————

[182] *First Report and Order*, 22 FCC Rcd at 5152, para. 112.

[183] 47 U.S.C. § 541(a)(4)(B).

[184] *First Report and Order*, 22 FCC Rcd at 5152, para. 112 (quoting American Heritage Dictionary, Second College Edition (1991)). Citing section 621(a)(1)'s prohibition on franchising authorities from "unreasonably" refusing to award competitive franchises, the Commission found that, as a general matter, PEG support required by an LFA in exchange for a franchise should be limited to what is reasonably necessary to support "adequate" PEG facilities. *Id.* at 5153, para. 115. Based on that reasoning, the *First Report and Order* found certain LFA requirements regarding PEG channels to be unreasonable, including (1) duplicative PEG requirements; or (2) requiring a new entrant to pay PEG support in excess of the incumbent's obligations. *Id.* at 5154, paras. 119-20.

[185] *Second FNPRM*, 33 FCC Rcd at 8963-64, paras. 20, 23.

[186] *See* NCTA Reply, Appendix (*Examples of Franchising Authority Overreach*) at 10-11 (describing LFA demands ranging from seven to as many as 43 PEG channels).

[187] *See, e.g.*, Minnesota Association of Community Telecommunications Administrators Mar. 5, 2019 *Ex Parte* at 2-3.

[188] *See, e.g.*, Kan. Stat. § 12-2023(5)(B)(h)(1) (establishing limit of two PEG channels); N.R.S § 711.810 (Nevada) (establishing limit of three PEG channels); Mo. Rev. Stat § 67.2703 (same); O.C.G.A § 36-76-8 (Georgia) (same); LA. RS 45:1369 (Louisiana) (same); Ohio Rev. Code. § 1332.30 (same); S.C. Code Ann. § 58-12-370 (same); Tenn. Code Ann. § 7-59-309(e) (same); Tex. Util. Code § 66.009(c) (same); Wisc. Stat. § 66.0420(5)(a) (same).

[189] *See, e.g.*, Fla. Stat. § 610.109(5) (PEG channels must be "activated and substantially used" for "at least 10 hours per day on average, of which at least 5 hours must be non-repeat programming as measured on a quarterly basis," excluding "[s]tatic information screens or bulletin-board programming"; and requiring the return of PEG capacity if

(continued….)

**Federal Communications Commission** **FCC 19-80**

statutory cap on franchise fees that LFAs may collect, the Cable Act allows LFAs to seek support for PEG programming from cable operators, while guarding against the possibility that LFAs will make demands for such programming without regard to cost.

53. Some commenters have suggested that the proposals in the *Second FNPRM* threaten to eliminate or drastically reduce PEG programming.[211] We disagree. Significantly, any adverse impact of our ruling on PEG programming should be mitigated by (1) the expansion of the "capital cost" exclusion beyond merely capital costs associated with construction[212]; and (2) our decision to defer ruling on whether the costs of channel capacity may be counted under this exclusion.[213] Under the interpretation adopted in this Order, cable operators will continue to provide support where an LFA chooses, but some aspects of that support will now be properly counted against the statutory five percent franchise fee cap, as Congress intended.[214] We recognize that this represents a departure from the longstanding treatment of PEG costs by LFAs and cable operators. We do not, however, believe that these conclusions will eliminate PEG programming. Nor do we believe that the existing practice was lawful merely because it was longstanding: the Commission's duty is to conform its rules to law, not tradition.

54. To the extent that existing practices are inconsistent with the law, LFAs will still have a choice: they can continue to receive monetary franchise payments up to the five percent cap, they can continue to receive their existing PEG support and reduce the monetary payments they receive, or they can negotiate for a reduction of both that fits within the bounds of the law that Congress adopted.

### c. I-Nets

55. We find that the costs associated with the construction, maintenance, and service of an I-Net fall within the five percent cap on franchise fees. Such costs are cable-related, in-kind contributions that meet the definition of franchise fee. In particular, agreeing to construct, maintain, and provide I-Net service pursuant to the terms of a franchise agreement is necessarily cable-related, is an in-kind (*i.e.*, non-monetary) contribution imposed on a cable operator by a franchise authority, and is not included in one of the enumerated exceptions from the franchise fee in section 622(g)(2) of the Act.[215] Thus, we believe that

---

(Continued from previous page)
these criteria are not met); Cal. Pub. Util. Code § 5780(e) (requiring the return of PEG capacity to the cable operator where the channel "is not utilized by the local entity for at least eight hours per day as measured on a quarterly basis"); Wis. Stat. § 66.0420(5)(b)(1)(a)-(b) (requiring the return of PEG capacity that is not "substantially utilized by the municipality," defined as providing "40 hours or more of programming on the PEG channel each week and at least 60 percent of that programming is locally produced"). *See also* NCTA Apr. 18, 2019 *Ex Parte* at 6, n.28.

[190] *See, e.g.*, O.C.G.A § 36-76-8 (maximum of two PEG channels where the population is less than 50,000, and maximum of three PEG channels elsewhere); Wisc. Stat. § 66.0420(5) (same); N.R.S § 711.810 (same, but using 55,000 population as the inflection point); Tenn. Code Ann. § 7-59-309 (maximum of one PEG channel where the population is less than 25,000, maximum of two PEG channels where the population is greater than 25,000 but less than 50,000, and maximum of three PEG channels where the population exceeds 50,000).

[191] *See, e.g.*, Altice May 9, 2019 *Ex Parte* at 9 ("Given the uncertainty around the valuation of channel capacity on cable systems for PEG use, the Commission should consider adopting a rebuttable presumption under Section 621(a)(4)(B) that providing three linear standard-definition PEG channels satisfies a cable operator's obligations under Section 611(a), unless state law requires fewer channels." (citations omitted)). As noted in paragraph 45, the Commission concluded that "adequate" should be given its plain meaning, "satisfactory or sufficient" in the *First Report and Order*. *First Report and Order*, 22 FCC Rcd at 5152, para. 112. The Sixth Circuit affirmed this interpretation. *All. for Cmty. Media*, 529 F.3d at 785.

[192] *See, e.g.*, LFA Comments at 12 (discussing the need for a greater number of PEG channels where a franchise covers a large area with many cable operators). *See also* 47 U.S.C. § 546(a)(1)(A), 546(c)(1)(D) (discussing cable renewal standards).

[193] LFAs argue that relying on the section 621 "adequate" standard conflicts with the standards established by section 626 in the context of franchise renewals, which generally ask whether a renewal proposal is reasonable to meet the "needs and interests" of the community. *See* Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 8. We see no such conflict. Section 621 establishes "General Franchise Requirements," and nothing in Section 626

(continued....)

including such services in the franchise fee is consistent with the statute.[216]  As we tentatively concluded in the *Second FNPRM*, treating cable-related, in-kind requirements, such as I-Net requirements, as franchise fees would not undermine provisions in the Act that authorize or require LFAs to impose cable-related obligations on franchisees.[217]  We disagree with LFA commenters who argue that the cost of I-Nets should be excluded from the franchise fee.[218]  Although such commenters contend that "[t]he Commission's proposal to require LFAs to pay for I-Nets . . . cannot be squared with the statute,"[219] it is entirely consistent with the statute to find that franchising authorities may impose cable-related requirements, such as requiring dedicated channel capacity on I-Nets, on cable operators, but also to find that funding for these franchise requirements applies against the five percent cap.[220]  Similar to our conclusion with respect to PEG support, while we acknowledge that I-Nets provide benefits to communities,[221] such benefits cannot override the statutory framework, which carves out only limited exclusions from franchise fees.

     56.     Further, as we conclude above, we disagree with commenters that section 611(b) of the Act, which authorizes LFAs to require that channel capacity on I-Nets be designated for educational and governmental use, should be interpreted to exempt the costs of I-Nets from franchise fees.[222]  There is no basis in the statutory text for concluding that section 611(b) imposes any limit on the definition of franchise fee.[223]  Moreover, section 622(g) defines what is included in the franchise fee, and section 622(g)(2) carves out only limited exclusions for PEG-related costs and does not exclude I-Net-related costs.  As we observe above,[224] since Congress enacted the PEG and I-Net provisions at the same time it added the franchise fee provisions, it could have explicitly excluded all costs related to I-Nets if it had intended they not count toward the cap.[225]

### d.     Build-Out and Customer Service Requirements

     57.     We conclude that franchise terms that require cable operators to build their systems to cover certain localities in a franchise area do not count toward the five percent cap.[226]  As we explain

---

(Continued from previous page) ⎯⎯⎯⎯⎯⎯

suggests that these general limits do not apply in the context of a franchise renewal.  *See* 47 U.S.C. §§ 541, 546.  As NCTA points out, to find that franchise renewals are constrained only by section 626's "needs and interests" inquiry would mean, among other things, that franchise renewals would be unconstrained by the statutory cap on franchise fees in section 622.  *See* NCTA July 25, 2019 *Ex Parte* at 6.

[194] 47 U.S.C. § 555(a) ("Any cable operator adversely affected by any final determination made by a franchising authority under Section 621(a)(1), 625 or 626 may commence an action within 120 days after receiving notice of such determination may be brought in—(1) the district court of the United States for any judicial district in which the cable system is located; or (2) in any State court of general jurisdiction having jurisdiction over the parties.").

[195] *See supra* para. 36 (distinguishing capital expenditures from operating expenditures).

[196] *Id.  See also* NCTA July 18, 2019 *Ex Parte* at 2 ("the costs for using [a PEG] facility—and the costs for using capacity over shared facilities to transmit PEG programming—and not just the costs of maintenance of such facility, would be considered operating costs under the statute and the *Draft Order*. The fair market value of the use of such capacity, therefore, are costs that count against the franchise fee cap.").

[197] NCTA July 18, 2019 *Ex Parte* at 2; NCTA Comments at 47-48.

[198] NCTA July 29, 2019 *Ex Parte* at 2-3.  *See also* Merriam-Webster, Definition of "Capital Expenditure," www.merriam-webster.com (accessed Apr. 15, 2019) (defining "capital assets" as "**long-term** assets either tangible or intangible"); *supra* para. 36.

[199] 47 U.S.C. § 541(a)(4)(B); NCTA July 18, 2019 *Ex Parte* at 2. We note, however, that NCTA cites a particularly egregious example of a "transport line [that] is used once a year for a Halloween parade" that seems well beyond what constitutes adequate facilities.  NCTA July 29, 2019 *Ex Parte* at 1-2.

[200] 47 U.S.C. § 555(a) ("Any cable operator adversely affected by any final determination made by a franchising

(continued….)

herein, Title VI establishes a framework that reflects a fundamental bargain between the cable authority and franchising authority—a cable operator may apply for and obtain a franchise to construct and operate facilities in the local rights-of-way and, in exchange, an LFA may impose fees and other requirements as set forth in the Act.[227]  The statutory framework makes clear that the authority to construct a cable system is granted to the cable operator as part of this bargain and that the costs of such construction are to be borne by the cable operator.  Specifically, section 621(a)(2)(B) of the Act provides that "[a]ny franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, . . .  except that in using such easements the cable operator shall ensure . . . that the cost of the installation, construction, operation, or repair of such facilities be borne by the cable operator or subscriber, or a combination of both."[228]  Because the statute is clear that cable operators, not LFAs, are responsible for the cost of building out cable systems, it would be inconsistent with the statutory text and structure to count these costs as part of the franchise fee.[229]  Both cable industry and LFA commenters generally support the contention that build-out obligations should not count toward the five percent franchise fee cap.[230]

58.    We also conclude that franchise terms that require cable operators to comply with customer service standards do not count toward the five percent cap.[231]  LFA commenters explain that cable operators are required to comply with customer service standards under federal or state law, and that cable franchises may include an obligation to comply with customer service standards.[232]  Notably, section 632 of the Act directs the Commission to "establish standards by which cable operators may fulfill their customer service requirements," including "at a minimum, requirements governing—(1) cable system office hours and telephone availability; (2) installations, outages, and service calls; and (3) communications between the cable operator and the subscriber (including standards governing bills and refunds."[233]  The Commission implemented this mandate in section 76.309 of its rules, which sets forth with specificity the customer service standards to which cable operators are required to adhere relating to cable system office hours and telephone availability, installations, outages and service calls, and communications between cable operators and cable subscribers.[234]  We find that franchise terms that

---

(Continued from previous page)
authority under Section 621(a)(1), 625 or 626 may commence an action within 120 days after receiving notice of such determination may be brought in—(1) the district court of the United States for any judicial district in which the cable system is located; or (2) in any State court of general jurisdiction having jurisdiction over the parties.").

[201] *See, e.g.*, ACT Comments at 3 (calling local PEG programming "critically important"); City Coalition Comments at 17-18 (noting, among other things, that PEG programming has become increasingly important and other sources of local news have experienced resource constraints and industry consolidation); Comments of Common Frequency, at 2 (Nov. 14, 2018) (Common Frequency Comments) ("PEGs also provide platforms for free speech, space for communities to organize, and serve as advocates for media access."); Comments of King County, Washington, at 9 (King County Comments) (noting that PEG channels provide important programming such as County Council meetings and programming targeted at minority communities); LMCTV Comments at 1-2 (citing the educational resources that PEG channels provide to the local community); Letter from Rony Berdugo, Legislative Representative, League of California Cities, to Ajit Pai, Chairman, FCC, at 2 (Oct. 30, 2018) ("PEG programming offers a host of community benefits, including public access channels, educational access channels, and government access channels all aimed at providing locally beneficial information."); City and County of San Francisco Comments at 2 (noting that SFGovTV provides "access to the legislative process," explains local issues, explores neighborhoods, and offers a forum for local candidates for office).

[202] 47 U.S.C. § 542(g)(2)(C) (excluding only PEG related "capital costs" from the definition of "franchise fees").

[203] *Id.* § 542(g)(2)(B)-(C).  *See also* H.R. Rep. No. 98–934, at 30 ("Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet.  They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas.  PEG channels also contribute to an informed citizenry by bringing local schools into the home, and by showing the public local government at work.").

[204] *Accessibility of User Interfaces, & Video Programming Guides & Menus*, Report and Order, MB Docket Nos. 12-108, 12-107, 28 FCC Rcd 17330, 17378, para. 75 (2013) ("We recognize the important role of PEG providers in

(continued....)

require cable operators to adhere to customer service standards are not part of the franchise fee. In contrast to in-kind, cable-related contributions that are franchise fees subject to the statutory cap, such as the provision of free cable service to government buildings or PEG and I-Net support,[235] customer service obligations are not a "tax, fee, or assessment" imposed on a cable operator; they are regulatory standards that govern how cable operators are available to and communicate with customers. Indeed, as the legislative history explains, "[i]n general, customer service means the direct business relation between a cable operator and a subscriber," and "customer service requirements include requirements related to interruption of service; disconnection; rebates and credits to consumers; deadlines to respond to consumer requests or complaints the location of the cable operator's consumer service offices; and the provision to customers (or potential customers) of information on billing or services."[236] Based on our review of the statutory text and legislative history, we find no indication that Congress intended that standards governing a cable operator's "direct business relation" with its subscribers should count toward the franchise fee cap. Apart from ACA, no commenter argued that customer service obligations should be included as franchise fees.[237]

### 3. Valuation of In-Kind Contributions and Application to Existing Franchises

59. As we explain in this section, we conclude that cable-related, in-kind contributions will count toward the five percent franchise fee cap at their fair market value. Because we conclude above that most cable related, in-kind contributions must be included in the franchise fee, cable operators and LFAs must assign a value to them. In our prior rulemakings, we did not provide guidance on how to value such contributions,[238] but in the *Second FNPRM*, the Commission recognized that cable-related contributions could count toward the franchise fee cap at cost or at fair market value, and proposed to count toward the franchise fee cap at their fair market value.[239]

60. Most critiques of applying fair market valuation in this context challenge how it could be applied to PEG channel capacity.[240] But, as discussed above, we have not yet determined whether to

---

(Continued from previous page)
informing the public, including those who are blind or visually impaired, on local community issues. . . .").

[205] 47 U.S.C. § 542. *See* Letter from Rep. Robert E. Latta, Member of Congress, *et al.*, to Chairman Ajit Pai, FCC at 1 (July 22, 2019) ("The Cable Act carefully balanced the need to compensate communities for use of public rights-of-way with imperatives to expand services and limit costs for consumers.").

[206] 47 U.S.C. § 541(a)(4)(B).

[207] *See, e.g.*, Altice Reply at 7 (describing what it claims are excessive demands for PEG support); NCTA Reply, Appendix (*Examples of Franchising Authority Overreach*) at 9-11 (describing what NCTA argues are excessive LFA demands for PEG operational support, financial support, and channel capacity requirements).

[208] Altice Reply at 7.

[209] NCTA Comments at 43 (citing *First Report and Order*, 22 FCC Rcd 5149-50, paras. 105-08). *See also* Americans for Tax Reform May 8, 2019 *Ex Parte*, Att. at 3 (showing that extra-statutory exactions from cable operators "reduce the expected flow of revenues and/or increase the cost of an investment project, either of which reduces the net present value of an investment project and . . . attenuates capital investments").

[210] *See supra* paras. 38-41 (discussing the capital cost exclusion under section 622(g)(2)(C)).

[211] *See, e.g.*, Free Press Reply at 1 (noting that the proposal "threaten[s] PEG channel support"); NATOA *et al*. Comments at 10 (warning that "drastic reductions in franchise fees" will jeopardize the existence of PEG stations); Hawaii Comments at 7 ("Treating PEG channel capacity as a franchise fee would also result in an impossible choice for the State because the majority of the franchise fees that are currently collected are allocated to the PEG access organizations for their operating expenses"). This concern was also expressed in a number of letters from members of Congress. *See, e.g.*, Letter from Sen. M. Hirono to Ajit Pai, Chairman, FCC (Dec. 18, 2018) ("The proposed rulemaking, if adopted as currently proposed, would implement an overly broad definition of in-kind contributions

(continued….)

Federal Communications Commission FCC 19-80

assign the value of PEG channel capacity contributions toward the five percent franchise fee cap, and therefore we do not need to address these arguments.

61.     We must address the value of other in-kind contributions, however, including free service to public buildings and I-Net contributions.  We believe that fair market value, where there is a product in the market,[241] is the most reasonable valuation for in-kind contributions because it is easy to ascertain—cable operators have rate cards to set the rates that they charge customers for the services that they offer.  Moreover, a fair market valuation "reflects the fact that, if a franchising authority did not require an in-kind assessment as part of its franchise, it would have no choice but to pay the market rate for services it needs from the cable operator or another provider."[242]  In contrast, valuing these in-kind contributions at cost would "shift the true cost of an exaction from their taxpayer base at large to the smaller subset of taxpayers who are also cable subscribers."[243]  As we note above, Congress adopted a broad definition of franchise fee to limit the amount that LFAs may exact from cable operators.[244]  Accordingly, we conclude that a fair market valuation for in-kind contribution best adheres to Congressional intent.

62.     The franchise fee rulings we adopt in this Order are prospective.[245]  Thus, cable operators may count only ongoing and future in-kind contributions toward the five percent franchise fee cap after the Order is effective.  There is broad record support for applying the rulings prospectively; no commenter argues that our rulings should apply retroactively to allow cable operators to recoup past payments that exceed the five percent franchise fee cap.[246]  To the extent a franchise agreement that is currently in place conflicts with this Order, we encourage the parties to negotiate franchise modifications within a reasonable time.[247]  If a franchising authority refuses to modify any provision of a franchise agreement that is inconsistent with this Order, that provision is subject to preemption under section 636(c).

63.     Many LFAs express concern that our rulings could disrupt their budgets, which rely upon the franchise fees that they expect to receive.[248]  It is by no means clear from the record what fiscal

---

(Continued from previous page) ────────────────

in a way that would encourage cable providers to reduce the dollar contribution portion of the franchise fee. This would have the effect of constraining PEGs ability to serve the public as they have for decades."); Letter from Rep. G. Moore to Ajit Pai, Chairman, FCC, at 2 (Dec. 14, 2018) ("Under the FCC's proposal, Wisconsin municipalities will have a hard choice to make between crucial municipal services and purchasing a PEG channel for the use of the community."); Letter from Rep. E. Engel to Ajit Pai, Chairman, FCC (Dec. 13, 2018) ("I am concerned that the FCC's current proposal could jeopardize critical funding for public, educational, and governmental (PEG) stations.").

[212] *Compare supra* para. 40 *with Second FNPRM*, 33 FCC Rcd at 8962, para. 19.

[213] *Compare supra* para. 44 *with Second FNPRM*, 33 FCC Rcd at 8962-63, para. 20.  NATOA *et al*. say that these aspects of our decision will not have a mitigating impact on the availability of PEG programming.  *See* NATOA *et al*. July 24, 2019 *Ex Parte* at 4.  They suggest that this Order "is not a boon to LFAs" because it was already clear that both construction-related and non-construction-related PEG equipment costs are exempt from the franchise fee cap.  This is incorrect.  As we explain above, the scope of the PEG capital cost exemption previously was left unsettled.  *See supra* para. 34.  This Order clarifies that issue by finding that equipment costs unrelated to construction may be considered capital costs for purposes of section 622(g)(2)(C).

[214] Finally, a number of commenters argue that PEG requirements confer a benefit on the community, like buildout requirements, and therefore should similarly not be considered a "contribution" to LFAs.  We find that PEG requirements are distinguishable from buildout requirements for the reasons discussed below.  *See infra* para. 57.  PEG requirements, unlike buildout requirements, are also specifically discussed in the definition of franchise fee.

[215] *See* 47 U.S.C. § 542(g)(2); *supra* para. 11.  *See also* 47 U.S.C. § 531(f) (defining an "institutional network" or I-Net as "a communications network which is constructed or operated by the cable operator and which is generally available only to subscribers who are not residential subscribers").

choices remain available to the LFAs, but in any event, delaying the effect of our decision to address this concern would not be consistent with the statutory text. It is strongly in the public interest to prevent the harms from existing franchise agreements to continue for years until those agreements expire.[249] In addition, the changes we adopt today were reasonably foreseeable because we largely adopt the tentative conclusions set forth in the *Second FNPRM*.[250] Finally, we note that LFAs can continue to benefit from their agreements by choosing to continue to receive their existing in-kind contributions, while reducing the monetary payments they receive.[251] Thus, consistent with the Act, we apply our rulings to future contributions cable operators make pursuant to existing franchise agreements.

### B.    Mixed-Use Rule

64.    In this section, we address the second issue remanded from the Sixth Circuit in *Montgomery County*, which relates to the Commission's mixed-use rule. As explained above, the court in *Montgomery County* found that the Commission, in its *Second Report and Order* and *Order on Reconsideration*, failed to identify a valid statutory basis for its application of the mixed-use rule to incumbent cable operators because the statutory provision on which the Commission relied to do so – section 602(7)(C) of the Act – applies by its terms only to Title II carriers, and "many incumbent cable operators are not Title II carriers."[252] The court thus vacated and remanded the mixed-use rule as applied to those cable operators, directing the Commission "to set forth a valid statutory basis . . . for the rule as so applied."[253] For the reasons set forth below, we adopt our tentative conclusion that the mixed-use rule prohibits LFAs from regulating under Title VI the provision of any services other than cable services offered over the cable systems of incumbent cable operators, except as expressly permitted in the Act.[254]

65.    Our conclusions regarding the scope of LFAs' authority to regulate incumbent cable

(Continued from previous page) ─────────────────

[216] *See* NCTA Comments at 49-50. *See Second FNPRM*, 33 FCC Rcd at 8963, para. 20.

[217] *Second FNPRM*, 33 FCC Rcd at 8962-63, para. 20. *See supra* para. 20.

[218] *See, e.g.*, City of Arlington Comments at 9; Charles County Comments at 17-19.

[219] *See* Anne Arundel County *et al*. Comments at 17.

[220] *See, e.g.*, NCTA Reply at 9 (explaining that "Congress left to the franchising authority's discretion how best to allocate the franchise fee to reflect its community's particular cable-related needs"); *supra* para. 20.

[221] *See, e.g.*, Hawaii Comments at 8; City of Hagerstown Reply at 10-11. *See also* NATOA July 24, 2019 *Ex Parte* at 1 (arguing that this decision could "create significant public safety risks if, for example, [its] treatment of existing franchise obligations affects infrastructure such as institutional networks now being used for delivery of public safety services"). Anne Arundel County *et al*. contend that the obligation to provide I-Nets "benefits not only the public, but also the cable operator, who is in a position to sell commercial services via I-Nets," and they argue that the Commission "offers no explanation as to how such a mutually beneficial arrangement constitutes a tax." *See* Anne Arundel County *et al*. July 24, 2019 *Ex Parte* at 8. However, it is unclear from the record to what extent, if any, cable operators benefit from providing I-Nets. *See, e.g.*, NCTA Reply at 17 ("I-Nets, and other in-kind exactions serve no similar essential function for the provision of cable service to subscribers, but rather provide value to franchising authorities or particular third parties for purposes determined to be in the public interest by the franchising authority.").

[222] 47 U.S.C. § 531(b); *supra* para. 20.

[223] *See* ACA Comments at 6; NCTA Reply at 7-8.

[224] *See supra* para. 20.

[225] Anne Arundel County *et al*. suggests that our interpretation of the statute as it relates to I-Nets is somehow inconsistent with the Commission's holding in a 1996 open video systems order. *See* Anne Arundel County *et al*. July 24, 2019 *Ex Parte* at 12-13 (citing *Implementation of Section 302 of the Telecommunications Act of 1996; Open Video Systems*, Third Report and Order and Second Order on Reconsideration, 11 FCC Rcd 20227 (1996) (*OVS Order*)). Contrary to Anne Arundel County *et al*.'s assertion, the Commission did not conclude in the *OVS Order* that I-Nets were meant to be excluded from the franchise fee. Rather, that order affirmed the Commission's

(continued….)

operators' non-cable services, facilities, and equipment follow from the statutory scheme. Congress in Title VI intended, among other things, to circumscribe the ability of franchising authorities to use their Title VI authority to regulate non-cable services provided over the cable systems of cable operators and the facilities and equipment used to provide those services. As explained below, the legislative history of the 1984 Cable Act and subsequent amendments to Title VI reflect Congress's recognition that cable operators potentially could compete with local telephone companies in the provision of telecommunications service and its intent to maintain the then-existing *status quo* concerning regulatory jurisdiction over cable operators' non-cable services, facilities, and equipment.[255] Under the *status quo*, regulation of non-cable services provided over cable systems, including telecommunications and information services, was the exclusive province of either the Commission or state public utility commissions.[256]

66.     *The Mixed-Use Rule Prohibits LFAs From Regulating Under Title VI the Non-Cable Services, Facilities, and Equipment of Incumbent Cable Operators That Are Also Common Carriers.* As an initial matter, we reaffirm the Commission's application of the mixed-use rule to prohibit LFAs from using their cable franchising authority to regulate any services other than cable services provided over the cable systems of any incumbent cable operator that is a common carrier,[257] with the exception of channel capacity on I-Nets.[258]

67.     As noted above, the Commission in the *First Report and Order* found that the then-existing operation of the local franchising process constituted an unreasonable barrier to new entrants in the marketplace for cable services and to their deployment of broadband, in violation of section 621(a)(1) of the Act.[259] The Commission adopted the mixed-use rule with respect to new entrants to address this unreasonable barrier. It provides, in relevant part:

---

(Continued from previous page) ────────────────

decision to preclude local franchising authorities from requiring open video system operators to build I-Nets, while also clarifying that this decision is not inconsistent with permitting the local franchising authority to require channel capacity on a network if an open video system operator does build one. *See OVS Order*, 11 FCC Rcd at 20290-91, paras. 146-47. As we explain above, it is entirely consistent with the statute to find that franchising authorities may impose cable-related requirements, such as requiring dedicated channel capacity on I-Nets, but also to find that funding for these requirements applies against the five percent cap.

[226] *See Second FNPRM*, 33 FCC Rcd at 8963, para. 21. Build-out requirements are requirements that a franchisee expand cable service to parts or all of the franchise area within a specified period of time. *See First Report and Order*, 22 FCC Rcd at 5107, para. 7.

[227] *See infra* para. 84.

[228] 47 U.S.C. § 541(a)(2)(B).

[229] Because the statute is clear with regard to cable operator responsibility for construction costs, we reject ACA's argument that "build-out obligations should only be excluded [from the franchise fee] to the extent an LFA needs to meet its obligation under paragraph 621(a)(3)" to assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides. *See* ACA Comments at 7-8; 47 U.S.C. § 541(a)(3). *See also* Anne Arundel County *et al.* Reply at 9-11; CAPA Reply at 13.

[230] *See* Comments of the City of Murfreesboro, Tennessee, at 2 (Nov. 6, 2018) (City of Murfreesboro Comments); Comments of the City of Pasco, Washington, at 2 (Nov. 14, 2018); Comments of the City of Springfield, at 2 (Nov. 13, 2018); Anne Arundel County *et al.* Reply at 9-10; Free Press Reply at 5, NCTA Reply at 16. While some LFA commenters disagree with distinguishing between build-out obligations and other cable-related contributions such as PEG and I-Net support based on which entities receive the benefit of such obligations or whether such obligations can be considered "essential" to the provision of cable services, because we have clarified the rationale for excluding build-out obligations, we do not need to address these arguments. *See* AWC *et al.* Comments at 10-11; CAPA Comments at 12-13; Hawaii Comments at 10-11; City of Murfreesboro Comments at 2-3; NATOA *et al.* Comments at 6-7; City of New York Comments at 8-9; TBNK Comments at 7; Free Press Reply at 5-6; Hawaii Reply at 3-4. *See also* State of Hawaii July 22, 2019 *Ex Parte* at 1-4; Anne Arundel County, *et al.* July 24, 2019 *Ex*

(continued….)

**Federal Communications Commission**                              **FCC 19-80**

LFAs' jurisdiction applies only to the provision of cable services over cable systems. To the extent a cable operator provides non-cable services and/or operates facilities that do not qualify as a cable system, it is unreasonable for an LFA to refuse to award a franchise based on issues related to such services or facilities. . . . [A]n LFA may not use its video franchising authority to attempt to regulate [an] entire network beyond the provision of cable services.[260]

68.   The Commission in the *Second Report and Order* extended to incumbent cable operators several rules adopted in the *First Report and Order*, including the mixed-use rule.[261] Although, as noted, the Sixth Circuit in *Montgomery County* vacated and remanded the Commission's application of the mixed-use rule with respect to incumbent cable operators that are not common carriers, it left undisturbed application of the rule to incumbent cable operators that are also common carriers.[262] Consistent with the court's ruling, therefore, we adopt our tentative conclusion and reaffirm that the mixed-use rule prohibits LFAs from regulating the provision of non-cable services offered over the cable systems of incumbent cable operators that are common carriers.[263]

69.   Our interpretation is consistent with the text of section 602(7)(C), which excludes from the term "cable system" "a facility of a common carrier which is subject, in whole or in part, to the provisions of Title II of this Act."[264] We are not persuaded by assertions to the contrary. Anne Arundel County *et al*. argues, for example, that a cable operator's provision of telecommunications services via its cable system (either directly or through a subsidiary) "does not . . . suddenly [transform its cable system] into a Title II facility" for purposes of applying the section 602(7)(C) common carrier exception.[265] City of Philadelphia *et al*. similarly argues that the common carrier exception in section 602(7)(C) was meant to protect Title II common carriers from regulation by LFAs under their Title VI franchising authority and thus cannot reasonably be read to apply to any cable operator that provides Title II and other non-cable services over a system that is a cable system.[266]

---

(Continued from previous page) ───────────────────
*Parte* at 2-4; NATOA *et al*. July 25, 2019 *Ex Parte* at 5-6.

[231] In the *Second FNPRM*, we sought comment on whether there are other requirements besides build-out requirements that should not be considered contributions to an LFA. *See Second FNPRM*, 33 FCC Rcd at 8963, para. 21.

[232] *See* Anne Arundel County *et al*. Comments at 28 ("LFAs often impose obligations such as . . . minimum customer service obligations on cable operators that may still result in profit to the cable operator . . . but also do not directly serve county personnel or buildings."); *id*. at 29 (providing as an example the California state franchise, which requires state franchise holders to comply with customer service and protection standards); City of Newton Comments at 14 ("Under federal and state law, cable operators are required to comply with customer service standards. Cable franchise agreements include an obligation to comply with these customer service standards. Compliance with types of consumer-facing standards should not be treated as cable-related in-kind contributions."). *See also* NCTA Mar. 13, 2019 *Ex Parte* at 8 (observing that "neither the Commission nor the cable industry has suggested that . . . costs [of customer service obligations] should count toward the statutory cap").

[233] 47 U.S.C. § 552(b).

[234] 47 CFR § 76.309(c)(1)-(3).

[235] We clarify that if LFAs request build-out to an area that includes a public building, we would consider that to be a build-out requirement that is not subject to the franchise fee. However, we note that our conclusion with respect to build-out and customer service requirements is entirely separate from our findings regarding the provision of free or discounted services to public buildings and the provision of I-Net services. I-Net services as well as free or discounted services to public buildings are counted toward the franchise fee for the reasons explained above. *See supra* Sections III.A.2.a, III.A.2.c.

[236] H.R. Rep. No. 98-934, at 79 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 4655, 4716.

70.     To the extent these commenters argue that section 602(7)(C) precludes LFAs only from regulating non-cable services provided over the facilities of incumbent local exchange carriers that subsequently begin to provide cable service, we find such argument is not supported by the language of the statute.  As noted in the *Second FNPRM*, although new entrants into the cable services market may confront obstacles different from those of incumbent cable operators, the statute makes no distinction between these types of providers.[267]  In the absence of any textual basis for treating incumbent cable operators that provide telecommunications services differently from new entrants that do so, we conclude that a facility should be categorized as "a facility of a common carrier" under section 602(7)(C) so long as it is being used to provide some type of telecommunications service, irrespective of whether the facility was originally deployed by a provider that historically was treated as a "common carrier."

71.     This interpretation also is consistent with the legislative history of the 1984 Cable Act.  Although, as City of Philadelphia *et al.* points out, one of the concerns expressed in the legislative history was the potential that cable operators' provision of telecommunications services could enable large users of such services to bypass the local telephone companies and thereby threaten universal service,[268] the legislative history also reflects Congressional recognition that "ultimately, local telephone companies and cable companies could compete in *all* communications services."[269]  The legislative history clarifies, moreover, that Congress intended the 1984 Cable Act to "maintain[] [then-]existing regulatory authority over all . . . communications services offered by a cable system, including . . . services that could compete with communications services offered by telephone companies."[270]  Indeed, the legislative history is replete with statements reflecting Congress's intent to preserve the then-*status quo* regarding the ability of federal, state, and local authorities to regulate non-cable services provided via cable systems.[271]  In light of its stated intention to maintain the jurisdictional *status quo*, we find that Congress intended via section 602(7)(C) to preclude LFAs from regulating under Title VI the provision of telecommunications services by incumbent cable operators, services that historically have been within the exclusive purview of the Commission (with respect to interstate services) or state public utility commissions (with respect to intrastate services).[272]  Moreover, section 602(7)(C) broadly states that, with narrow exceptions, the

---

(Continued from previous page)

[237] *See* ACA Reply at 17 (arguing that cable-related, in-kind contributions on any cable franchisee, other than capital costs for PEG access facilities, should count towards the franchise fee cap).  For the reasons discussed above, we disagree with ACA that the costs of complying with mandated customer service standards should be counted toward the franchise fee cap.

[238] *First Report and Order*, 22 FCC Rcd at 5149-50, paras. 105-108.

[239] *Second FNPRM*, 33 FCC Rcd at 8964, para. 24.

[240] *See, e.g.*, Anne Arundel County *et al.* Comments at 31; QC4 Comments at 5; CCSF Comments at 4-7; BNN Reply at 4.

[241] *See, e.g.*, NCTA Comments at 53-55 (explaining that parties can establish the value of many services, including I-Net service, based on what "cable operators are charging third parties for a comparable service" and the "[m]arket value of equivalent services and equipment from the relevant cable operator").  We note that certain business or enterprise services may be comparable to I-Nets.

[242] NCTA Comments at 52.  This demonstrates the flaw in NATOA *et al.*'s argument that we must provide guidance on how to calculate fair market value.  *See* NATOA July 24 *Ex Parte* at 7.  If the LFA believes that the cable operator's proposed valuation is too high, the LFA is free to forgo the in-kind contribution, accept a monetary franchise fee payment, and use the funds it received to purchase the good or service in the competitive marketplace.

[243] NCTA Reply at 19.

[244] *See supra* paras. 12-16.  *See also* 129 CONG. REC. 15,461 (1983) (remarks of Senator Goldwater) ("[T]he overriding purpose of the 5-percent fee cap was to prevent local governments from taxing private operators to death as a means of raising local revenues for other concerns.  This would be discriminatory and would place the private operator/owners at a disadvantage with respect to their competitors.")

[245] 5 U.S.C. § 551(4) ("'rule' means the whole or a part of an agency statement of general or particular applicability

(continued….)

facility of a common carrier is only "considered a cable system to the extent such facility is used in the transmission of video programming directly to subscribers," and therefore not with respect to provision of any other services. For these reasons, we see no basis for altering our previous conclusion, as upheld by the Sixth Circuit,[273] that the mixed-use rule prohibits LFAs from exercising their Title VI authority to regulate the provision of non-cable services provided via the cable systems of incumbent cable operators that are common carriers, except as otherwise provided in the Act.

72. *The Mixed-Use Rule Prohibits LFAs From Regulating Under Title VI the Non-Cable Services, Facilities, and Equipment of Incumbent Cable Operators That Are Not Common Carriers*. We also adopt our tentative conclusion that LFAs are precluded from using their Title VI franchising authority to regulate the non-cable services (e.g., information services such as broadband Internet access) of incumbent cable operators that do not provide telecommunications services.[274] As directed by the court, we explain herein our statutory bases for concluding that LFAs lack authority under Title VI to regulate non-cable services of incumbent cable operators that do not provide telecommunications services.

73. Section 624 of the Act, which principally governs franchising authority regulation of services, facilities, and equipment, provides in subsection (a) that "[a] franchising authority *may not regulate* the services, facilities, and equipment provided by a cable operator *except to the extent consistent with [Title VI of the Act]*."[275] The subsequent provision, section 624(b)(1), provides that franchising authorities "may not . . . establish requirements for video programming or other *information services*."[276] Although the term "information service" is not defined in section 624, the legislative history of that provision distinguishes "information service" from "cable service."[277] In particular, the legislative history explains that "[a]ll services offered by a cable system that go beyond providing generally-available video programming or other programming are not cable services" and "a cable service may not include 'active *information services*' such as at-home shopping and banking that allows transactions between subscribers and cable operators or third parties."[278]

---

(Continued from previous page) ─────────────────

*and future effect* designed to implement, interpret, or prescribe law or policy." (emphasis added)).

[246] *See, e.g.*, City Coalition Comments at 18-19; Free State Reply at 12-13; King County Comments at 11; NCTA Reply at 22-23.

[247] The City Coalition proposes that the parties should modify their franchises to comply with this Order via the franchise modification process set forth in section 625 of the Act. 47 U.S.C. § 545; City Coalition Comments at 19, n.89 ("the Second FNPRM could only be incorporated into existing agreements through a Section 545 proceeding."). Under those procedures, an LFA has 120 days to make a final decision about a cable operator's request to modify a franchise agreement. We do not adopt this framework, however, because as NCTA points out, the parties may not modify PEG requirements under section 625, and therefore cable operators and LFAs could not use that procedure to bring franchise agreements into compliance in every case. NCTA July 19 *Ex Parte* at 4. Therefore, we encourage the parties to negotiate franchise modifications within a reasonable time and find that 120 days should be, in most cases, a reasonable time for the adoption of franchise modifications.

[248] *See, e.g.*, City Coalition Comments at 18-19; City of Newton Apr. 17, 2019 *Ex Parte* at 9; AWC Apr. 3, 2019 *Ex Parte* at 5; Letter from Charlie Seelig, Town Administrator, Town of Halifax, MA, to Marlene H. Dortch, Secretary, FCC at 1 (July 22, 2019).

[249] *See* Letter from Katie McAuliffe Executive Director, Digital Liberty Federal Affairs Manager, Americans for Tax Reform, to Marlene H. Dortch, Secretary, FCC at Attachment at 8 (May 8, 2019) (stating that cable franchise agreements "typically have terms of about 10 to 15 years").

[250] *See supra* note 41. Indeed, the lawfulness of excluding costs associated with PEG/I-Nets from the franchise fee cap has been under Commission scrutiny for more than a decade (*see, e.g., 621 First R&O and FNRPM*, 22 FCC Rcd 5701, 5750-51, 5765, paras. 109, 110, 140 (2007)), and in 2008, the Sixth Circuit affirmed the Commission's determination as to new entrants that PEG related costs which do not qualify as capital costs are subject to the franchise fee cap. *See Alliance for Community Media v. FCC*, 529 F.3d 763, 583-86 (6th Cir. 2008). Therefore, we

(continued....)

**Federal Communications Commission**                    **FCC 19-80**

74.     We find significant that the description of the term "information services" in the legislative history (*i.e.*, "services providing subscribers with the capacity to engage in transactions or to store, transfer, forward, manipulate, or otherwise process information or data [which] would not be cable services")[279] aligns closely with the 1996 Telecommunications Act's definition of "information service" codified in section 3(24) of the Act (*i.e.*, "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications").[280]  We conclude, therefore, that for purposes of applying section 624(b), interpreting the term "information services" to have the meaning set forth in section 3(24) of the Act is most consistent with Congressional intent.[281]  Because the Commission has determined that broadband Internet access service is an "information service" under section 3(24),[282] we likewise find that section 624(b)(1) precludes LFAs from regulating broadband Internet access provided via the cable systems of incumbent cable operators that are not common carriers.  Moreover, even if the definition set forth in section 3(24) was not the intended definition of "information services" for purposes of section 624(b)(1), the highly analogous descriptions of this term in the legislative history of the 1984 Act also would apply to broadband Internet access service.[283]  Thus, in either case, LFAs may not lawfully impose fees for the provision of information services (such as broadband Internet access) via a franchised cable system or require a franchise (or other authorization) for the provision of information services via such cable system.[284]  We also clarify that LFAs and other state and local governmental units[285] cannot impose additional requirements on mixed-use "cable systems" in a manner inconsistent with this Order and the Act under the pretense that they are merely regulating facilities and equipment rather than information services.[286]

75.     Although we recognize that a later provision, section 624(b)(2)(B), permits franchising authorities to enforce requirements for "broad categories of video programming or *other services*,"[287] when read together with the specific injunction against regulation of "information services" in section

---

(Continued from previous page) ─────────────────

find Anne Arundel County's argument that this "decision represents [an] 'unexpected surprise'" to be unfounded. *See* Letter from Joseph Van Eaton *et al*., Counsel to Anne Arundel County, *et al.* to Marlene H. Dortch, Secretary, FCC at 13 (July 24, 2019) (citing *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

[251] Take, for example, a franchise agreement that requires a cable operator to deliver free cable service to all municipal buildings and contribute a monetary payment of five percent of its gross revenues derived from the operation of its cable system to provide cable services.  In that case, the LFA may wish to either (1) continue to receive the existing free cable service and a monetary payment of five percent minus the fair market value of that service, or (2) discontinue service and receive a monetary payment of five percent, or (3) reduce the free cable service to select municipal buildings and receive a monetary payment of the five percent minus the fair market value of the reduced service.  However, what an LFA may not do is ask a cable operator to "voluntarily" waive the statutory cap by asking it to continue providing free cable service to all municipal buildings and contribute the five percent monetary payment, or request that a cable operator waive anything else under the statute as interpreted by the Commission.  *See, e.g.*, Altice May 9, 2019 *Ex Parte* at 9 ("Some franchising authorities take advantage of periods in which they have maximum leverage to ask cable operators like Altice USA to 'voluntarily' waive the cap and accede to making payments or contributions that are not offset against the statutory limit on franchise fees.  That pressure puts operators in a bind because, as a practical matter, they are often not in a position to resist franchising authority demands since the franchising authority exercises the sole domain over ROW access—which is one of the precise concerns that led to adoption of the Federal Cable Act in the first place.").  *See also Amendment of Parts 1, 63, and 76 of the Commission's Rules to Implement the Provisions of the Cable Communications Policy Act of 1984*, Report and Order, 58 R.R.2d 1, 35, n.91 ("we note that neither a cable operator nor a franchising authority may waive mandatory sections of the Cable Act in reaching franchise agreements.").  Accordingly, we reject the request of NATOA that we clarify that this Order "is permissive not mandatory."  NATOA July 24, 2019 *Ex Parte* at 2.  Complying with the terms of the statute is not optional.

[252] *Montgomery County*, 863 F.3d at 493.

[253] *Id.*

624(b)(1), we find that it would be unreasonable to construe section 624(b)(2)(B) as authorizing LFA regulation of information services when (b)(1) precludes franchising authorities from regulating such services.[288]  As we noted in the *Second FNPRM*, the legislative history explains that section 624(b)(2)'s grant of authority "to enforce requirements . . . for broad categories of video programming or other services"[289] was intended merely to "assure[] the franchising authority that commitments made in an arms-length situation will be met," while protecting the cable operator from "being forced to provide specific programming or items of value which are not utilized in the operation of the cable system." [290] Reading these provisions together, it is apparent that Congress intended to permit LFAs to *enforce* franchise requirements governing "other services" under (b)(2), but only to the extent they are otherwise permitted to *establish* such requirements under (b)(1).[291]  Because LFAs lack authority to regulate information services under section 624(b)(1), they may not lawfully enforce provisions of a franchise agreement permitting such regulation under section 624(b)(2), even if such provisions resulted from arms-length negotiations between the cable operator and LFA.[292]  That is, the grant of authority to "enforce" certain requirements under section 624(b)(2)(B) does not give franchising authorities an independent right to impose requirements that they otherwise may not "establish" under section 624(b)(1).[293]  We thus reject claims to the contrary.[294]

76.  As discussed above, Congress in the 1984 Cable Act intended to preserve the *status quo* with respect to federal, state, and local jurisdiction over non-cable services, which lends further support to our conclusion that LFAs may not use their cable franchising authority to regulate information services provided over a cable system.[295]  Because information services that are interstate historically have fallen outside the lawful regulatory purview of state and local authorities,[296] including LFAs, construing section 624(b) to bring those services within the scope of permissible LFA authority under Title VI would be fundamentally at odds with Congressional intent.  For this reason, we reject City of Philadelphia *et al*.'s contention that our application of the mixed-use rule is barred by the Act because "[t]he 'regulatory and jurisdictional status quo' in 1984 . . . included [LFAs'] use of the franchise and franchise agreement to

---

(Continued from previous page)

[254] *Second FNPRM,* 33 FCC Rcd at 8952, para. 26 (tentatively concluding that to the extent that any incumbent cable operators offer any telecommunications services, they can be regulated by LFAs only to the extent they provide cable service); *id.* paras. 27-28 (tentatively concluding that LFAs are prohibited from regulating the provision of broadband Internet access and other information services by incumbent cable operators that are not common carriers).

[255] *See infra* notes 271, 272.

[256] Specifically, the Commission historically has had jurisdiction over interstate telecommunications and information services.  States have had jurisdiction over intrastate telecommunications services but not information services, which are jurisdictionally interstate.  *See infra* note 272.  We thus reject the City of Eugene's suggestion that maintaining the "status quo" supports broad state and local authority over non-cable services provided via cable systems.  *See* City of Eugene July 24, 2019 *Ex Parte* at 5.

[257] "Non-cable" services offered by cable operators include telecommunications services and non-telecommunications services.  *Second FNPRM,* 33 FCC Rcd at 8964-65, para. 25.  Telecommunications services offered by cable operators include, for example, business data services, which enable dedicated point-to-point transmission of data at certain guaranteed speeds and service levels using high-capacity connections, and wireless telecommunications services.  *Id.*  Non-telecommunications services offered by cable operators include, but are not limited to, information services (such as broadband Internet access services), private carrier services (such as certain types of business data services), and Wi-Fi services.  *Id.*  Cable operators also may offer facilities-based interconnected Voice over Internet Protocol (VoIP) service, which the Commission has not classified as either a telecommunications service or an information service, but which is not a cable service.  *Id.*

[258] Nothing in this Order is intended to limit LFAs' express authority under section 611(b) of the Act, 47 U.S.C. § 531(b), to require I-Net capacity.  *But see supra* paras. 55-56 regarding franchise fee treatment of I-Nets.

[259] *First Report and Order,* 22 FCC Rcd at 5102, para. 1.  The Sixth Circuit rejected challenges to the Commission's *First Report and Order.  Alliance,* 529 F.3d 763.

**Federal Communications Commission**                    **FCC 19-80**

regulate . . . cable systems that [Congress] recognized were carrying both cable services and non-cable communications."[297]  The statutory design as reflected in other provisions of Title VI reinforces our conclusion that LFAs are precluded under section 624(b)(1) from regulating non-cable services provided over the cable systems of incumbent cable operators that are not common carriers.[298]  LFAs, therefore, may not lawfully regulate the non-cable services of such cable operators, including information services (such as broadband Internet access), private carrier services (such as certain types of business data services), and interconnected VoIP service.[299]  For example, this precludes LFAs from not only requiring such a cable operator to pay fees or secure a franchise to provide broadband service via its franchised cable system, but also requiring it to meet prescribed service quality or performance standards for broadband service carried over that cable system.

77.    We find unconvincing arguments that the statute compels a broader reading of LFAs' authority under Title VI to regulate cable operators' non-cable services, facilities, and equipment.  Anne Arundel County *et al.* maintains, for example, that because section 624(a) grants LFAs authority to regulate a "cable operator," a term the Act defines as "[a] person . . . who provides cable service over a cable system,"[300] LFAs generally are authorized to regulate any of the services provided by a "cable operator" over a "cable system," including non-cable services.[301]  Anne Arundel County *et al.* contends further that under section 624(b), LFAs "to the extent related to the establishment or operation of a cable system . . . may establish requirements for facilities and equipment"[302] and argues that the Act cannot be construed as limiting LFAs' jurisdiction to cable services since it permits LFAs to require, for example, build out and institutional networks.[303]  We disagree with these arguments.  Although, as Anne Arundel County *et al.* and others note,[304] the Act in certain circumstances permits LFAs to impose on cable operators certain requirements that are not strictly related to the provision of cable service,[305] such circumstances constitute limited exceptions to the general prohibition on LFA regulation of non-cable services contained in section 624.[306]  They also do not override the specific prohibition on regulation of

(Continued from previous page) ──────────────

[260] *First Report and Order*, 22 FCC Rcd at 5153, paras. 121-22.

[261] *Second Report and Order*, 22 FCC Rcd at 19640-41, para. 17.  The Commission adhered to that conclusion on reconsideration.  *Order on Reconsideration*, 30 FCC Rcd at 816, para. 14.

[262] *Montgomery County*, 863 F.3d at 493 (finding that "on the record now before us, the FCC's extension of the mixed-use rule to incumbent cable providers that are not common carriers is arbitrary and capricious").  Our conclusion that the mixed-use rule applies to cable operators that are common carriers is based on our interpretation of sections 3(51) and 602(7)(C) of the Act.  *Second FNPRM*, 33 FCC Rcd at 8965-66, para. 26.  Under section 3(51) of the Act, a "provider of telecommunications services" is a "telecommunications carrier," which the statute directs "shall be treated as a common carrier under this Act only to the extent that it is engaged in providing telecommunications services."  47 U.S.C. § 153(51).  Thus, to the extent that an incumbent cable operator provides telecommunications service, it would be treated as a common carrier subject to Title II of the Act with respect to its provision of such telecommunications service.

[263] *Second FNPRM*, 33 FCC Rcd at 8965-66, para. 26.  NCTA asserts that many cable operators currently provide telecommunications services.  NCTA Comments at 7, n.16.

[264] 47 U.S.C. § 522(7)(C).

[265] Anne Arundel County *et al*. Comments at 40-41 (asserting that under common carrier law, "it is the service which is the focus, not the facility. . . .  [A] telecommunications service is defined 'regardless of the facilities used'. . . .  Thus, a common carrier facility is subject to Title II only to the extent it is offering Title II services, and a facility owned by the cable operator could be used in the provision of Title II services . . . without being a common carrier facility").

[266] City of Philadelphia *et al*. Comments at 44-45.  City of Philadelphia *et al*. asserts further that:

The FCC . . . ignores the structure of the Communications Act by conflating communications *services*, cable and non-cable, with communications *systems*.  Title II defines . . . 'common carriers' . . . in terms of the . . . 'telecommunications services' they provide, not in terms of the facilities they use to provide them. . . .  Title VI, to the contrary, focuses on the facility, by

(continued….)

information services set forth in section 624(b)(1). This interpretation accords with one of the 1984 Cable Act's principal purposes to "continue[] reliance on the local franchising process as the primary means of cable television regulation, while *defining and limiting the authority that a franchising authority may exercise through the franchise process*."[307]

78.    We also conclude, contrary to the assertions of some commenters,[308] that it would conflict with Congress's goals in the Act to permit LFAs to treat incumbent cable operators that are not common carriers differently from incumbent cable operators and new entrants that are common carriers in their provision of information services, including broadband Internet access service.[309] As we noted in the *Second FNPRM*, incumbent and new entrant cable operators (whether or not they are also common carriers) often compete in the same markets and offer nearly identical services to consumers.[310] Thus, to allow LFAs to regulate the latter group of providers more strictly, such as by subjecting them to franchise and fee requirements for the provision of non-cable services,[311] could place them at a competitive disadvantage.[312] A report submitted by NCTA asserts, for example, that two fixed broadband providers may build out their networks differently, with one utilizing wireless backhaul and the other using landline backhaul, but "if one has inputs subjected to [fees] and the other does not, the differential . . . treatment can distort competition between the two, even when the services provided . . . are indistinguishable to the consumer."[313] The distortion to competition that stems from "hampering a subset of competitors,"[314] in turn, reduces the incentives of those competitors to invest in cable system upgrades for the provision of both cable and non-cable services, which could thwart the 1996 Act's goals to promote competition among communications providers and secure lower prices and higher quality services for consumers.[315] Such regulations, moreover, impede the Commission's development of a "consistent regulatory framework across all broadband platforms,"[316] which is "[o]ne of the cornerstones of [federal] broadband policy."[317]

79.    We also are not convinced by arguments that interpreting the Act to bar LFAs from

(Continued from previous page) ———————————

> defining a 'cable system' as a communications system that has particular characteristics . . . and that is 'designed to provide cable service which includes video programming.' The cable system is a cable system if it satisfies the defining characteristics of such a communications system, regardless of whether it is used for non-cable, non-Title VI services. LFA authority to regulate goes with the system. . . .

*Id*. at 46-47 (citations omitted).

[267] *Second FNPRM*, 33 FCC Rcd at 8965-66, para. 26.

[268] City of Philadelphia *et al*. Comments at 46-48, *citing* 1984 Cable Act House Report, H.R. Rep. No. 98-934 (1984), *as reprinted in* 1984 U.S.C.C.A.N. at 4659-60. In particular, City of Philadelphia *et al*. asserts that:

> Congress' stated reason for excepting Title II telephone and data transmission services from LFA regulation . . . was . . . to protect Title II telephone companies from unfair competition by cable operators. . . . Congress' fear was that cable operators could furnish the core services of Title II carriers . . . at lower cost because they were not subject to common carrier regulations, . . . forcing [telephone companies] to raise rates on telephone service to compensate for the lost business. . . . [T]he Title II exception was [intended] to achieve competitive equity between Title II telephone companies and cable operators.

*Id*. (citations omitted). *See also* 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4664-66.

[269] *Id.* at 4665 (emphasis added).

[270] *Id*. at 4666.

[271] *See, e.g.*, *id*. at 4678 ("The Committee . . . intends that nothing in Title VI shall be construed to affect existing regulatory authority with respect to non-cable communications services provided over a cable system"); *id*. ("This legislation does not affect existing regulatory authority over the use of a cable system to provide non-cable communications services, such as private line transmission or voice communication, that compete with services provided by telephone companies."); *id*. at 4697 ("The Committee intends that state and federal authority over non-

(continued….)

**Federal Communications Commission** **FCC 19-80**

regulating non-cable facilities and equipment placed in public rights-of-way would pose a safety risk to the public because cable operators would have unfettered discretion to install non-cable facilities without review or approval by local authorities.[318] Section 636(a) of the Act specifically provides that "[n]othing in [Title VI] shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of [Title VI]."[319] This provision, which is an express exception to Title VI's general prohibition on franchising authority regulation of non-cable facilities and equipment, thus permits LFAs to impose requirements on non-cable facilities and equipment designed to protect public safety, so long as such requirements otherwise are consistent with the provisions of Title VI.[320]

## C. Preemption of Other Conflicting State and Local Regulation

80.    As noted above, Title VI does not permit franchising authorities to extract fees or impose franchise or other requirements on cable operators insofar as they are providing services other than cable services. Ample record evidence shows, however, that some states and localities are purporting to assert authority to do so outside the limited scope of their authority under Title VI. These efforts appear to have followed the decision by the Supreme Court of Oregon in *City of Eugene v. Comcast,*[321] which upheld a local government's imposition of an additional seven percent "telecommunications" license fee on the provision of broadband services over a franchised cable system with mixed use facilities. To address this problem, we now expressly preempt any state or local requirement, whether or not imposed by a franchising authority, that would impose obligations on franchised cable operators beyond what Title VI allows.[322] Specifically, we preempt (1) any imposition of fees on a franchised cable operator or any affiliate using the same facilities franchised to the cable operator[323] that exceeds the formula set forth in section 622(b) of the Act and the rulings we adopt today, whether styled as a "franchise" fee, "right-of-access" fee, or a fee on non-cable (*e.g.*, telecommunications or broadband) services, and (2) any requirement that a cable operator with a Title VI franchise secure an additional franchise or other authorization to provide non-cable services via its cable system.[324] We base these conclusions on

(Continued from previous page) ———————————————

cable communications services under the status quo shall be unaffected by the provisions of Title VI. . . . This approach protects cable companies from unnecessary regulation, while reserving for state and federal officials the authority they need to address the issue of competition between telephone and cable companies. . . ."); *id.* at 4698 ("The Committee does not intend to address the question of regulatory jurisdiction over non-cable communications services provided over cable systems. . . . The intent of the Committee is not to address the jurisdictional question at all."); *id.* at 4700 ("It is the intent . . . that, with respect to non-cable communications services, both the power of any state public utility commission and the power of the FCC be unaffected by the provisions of Title VI. Thus, Title VI is neutral with respect to such authority.").

[272] This interpretation is reinforced by both the text of section 621(b)(3) of the Act and its legislative history (relating to the provision of telecommunications services by cable operators), which Congress added to Title VI through the Telecommunications Act of 1996:

The intent of [section 621(b)(3)(A)] is to ensure that regulation of telecommunications services, which traditionally has been regulated at the Federal and State level, remains a Federal and State regulatory activity. The Committee is aware that *some [LFAs] have attempted to expand their authority over the provision of cable service to include telecommunications service offered by cable operators.* Since 1934, the regulation of interstate and foreign telecommunications services has been reserved to the Commission; the State regulatory agencies have regulated intrastate services. It is the Committee's intention that when an entity, whether a cable operator or some other entity, enters the telephone exchange service business, such entity should be subject to the appropriate regulations of Federal and State regulators.

1996 Act House Report, H.R. Rep. No. 104-204, 104th Cong., 1st Sess. 86, 93 (1995) (emphasis added). The fact that section 621(b)(3) seeks to protect *incumbent* cable operators from LFA regulation under Title VI when they provide certain non-cable services, *i.e.*, telecommunications services, further undermines LFAs' assertion that the common carrier exception in section 602(7)(C) was intended to shield from LFA regulation only the provision of

(continued….)

Congress's express decision to preempt state and local laws that conflict with Title VI of the Communications Act (section 636(c)), the text and structure of Title VI and the Act as a whole, Congressional and Commission policies (including the policy of nonregulation of information services), and the Supremacy Clause of the U.S. Constitution.[325]

81.    *Authority to Preempt*.  Congress has the authority to preempt state law under Article VI of the U.S. Constitution.  While Congress's intent to preempt sometimes needs to be discerned or implied from a purported conflict between federal and state law, here Congress spoke directly to its intent to preempt state and local requirements that are inconsistent with Title VI.  This express preemption extends beyond the actions of any state or local franchising authority.  Section 636(c) of the Act provides that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded."[326]  The reference in section 636(c) to "this chapter" means that Congress intended to preempt any state or local law (or any franchise provision) that is inconsistent with any provision of the Communications Act, whether or not codified in Title VI.[327]  Moreover, section 636(c) applies broadly to "*any* [inconsistent] provision of law" of "*any State, political subdivision, or agency thereof*."[328]  That means that Congress intended that states and localities could not "end-run" the Act's limitations by using other governmental entities or other sources of authority to accomplish indirectly what franchising authorities are prohibited from doing directly.[329]

82.    Where Congress provides an express preemption provision such as section 636(c), the Commission has delegated authority to identify the scope of the subject matter expressly preempted and assess whether a state's law falls within that scope.[330]  The Commission may, therefore, expressly bar states and localities from acting in a manner that is inconsistent with both the Act and the Commission's interpretations of the Act, so long as those interpretations are valid.[331]  We therefore disagree with assertions that the Commission lacks authority to preempt non-cable regulations imposed by states and localities pursuant to non-Title VI sources of legal authority.[332]

(Continued from previous page) ────────────────────────
non-cable services by *new entrants*.

[273] *Second Report and Order*, 22 FCC Rcd at 19640, para. 17; *Montgomery County*, 863 F.3d at 493.  *See also Second FNPRM*, 33 FCC Rcd at 8965-66, para. 26 (tentatively concluding that the mixed-use rule "prohibits LFAs from regulating the provision of any services other than cable services offered over the cable systems of incumbent cable operators that are common carriers, or from regulating any facilities and equipment used in the provision of any services other than cable services offered over the cable systems of incumbent cable operators that are common carriers. . . .").  Certain LFA advocates appear to concede that the Act precludes LFAs from regulating under Title VI a cable operator's provision of telecommunications services via its cable system.  *See, e.g.*, NATOA *et al*. Comments at 16-17 (stating that the definition of cable system "establishes that Title VI does not authorize LFAs to regulate the telecommunications services provided over what is otherwise a cable system"); Anne Arundel County *et al*. Comments at 37-38 (recognizing that various provisions in section 621 preclude LFA regulation of telecommunications services by cable operators, but stating that "[a]s long as a local government possesses authority to regulate telecommunications from a source other than Title VI franchise authority, none of these provisions prohibit it").  *See also Montgomery County*, 863 F.3d at 492 ("The Local Regulators admit that the FCC's mixed-use decision is 'defensible as applied to Title II carriers,' since the Act expressly states that [LFAs] may regulate Title II carriers only to the extent they provide cable services.").

[274] *Second FNPRM*, 33 FCC Rcd at 8966-67, para. 27.

[275] 47 U.S.C. § 544(a) (emphasis added).

[276] *Id*. § 544(b)(1) (emphasis added).  While the preamble to section 624(b) specifically limits the provision to franchises "granted after the effective date of this title" and therefore appears to grandfather local regulation of information services that may have occurred prior to 1984, when Title VI took effect, we note that very few franchises in effect today were granted prior to that year.

[277] 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4679.

83. *Scope of Preemption.* The Commission's task, then, in interpreting the scope of preemption under section 636(c) is to determine whether specific state or local requirements are inconsistent with Title VI or other provisions in the Communications Act. Looking at the provisions of Title VI and the Act as a whole, we have little trouble concluding that Congress did not intend to permit states, municipalities, or franchising authorities to impose fees or other requirements on cable operators beyond those specified under Title VI, under the guise of regulating "non-cable services" or otherwise restricting a cable operator's construction, operation, or management of facilities in the rights-of-way.

84. As an initial matter, we note that Title VI establishes a framework that reflects the basic terms of a bargain—a cable operator may apply for and obtain a franchise to access and operate facilities in the local rights-of-way, and in exchange, a franchising authority may impose fees and other requirements as set forth and circumscribed in the Act. So long as the cable operator pays its fees and complies with the other terms of its franchise, it has a license to operate and manage its cable system free from the specter of compliance with any new, additional, or unspecified conditions (by franchise or otherwise) for its use of the same rights-of-way.

85. The substantive provisions of Title VI make the terms of this bargain clear. For starters, section 621(a)(1) provides franchising authorities with the right to grant franchises, and section 621(a)(2) explains that such franchises "shall be construed to authorize the construction of a cable system over public rights-of-way . . ."[333] A "cable operator," in turn, may not provide "cable service" unless the cable operator has obtained such a franchise.[334] Other provisions make clear that a franchise does not merely authorize the construction of a cable system, but also the "management and operation of such a cable system,[335] including the installation of Wi-Fi and small cell antennas attached to the cable system."[336]

86. The right to construct, manage, and operate a "cable system" does not mean merely the right to provide cable service.[337] Numerous provisions in Title VI evidence Congress's knowledge and understanding that cable systems would carry non-cable services—including telecommunications and

(Continued from previous page) ─────────────────────

[278] *Id.* (emphasis added). *See also id.* at 4681 ("Some examples of non-cable services would be: shop-at-home and bank-at-home services, electronic mail, one-way and two-way transmission of non-video data and information not offered to all subscribers, data processing, video-conferencing, and all voice communications."); *id.* ("Many commercial *information services* today offer a package of services, some of which (such as news services and stock listings) would be cable services and some of which (such as electronic mail and data processing) would not be cable services. . . . [T]he combined offering of a non-cable shop-at-home service with service that by itself met all the conditions for being a cable service would not transform the shop-at-home service into a cable service, or transform the cable service into a non-cable communications service.") (emphasis added).

[279] *Id.* at 4679.

[280] 47 U.S.C. § 153(24).

[281] *Second FNPRM*, 33 FCC Rcd at 8966-67, para. 27. The fact that the "information services" definition in section 3(24) of the Act was enacted as part of the 1996 Act – more than ten years after Congress passed section 624(b) – supports our conclusion that LFAs lack authority under section 624(b)(1) to regulate information services. The absence in Title VI of specific references to the section 3(24) definition of "information service" suggests only that Congress, in passing the 1996 Act, did not wish to re-open the 1984 Cable Act; it does not indicate that Congress intended to grant LFAs general authority to regulate information services.

[282] The Commission in 2018 reinstated the "information service" classification of broadband Internet access service. *Restoring Internet Freedom Order*, WC Docket No. 17-108, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd at 320-321, paras. 26-29 (2018) (*Restoring Internet Freedom Order*).

[283] 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4680-81.

[284] Application of the mixed-use rule to broadband Internet access service is not tied to the Commission's classification of broadband as an information service. Under the Commission's prior conclusion in 2015 that broadband Internet access service is a Title II telecommunications service, the mixed-use rule would apply based on the provisions of Title VI for the reasons explained above in paragraphs 66-71.

information services.  The definition of "cable system," for example, anticipates that some facilities may carry both telecommunications and cable services.[338]  With respect to information services, section 601 of the Act provides that one of Title VI's purposes is to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public."[339]  And, as we have already seen, Congress expressly provided in section 624(b) for "mixed-use" facilities that carry both cable services and "video programming or other information services."[340]

87.　　　The legislative history reinforces the conclusion that Congress understood that a franchised "cable system" would carry both cable and non-cable services.  The House Report, for example, explains that "[t]he term 'cable system' is not limited to a facility that provides only cable service which includes video programming.  Quite the contrary, many cable systems provide a wide variety of cable services and other communications services as well.  A facility would be a cable system if it were designed to include the provision of cable services (including video programming) along with communications services other than cable service."[341]

88.　　　The point is that Congress was well aware that "cable systems" would be used to carry a variety of cable and non-cable services.  It follows that Congress could have, if it wanted, provided significant leeway for states, localities, and franchising authorities to tax or provide other regulatory restrictions on a cable system's provision of non-cable services in exchange for the cable operator receiving access to the rights-of-way.  But as it turns out, the balance of Title VI makes clear that Congress sharply circumscribed the authority of state or local governments to regulate the terms of this exchange.  Today, we make clear that, under section 636(c), states, localities, and franchising authorities may not impose fees or restrictions on cable operators for the provision of non-cable services in connection with access to such rights-of-way, except as expressly authorized in the Act.  We provide

(Continued from previous page) ————————————————————

[285] *See infra* section III.C.

[286] For this reason, we reject assertions that section 624's grant of authority to "establish" and "enforce" certain requirements for facilities and equipment would permit LFAs to bypass the statutory prohibition on regulation of information services.  *See, e.g.*, Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 9.

[287] 47 U.S.C. § 544(b)(2)(B) (emphasis added).

[288] *Second FNPRM*, 33 FCC Rcd at 8967-68, para. 28.  We note further that the limitation on the ability of franchising authorities to establish requirements under section 624(b)(1) extends specifically to "information services," whereas the authority granted to franchising authorities in section 624(b)(2) makes no mention of "information services."  *Id.* n.135.

[289] 47 U.S.C. § 544(b)(2)(B).

[290] *Second FNPRM*, 33 FCC Rcd at 8967-68, para. 28, n. 135, *citing* 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4706.

[291] Although the legislative history provides examples of "broad categories of video programming," *id.* at 4705-06 (stating that the franchising authority may enforce provisions for children's programming, news and public affairs programming, sports programming and other broad categories of programming), it does not specify what services are encompassed within the phrase "other services" for purposes of applying section 624(b)(2)(B).  Although the phrase "other services" is ambiguous, it would be unreasonable to conclude that Congress intended for it to include services, such as information services, that franchising authorities are not empowered to regulate under section 624.  Rather, we find it more reasonable to construe the phrase as referring to services that franchising authorities lawfully could require under Title VI, such as the provision of PEG channels and I-Net capacity.  We, therefore, reject Anne Arundel County *et al.*'s assertion that the term "other service" in section 624(b)(2)(B) includes information services.  Anne Arundel County *et al.* Comments at 38-39, n. 111.

[292] We thus disagree with City Coalition's contention that "[i]f . . . a cable operator agrees to undertake obligations regarding information services though arms-length negotiation – be they obligations regarding facilities that are not part of the cable system or obligations regarding noncable services – then a LFA may enforce those obligations."  City Coalition Comments at 22.

further explanation in two critical areas to clarify that these categories of state and local restrictions are preempted: (a) additional franchise fees beyond those authorized in Section 622 and (b) additional franchises or regulatory restrictions on a cable operator's construction, management, or operation of a cable system in the rights-of-way.

89.    *Additional fees.*  Both Congress and the Commission have recognized that the franchise fee is the core consideration that franchising authorities receive in exchange for the cable operator's right to access and use the rights-of-way.[342]  As explained in detail above, Congress carefully circumscribed how this fee should be calculated:  It provided that "the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system *to provide cable services*".[343]  We must assume that Congress's careful choice of words was intentional.  While the fee would apply to the "cable operator" with respect to any "cable system," it would only apply to revenue obtained from "cable services," *not* non-cable services that Congress understood could provide additional sources of revenue.

90.    We find additional support for this conclusion in Congress's broad definition of the term "franchise fee," which covers "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber or both, solely because of their status as such."[344]  This broad definition was intended to limit the imposition of any tax, fee, or assessment of any kind—including fees purportedly for provision of non-cable services or for, access to, use of, or the value of the rights of way[345]—to five percent of the cable operator's revenue from cable services.[346]  And its language reinforces the text of section 636(c) by making clear that a different state or local "governmental entity" cannot end-run the cap by imposing fees for access to any public right of way within the franchise area or in instances of overlapping jurisdiction.[347]

[293] NCTA Reply at 28 ("Although . . . Section 624(b) discusses [the prohibition on LFA regulation of information services] in the context of cable franchise proposals and renewals, the prohibition would lose all practical meaning if franchising authorities were able to circumvent it simply by waiting to impose . . . requirements on non-cable services until after cable franchise negotiations concluded. . . .").

[294] Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 8-9.

[295] 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4666.

[296] *Id.* at 4700 ("The FCC [under section 621(d)(1)] may require a cable operator to file informational tariffs for enhanced services which are under the FCC's jurisdiction when offered by common carriers. . . .  States would not have the authority to require cable operators to file [such] tariffs for . . . enhanced services . . . which are interstate in character. . . .").  The Commission has determined that the term "information service" has essentially the same meaning as the term "enhanced service" for purposes of applying the Act.  *See, e.g., Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, As Amended,* CC Docket No. 96-149, 11 FCC Rcd 21905, 21955, para. 102 (1996); *Federal-State Joint Board on Universal Service,* CC Docket No. 96-45, Report to Congress, 13 FCC Rcd 11501, 11511, para. 21 (1998).  *See also* 1996 Act Conference Report, S. Rep. 104-230 at 18 (Feb. 1, 1996) (stating that the 1996 Act "defines 'information service' similar to the FCC definition of 'enhanced services'"); *NCTA v. Brand X Internet Svcs.,* 545 U.S. 967, 992-994 (2005).  Moreover, even assuming that LFAs at the time Congress passed the 1984 Cable Act used their cable franchising authority to regulate non-cable services as City of Philadelphia *et al.* asserts, the provisions of section 624 plainly evidence Congressional intent to treat pre- and post-Act cable franchises differently.  *Compare* 47 U.S.C. § 544(b) (authorizing franchising authorities, in the case of franchises granted after the effective date of Title VI, to take certain actions "*to the extent related to* the establishment or operation of the cable system") (emphasis added) *with*

(continued....)

**Federal Communications Commission** FCC 19-80

91. In reaching this conclusion, we read the phrase "solely because of their status as such" as protective language intended to place a ceiling on any sort of fee that a franchising authority might impose on a cable operator *qua* cable operator or *qua* franchisee—that is, any fee assessed in exchange for the right to construct, manage, or operate a cable system in the rights-of-way. We therefore reject the claim of some commenters that this language permits localities to charge additional fees so long as the cable operator also acts as a telecommunications provider or Internet service provider, or so long as the state or locality can articulate some non-cable related rationale for its actions.[348] This alternate rationale flies in the face of statutory text. As noted above, a "cable operator" is defined not only as a person or entity that provides cable service, but also one that "controls or is responsible for, through any arrangement, the *management and operation* of such a cable system."[349] The management or operation of a cable system includes the maintenance of the system to provide non-cable services—which Congress understood would be supplied over the same cable facilities.[350] Because a fee that a state or locality imposes on a cable operator's provision of non-cable services relates to the "manage[ment] and operat[ion]" of its cable system, such fee is imposed on the cable operator "solely because of [its] status" as a cable operator and is capped by section 622.[351]

92. The structure of section 622 as a whole provides further support for our reading. The language "solely because of their status as such" operates to distinguish fees imposed on cable operators for access to the rights-of-way ("franchise fees"), which are capped, from "any tax, fee, or assessment of general applicability," which are not.[352] Section 622 thus envisions two mutually exclusive categories of assessments—(1) fees imposed on cable operators for access to the rights-of-way in their capacity as franchisees (that is, "solely because of their status as such") and (2) broad-based taxes. Understood in this manner, any assessment on a cable operator for constructing, managing, or operating its cable system in the rights-of-way is subject to the five-percent cap—even if other non-cable service providers (*e.g.*, telecommunications or broadband providers) are subject to the same or similar access fees.[353] This is because the definition of "franchise fee" in section 622(g)(1) centers on *why* the fee is imposed on a cable

(Continued from previous page)
47 U.S.C. § 544(c) (authorizing franchising authorities, in the case of franchises effective under prior law, to enforce requirements for the provision of services, facilities, and equipment "*whether or not related to* the establishment or operation of the cable system") (emphasis added).

[297] City of Philadelphia *et al.* Comments at 50-51.

[298] *See, e.g.*, 47 U.S.C. § 542(b) (limiting the franchise fees that a franchising authority may assess on a cable operator to "[five] percent of such cable operator's gross revenues derived . . . from the operation of the cable system *to provide cable services*") (emphasis added); *id.* § 541(b)(3)(B) (barring a franchising authority from "impos[ing] any requirement [under Title VI] that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator"); *id.* § 541(b)(3)(D) (barring a franchising authority from "requir[ing] a cable operator to provide any telecommunications services or facilities" as a condition of the grant or renewal of a franchise, with certain exceptions). We discuss section 622(b) of the Act, *id.* § 542(b), in greater detail in section C.

[299] Although interconnected VoIP service has not been classified by the Commission, LFA regulation of this service is prohibited under the mixed-use rule, as clarified in this Order, regardless of whether it is deemed a telecommunications service or an information service.

[300] *Id.* § 522(5)(A).

[301] *See, e.g.*, Anne Arundel County *et al.* Comments at 37, n. 105. Insofar as Anne Arundel County *et al.* is arguing that "once a cable operator, always a cable operator," and "once a cable system, always a cable system," *i.e.*, that when a cable operator deploys facilities, those facilities remain part of a cable system even when used to provide non-cable services, we disagree with that assertion. Consistent with our interpretation of section 602(7)(C) above, we find that a more reasonable reading of the statute is that the nature of facilities (*i.e.*, "cable system" or not) depends on how the facilities are used, not on whether the provider offered cable service at the time the facilities were deployed.

[302] Anne Arundel County *et al.* Comments at 37.

48

operator, *i.e.*, "solely because of [its] status" as a franchisee, and not *to whom* the fee is imposed, *i.e.*, "solely applicable" to a cable operator.[354] The entire category of "franchise fees" is subject to the five-percent cap, in distinction to generally-applicable taxes whose validity must be shown, at least in part, by their application to broader classes of entities or citizens beyond providers of cable and non-cable communications services.[355]

93.     The legislative history and purposes of the 1984 Cable Act support this broad and exclusive interpretation of the term "franchise fees."  It reveals, for example, that Congress initially established the section 622(b) cap on franchise fees out of concern that local authorities could use such fees as a revenue-raising mechanism.[356]  A reading of section 622 that would permit states and localities to circumvent the five percent cap by imposing unbounded fees on "non-cable services" would frustrate the Congressional purpose behind the cap and effectively render it meaningless.  The legislative history behind the 1996 amendments to section 622(b) make this intent explicit.  Prior to 1996, section 622 provided, in relevant part, that "the franchise fees paid by a cable operator with respect to any cable system shall not exceed [five percent] of such cable operator's gross revenues derived . . . from *the operation of the cable system*."[357]  The House Report accompanying the 1996 amendment,[358] which explained the addition of the key limitation "for the provision of cable services" in section 622(b), provides that:

> Franchising authorities may collect franchise fees under [section 622 of the Act] solely on the basis of the revenues derived by an operator *from the provision of cable service*. . . . This section does not restrict the right of franchising authorities to collect franchise fees on revenues from cable services and cable-related services, such as, but not limited to, revenue from the installation of cable service, equipment used to receive cable service, advertising over video channels, compensation received from video programmers, and other sources related to the provision of cable service over the cable system.[359]

---

(Continued from previous page) ————————————————

[303] *Id.  See also* Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 9, n.26 (noting that section 632(a) of the Act, 47 U.S.C. § 552(a), permits franchising authorities to establish and enforce "construction schedules and other construction-related performance requirements, of the cable operator").

[304] *See, e.g., id.*; City Coalition Comments at 21-22; City of New York Comments at 11-12.

[305] *See, e.g.*, 47 U.S.C. § 531(b), (f) (permitting franchising authorities, among other things, to require channel capacity on institutional networks); *id.* § 551(g) (providing that "[n]othing in [Title VI] shall be construed to prohibit any State or any franchising authority from enacting or enforcing laws consistent with this section for the protection of subscriber privacy").

[306] *See id.* § 544(a) ("[A] franchising authority *may not regulate* the services, facilities, and equipment provided by a cable operator *except to the extent consistent with this subchapter*. . . .") (emphasis added); *id.* § 541(b)(3)(D) ("[A] franchising authority *may not require* a cable operator to provide any telecommunications service or facilities, *other than institutional networks*, as a condition of the initial grant of a franchise, a franchise renewal, or transfer of a franchise.") (emphasis added).  *See also id.* § 541(b)(3)(A)-(C).  NATOA *et al.* agree that the grant to LFAs of authority to require I-Nets is an exception from the general injunction in section 621(b)(3)(D) against requiring cable operators to provide telecommunications services or facilities.  NATOA *et al.* Comments at 18, n.52.  NATOA *et al.* also appear to concede that section 624(b) precludes LFAs from regulating under Title VI information services provided over cable systems.  *Id.* at 18, n.53 ("To the extent [the Commission's conclusion] is . . . that Title VI does not grant LFAs authority over the information services provided over cable systems (other than as expressly provided in the Act. . .) . . . we agree that Title VI does not expressly grant such authority. . . .").

[307] 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4656 (emphasis added).

[308] *See, e.g.*, NATOA *et al.* Comments at 20-21.

[309] *Second FNPRM*, 33 FCC Rcd at 8969, para. 30.

94.     If, as CAPA asserts, Congress had intended the term "cable operator" as used in section 622(b) to refer to an entity only to the extent such entity provides cable service, there would have been no need for Congress to amend section 622(b) in this manner.[360]

95.     Although, as LFA advocates note,[361] section 621(d)(2) of the Act provides that "[n]othing in [Title VI] shall be construed to affect the authority of any State to regulate any cable operator to the extent that such operator provides any communication service other than cable service, whether offered on a common carrier or private contract basis,"[362] this provision is not an affirmative grant to states of authority to regulate non-cable services that they historically have not been empowered to regulate.  First, the term "State" in section 621(d) does not extend to LFAs; it is defined by reference to section 3 of the Communications Act.  The legislative history makes clear that this was a reference to the division of regulatory authority between the "state public utility commission and … the FCC."[363]  Second, this provision merely reflects Congress's intent in the 1984 Cable Act to preserve the *status quo* with respect to federal and state jurisdiction over non-cable services.[364]  As noted, under the then-existing *status quo*, the Commission had jurisdiction to regulate interstate services; states had jurisdiction to regulate intrastate services.[365]  Because the Commission historically has concluded that information service is jurisdictionally interstate,[366] it traditionally has fallen outside the proper regulatory sphere of state and local authorities.[367]  Moreover, the Commission has long recognized the impossibility of separately regulating interstate and intrastate information services.[368]  Thus, neither a state nor its political subdivisions may lawfully regulate such service under section 621(d)(2) by requiring a cable operator with a Title VI franchise to pay a fee or secure a franchise or other authorization to provide broadband Internet access service over its cable system.  To conclude otherwise would contravene Congress's intent in Title VI to maintain the jurisdictional *status quo* with respect to federal, state, and local regulation of non-cable services.[369]

(Continued from previous page) ———————————————————————————

[310] *Id.*

[311] In section III.C., we discuss franchise and fee requirements imposed by state and local governments, including LFAs, on franchised cable operators' provision of non-cable services.  We find that such requirements are preempted under section 636(c) of the Act.

[312] As NCTA notes, under the *First Report and Order*, LFAs may not lawfully require a telecommunications carrier with a preexisting right to access public rights-of-way for the provision of telecommunications services, to secure a Title VI franchise to provide non-cable services over its network.  We agree with NCTA that a cable operator with a preexisting right to access public rights-of-way for the provision of cable service likewise should not be required to obtain a separate authorization to provide non-cable services over its cable system, given that there is no incremental burden on the rights-of-way.  NCTA May 3, 2019 *Ex Parte* at 6.

[313] NCTA Reply App. 1, Report of Jonathan Orszag and Allan Shampine at 11 (Orszag/Shampine Analysis).

[314] *Id.*

[315] *Second FNPRM*, 33 FCC Rcd at 8969, para. 30.  *See also* Orszag/Shampine Analysis at 6 (estimating that even modest reductions in network improvements as a consequence of reduced incentives to invest easily could result in consumer welfare losses exceeding $40 billion by 2023); ICLE July 18, 2019 *Ex Parte* at 19 ("[T]here is little economic sense in arbitrarily distinguishing between new entrants and incumbents.  If the taxation of new broadband entrants under cable franchising rules would decrease their incentive to deploy, then the taxation of incumbent cable providers offering broadband services would similarly decrease their incentive to expand, upgrade, or make other broadband network investments.").  We find no record basis for concluding that these concerns are raised only with respect to incumbent cable operators, and not new entrants.  *Second FNPRM*, 33 FCC Rcd at 8969, para. 30, n.145 (seeking comment on whether concerns regarding regulatory disparity apply to new entrants that are not common

(continued….)

96.     We find unpersuasive NATOA *et al*.'s selective reading of the legislative history to conclude that Congress intended to permit states and localities to require franchised cable operators to pay additional rights-of-way fees for the provision of non-cable services.  NATOA *et al*. note that the House Conference Report accompanying the 1996 amendment stated that "to the extent permissible under state and local law, communications services, including those provided by a cable company, shall be subject to the authority of a local government to, in a nondiscriminatory and competitively neutral way, manage its public rights-of-way and charge fair and reasonable fees."[370]  Although the cited legislative history is relevant to our interpretation of the statute,[371] we do not read this language so broadly as permitting states and localities to charge redundant or duplicative fees on cable franchisees that are subject to the five-percent cap—a reading that would, as we have explained, eviscerate the cap entirely.  Rather, we conclude that, under section 636(c), and taking into account the provisions of Title VI as a whole, any fees that exceed the five-percent cap, as formulated in section 622, are not "fair and reasonable."[372]

97.     Consistent with Congress's intent, as early as 2002, the Commission has construed section 622(b) to permit franchising authorities to include in the revenue base for franchise fee calculations only those revenues derived from the provision of cable service.[373]  Thus, if a cable operator generates additional revenue by providing non-cable services over its cable system, such additional revenue may not be included in the gross revenues for purposes of calculating the cable franchise fee.[374]

98.     As courts have recognized, the Commission is charged with "the ultimate responsibility for ensuring a 'national policy' with respect to franchise fees."[375]  We exercise that authority today by making clear that states, localities, and cable franchising authorities are preempted from charging franchised cable operators more than five percent of their gross revenue from cable services.  This cap applies to any attempt to impose a "tax, fee, or assessment of any kind" that is not subject to one of the

(Continued from previous page) ─────────────────────
carriers).

[316] *Communications Assistance for Law Enforcement Act and Broadband Access and Services*, ET Docket No. 04-295, First Report and Order and Further Notice of Proposed Rulemaking, 20 FCC Rcd 14989, para. 33 (2005).

[317] *Id.  See also Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, CC Docket No. 02-33, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14852, paras. 1, 17 (2005) (recognizing the benefits of "crafting an analytical framework that is consistent, to the extent possible, across multiple platforms that support competing services," and thus adopting a framework that "regulat[es] like services in a similar functional manner.").  The fact that section 602(7)(C) excludes from the term "cable system" a facility of a common carrier subject to Title II of the Act, 47 U.S.C. § 522(7)(C), does not persuade us that Congress intended to permit LFAs to regulate incumbent cable operators that are not common carriers differently from incumbent cable operators and new entrants that are common carriers in their provision of non-cable services.  Rather, given Congress's desire in the Act to ensure "competitively neutral and nondiscriminatory" regulation, *see, e.g.*, 47 U.S.C. § 253(c), we find that section 602(7)(C)'s carve out of Title II facilities from the definition of "cable system" merely evinces Congressional intent to preclude franchising authorities from regulating any telecommunications services carried over a cable system.

[318] *See, e.g.*, City Coalition Comments at 24-25; City of Philadelphia *et al*. Comments at 44; King County Comments at 9-10; City of Lakewood Comments at 2; Massachusetts Municipal Association Comments at 2.

[319] 47 U.S.C. § 556(a).

[320] *See* NCTA Mar. 13, 2019 *Ex Parte* at 11 (asserting that the mixed-use rule would not "authorize cable operators to place new installations in public [rights-of-way] without limit" or prevent a locality from addressing "legitimate public safety and welfare issues, such as road closures and traffic management during installation and maintenance of cable plant and enforcement of building and electrical codes").

[321] *City of Eugene v. Comcast of Or. II, Inc.,* 375 P.3d 446 (Or. 2016) (*Eugene*).

[322] Such preemption applies to the imposition of duplicative taxes, fees, assessments, or other requirements on affiliates of the cable operator that utilize the cable system to provide non-cable services.  NCTA July 18, 2019 *Ex Parte* at 5.

enumerated exemptions in section 622(g)(2) on a cable operator's non-cable services or its ability to construct, manage, or operate its cable system in the rights-of-way.

99.    *Additional Franchises or Other Requirements.*  Congress also made clear that states, localities, and franchising authorities lack authority to require additional franchises or place additional nonmonetary conditions on a cable operator's provision of non-cable services that are not expressly authorized in the Act.  Several provisions state explicitly that franchising authorities may not regulate franchised "cable systems" to the extent that they provide telecommunications services.[376]  In addition, as we noted above, section 624(b)(1) precludes franchising authorities from "establish[ing] requirements for video programming or other information services."[377]  In the mixed-use rule we adopt today, we reasonably construed this provision to prohibit LFAs from regulating information services provided over cable systems.[378]

100.    As noted above, section 636(c) operates to preempt state and local requirements that would use non-Title VI authority to accomplish indirectly what franchising authorities are prohibited from doing directly.  Consistent with this reasoning, we conclude that any state or local law or legal requirement that obligates a cable operator franchised under Title VI to obtain a separate, additional franchise (or other authorization) or imposes requirements beyond those permitted by Title VI to provide cable or non-cable services, including telecommunications and information services, over its cable system conflicts with the Act and thus also is expressly preempted by section 636(c).  The mixed-use rule we adopt today represents a reasonable interpretation of the relevant provisions of Title VI as well as a balanced accommodation of the various policy interests that Congress entrusted to the Commission; therefore, it too has preemptive effect under section 636(c). [379]

(Continued from previous page) ————————————————

[323] For example, a cable operator may provide voice or broadband services through affiliates, and an LFA could not impose duplicative fees on those affiliates.

[324] We do not set forth an exhaustive list of state and local laws and legal requirements that are deemed expressly preempted.  Rather, we simply clarify that state and local laws and other legal requirements are preempted to the extent that they conflict with the Act and the Commission's implementing rules and policies.  As discussed in paragraph 105 below, such preempted requirements include those expressly approved in *Eugene*.

[325] Contrary to some assertions in the record, we find that the *Second FNPRM* provided adequate notice to interested parties that the Commission could exercise its preemption authority under section 636(c) to address local regulation of non-cable services outside Title VI.  *See, e.g.*, NATOA *et al.* July 24, 2019 *Ex Parte* at 10, City of Eugene July 24, 2019 *Ex Parte* at 2-4.  In support of its tentative conclusion that "[s]ection 624(b) of the Act prohibits LFAs from using their franchising authority to regulate the provision of information services, including broadband Internet access service," the *Second FNPRM* specifically cited section 636(c) and set forth the text of that provision nearly verbatim.  *Second FNPRM*, 33 FCC Rcd at 8966-67, para. 27, n. 126.  In addition, the Commission in the *Second FNPRM* tentatively concluded that preempted "entry and exit restrictions" include requirements that an incumbent cable operator obtain a franchise to provide broadband Internet access service and that LFAs therefore are expressly preempted from imposing such requirements.  *Id.* at 8968, para. 29.  The Commission sought comment on that tentative conclusion and on "whether there are other regulations imposed by LFAs on incumbent cable operators' provision of broadband Internet access service that should be considered entry and exit restrictions, or other types of economic or public utility-type regulations, preempted by the Commission."  *Id.*  Such regulations include duplicative fee and franchise requirements imposed by franchising authorities such as the City of Eugene, which is a "governmental entity empowered by . . . [s]tate [] or local law to grant a [cable franchise]."  47 U.S.C. § 522(10).  Indeed, the fact that multiple LFA advocates recognized that the *Second FNPRM* could be read to seek comment on the Commission's authority to preempt requirements imposed outside Title VI contradicts claims that the *Second FNPRM* did not adequately apprise parties of the possible scope of the Commission's preemption ruling.  *See, e.g.*, CAPA Comments at 17; City Coalition Comments at 21-22; NATOA *et al.* Comments at 13-15; Free Press Reply at 7-8.  Moreover, the fact that cable commenters in this proceeding referenced section 636(c) as a potential basis for our preemption ruling, *see, e.g.*, ACA Comments at 14; NCTA Comments at 36; ACA Reply at 5, demonstrates that such ruling is a "logical outgrowth" of the *Second FNPRM*.  *Covad Communications Co. v. FCC*, 450 F.3d at 528, 548 (D.C. Cir. 2006), *citing Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 548-49 (D.C. Cir.

(continued….)

101.    *Public Policy.*  Apart from our analysis of the text and structure of the Act and our longstanding delegated authority to preempt state regulations that are inconsistent with the Act, our preemption decisions today are also consistent with Congress's and the Commission's public policy goals and an appropriate response to problems that are apparent in the record.

102.    Recognizing that excessive regulation at the local level could limit the potential of cable systems to deliver a broad array of services, Congress expressed its intent to "minimize unnecessary regulation that would impose an undue economic burden on cable systems"[380] and "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public."[381]  More generally, section 230(b) of the Act expresses Congress's intent "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."[382]  Accordingly, the Commission has previously preempted state and local regulations that would conflict with this federal policy of nonregulation of information services.[383]  These longstanding federal policies provide further support for our decision today to read Title VI as prohibiting states, localities, and franchising authorities from imposing fees and obligations on cable operators beyond those expressly set forth in that Title.

103.    Our preemption decision today will advance these federal policies by preventing further abuses of state and local authorities of the kind manifested in the record in this proceeding.  In recent years, governmental entities at the local level increasingly have sought to regulate non-cable services provided over mixed-use cable systems franchised under Title VI, particularly broadband Internet access service.[384]  Such governmental entities have included not only state and local franchising authorities acting pursuant to the cable franchising provisions of Title VI, but also state and local entities purportedly acting pursuant to their police powers to regulate public rights-of-way or other powers derived from

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

1983) ("Whether the 'logical outgrowth' test is satisfied depends on whether the affected party 'should have anticipated' the agency's final course in light of the initial notice.").

[326] 47 U.S.C. § 556(c).  For purposes of this provision, the term "State" has the meaning given such term in section 3 of the Act.  *Id.*  Section 3, in turn, provides that "the term 'State' includes the District of Columbia and the Territories and possessions."  *Id.* § 153(47).

[327] *Id.* § 556(c).  Section 636(c)'s reference to "this chapter" is to the Communications Act of 1934, as amended, which is codified in Chapter 5 of Title 47 of the United States Code.  Section 636(c)'s reference to "this chapter" stands in contrast to other provisions in section 636, which reference "this subchapter," or Title VI of the Act.  *Compare* 47 U.S.C. § 556(c) *with id.* § 556(a), (b).

[328] *Id.* § 556(c) (emphasis added).  Contrary to some LFAs' assertion, *see* Anne Arundel County, *et al.* July 24, 2019 *Ex Parte* at 6, given that Congress in section 636(c) expressly preempted certain state and local laws, we need not find that federal preemption of laws governing intrastate telecommunications services is permissible under the "impossibility exception."  Nevertheless, we find that the impossibility doctrine further supports our decision herein.  *See Min. Pub. Util. Comm'n v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007) ("the 'impossibility exception' of 47 U.S.C. § 152(b) allows the FCC to preempt state regulation of a service if (1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective, *i.e.*, state regulation would conflict with federal regulatory policies.").

[329] Contrary to the suggestion of the City of Eugene, our preemption authority does not depend on Section 706 of the Act.  *See* City of Eugene July 24, 2019 *Ex Parte* at 5.

[330] *First Report and Order*, 22 FCC Rcd at 5157, para. 128.

[331] *See, e.g.*, *Liberty Cablevision of Puerto Rico, Inc. v. Municipality of Caguas*, 417 F.3d 216, 219-221 (1st Cir. 2005) (finding municipal ordinances that imposed franchise fees on cable operators were preempted under section 636(c) where inconsistent with section 622 of the Communications Act).  The Commission bears the responsibility of determining the scope of the subject matter expressly preempted by section 636(c).  *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 519 (1992); *Capital Cities Cable v. Crisp*, 467 U.S. 691, 699 (1984).

[332] *See, e.g.*, NATOA *et al.* Comments at 14-18; NATOA *et al.* Reply at 13; City of Philadelphia *et al.* Reply at 22-

(continued….)

**Federal Communications Commission** FCC 19-80

sources outside Title VI. Although the record reveals that such regulation takes many different forms, NCTA and other industry advocates have expressed acute concerns about two particular kinds of state and local regulation: (1) requirements obligating cable operators with a Title VI franchise that are subject to the franchise fee requirement in section 622(b) of the Act to pay additional fees for the provision of non-cable services (such as broadband Internet access) via their cable systems; and (2) requirements obligating cable operators with a Title VI franchise to secure an additional franchise (or other authorization) to provide non-cable services over their cable systems.[385] Our preemption decisions today are carefully tailored to address these problems and prevent states and localities from continuing to circumvent the carefully calibrated terms of Title VI through these and similar kinds of regulations.

104. We disagree with those commenters who attempt to minimize the harm posed by the state and local requirements that we preempt today. We disagree, for example, that cable industry claims regarding the impact of duplicative fee and franchise requirements on broadband deployment are belied by the industry's substantial investments to date in broadband infrastructure, and that such requirements thus will not adversely affect broadband investment going forward.[386] As the record reflects, even if cable operators were to continue to invest, such investments likely would be higher absent such requirements, and even small decreases in investment can have a substantial adverse impact on consumer welfare.[387] We also are persuaded that the imposition of duplicative requirements may deter investment in new infrastructure and services irrespective of whether or to what extent a cable operator passes on those costs to consumers.[388] Contrary to the assertions of some commenters,[389] we also believe that such requirements impede Congress's goal to accelerate deployment of "advanced telecommunications capability to all Americans."[390]

105. *Other Legal Considerations.* In reaching our decision today, we agree with the majority of courts that have found that a Title VI franchise authorizes a cable operator to provide non-cable services without additional franchises or fee payments to state or local authorities.[391] In so doing, we repudiate the reasoning in a 2016 decision by the Supreme Court of Oregon in *City of Eugene v.*

---

(Continued from previous page)

23; NATOA Mar. 15, 2019 *Ex Parte* at 2; Anne Arundel County *et al.* Comments at 37-39. *See also* City of Eugene Sept. 19, 2018 *Ex Parte* at 29-31, *citing Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991) (asserting that if Congress intends to preempt a power traditionally exercised by state or local governments, it must make such intent unmistakably clear in the language of the statute).

[333] 47 U.S.C. § 541(a)(2).

[334] *Id.* § 541(b)(1).

[335] *Id.* § 522(5). *See also id.* § 544(b) (establishing limitations on rules for "establishment or operation of a cable system"). We therefore reject LFA assertions that the absence in section 621(a)(2) of an express grant of authority to "operate" a cable system evinces Congress's intent that a Title VI franchise bestow only the right to construct, but not to operate, a cable system over public rights-of-way. *See, e.g.*, Anne Arundel County *et al.* Comments at 43.

[336] NCTA May 3, 2019 *Ex Parte* at 2 (urging the Commission to clarify that the Act precludes duplicative authorizations and fees imposed for access to rights-of-way to deploy Wi-Fi and small cell antennas attached to, or part of, the cable system); NCTA June 11, 2018 *Ex Parte* at 2 (asserting that certain localities have refused to authorize permits allowing installation of Wi-Fi equipment on cable facilities on the basis that the equipment does not support cable service, even though the equipment is used, in part, to allow cable subscribers to watch subscription video programming).

[337] As noted, under section 621(a)(2), "[a]ny franchise shall be construed to authorize the construction of a cable system over public rights-of-way." 47 U.S.C. § 541(a)(2). Because the "construction of a cable system" includes the installation of facilities and equipment needed to provide both cable and non-cable services, such as wireless broadband and Wi-Fi services, the grant of a Title VI franchise bestows the right to place facilities and equipment in rights-of-way to provide such services.

[338] *See, e.g.*, 47 U.S.C. § 522(7)(C) (providing that a "cable system" shall extend to the facility of a common carrier providing a Title II service only "to the extent such facility is used in the transmission of video programming

(continued….)

*Comcast*,[392] which appears to have prompted an increasing number of states and municipalities to impose fees on franchised cable operators' provision of non-cable services.[393] In *Eugene*, the court upheld the city's imposition of a separate, additional "telecommunications" license fee on the provision of broadband services over a franchised cable system, reasoning that the fee was not imposed pursuant to the city's Title VI cable franchising authority, but rather, under the city's authority as a local government to impose fees for access to rights-of-way for the provision of telecommunications services. For the reasons stated above, we conclude that *Eugene* fundamentally misreads the text, structure, and legislative history of the Act, and clarify that any state or local regulation that imposes on a cable operator fees for the provision of non-cable services over a cable system franchised under Title VI conflicts with section 622(b) of the Act and is preempted under section 636(c).[394]

106.    As noted above, although Sections 602(7)(C) and 624(b)(1) by their terms circumscribe *franchising authority* regulation of non-cable services *pursuant to Title VI*, section 636(c) makes clear that state and local authorities may not end-run the provisions of Title VI simply by asserting some other source of authority—such as their police powers to regulate access to public rights-of-way—to accomplish what Title VI prohibits. To be sure, section 636(a) provides that "[n]othing in [Title VI] shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of [Title VI]."[395] While we recognize that states and municipalities possess authority to manage rights-of-way that is distinct from their cable franchising authority under Title VI,[396] states and localities may not exercise that authority in a manner that conflicts with federal law. As the U.S. Supreme Court has found, "[w]hen federal officials determine, as the FCC has here, that restrictive regulation of a particular area is not in the public interest, [s]tates are not permitted to use their police power to enact such . . . regulation."[397]

107.    Our decision today still leaves meaningful room for states to exercise their traditional police powers under section 636(a).[398] While we do not have occasion today to delineate all the

(Continued from previous page) ———————————————————
directly to subscribers . . .").

[339] *Id.* § 521(4).

[340] *Id.* § 544(b)(1).

[341] 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4681 ("[C]able operators are permitted under the provisions of [the Cable Act] to provide any mixture of cable and non-cable service they choose."). *See also Heritage Cablevision Assocs. of Dallas, L.P. v. Texas Utils. Elec. Co.*, 6 FCC Rcd 7099, 7104, para. 24 (1991) ("[T]he House report accompanying the Cable Act clearly defeats [the] claim that a cable operator's facilities cease being a 'cable system' merely because they carry non-cable communications services in addition to video entertainment."), *aff'd, Texas Utils. Elec. Co. v. FCC*, 997 F.2d 925, 931-932 (D.C. Cir. 1993).

[342] 47 U.S.C. § 542. *See also* 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4663 (recognizing local government's entitlement to "assess the cable operator a fee for the operator's use of public ways" and establishing "the authority of a city to collect a franchise fee"); *First Report and Order*, 22 FCC Rcd at 5161, para. 135 (stating that "Congress enacted the cable franchise fee as the consideration given in exchange for the right to use the public ways").

[343] 47 U.S.C. § 542(b) (emphasis added).

[344] *Id.* § 542(g)(1).

[345] NCTA Apr. 19, 2019 *Ex Parte* at 2-3 (claiming that some governmental entities, such as the state of California, are imposing fees that exceed the five percent cap by styling such fees as a "tax" that nominally applies to other users of the rights-of-way, but whose valuation is inextricably linked to the provision of video services).

[346] State and local advocates do not appear to dispute that section 622(b) limits franchise fees to five percent of a cable operator's gross revenues derived from the provision of cable service only. *See, e.g.*, NATOA *et al.*

(continued....)

categories of state and local rules saved by that provision, we note that states and localities under section 636(a) may lawfully engage in rights-of-way management (*e.g.*, road closures necessitated by cable plant installation, enforcement of building and electrical codes) so long as such regulation otherwise is consistent with Title VI.[399] Similarly, we do not preempt state regulation of telecommunications services that are purely intrastate, such as requirements that a cable operator obtain a certificate of public convenience and necessity to provide such services. State regulation of intrastate telecommunications services is permissible so long as it is consistent with the Act and the Commission's implementing rules and policies.[400] We also do not disturb or displace the traditional role of states in generally policing such matters as fraud, taxation, and general commercial dealings, so long as the administration of such laws does not interfere with federal regulatory objectives.[401]

108. We also find unconvincing Anne Arundel County *et al.*'s argument that the Commission's preemption of state and local management of public rights-of-way violates the Tenth Amendment to the U.S. Constitution by "direct[ing] local governments to surrender their property and management rights to generate additional funds for use in the expanded deployment of broadband."[402] In particular, Anne Arundel County *et al.* contends that by preventing states and localities from overseeing use of their rights-of-way, the Commission effectively is commanding them to grant rights-of-way access on terms established by the Commission, rather than state or local governments.[403] That argument fails for multiple reasons.

109. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[404] We find that Anne Arundel County *et al.* has failed to demonstrate any violation of the Tenth Amendment.[405] As the Supreme Court has stated, "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."[406] Therefore, when Congress acts within the scope of its authority under the Commerce Clause, no Tenth Amendment issue arises.[407] Regulation of interstate telecommunications and information services, and

(Continued from previous page) ————————————————

Comments at 21-22; CAPA Reply at 20. *See also* City of New York Comments at 13. Rather, their claims, as discussed herein, are that fees on broadband and telecommunications services are not "franchise fees" at all—claims that we show are belied by the text, structure, and purposes of Title VI.

[347] *See, e.g.,* NCTA Apr. 19, 2019 *Ex Parte* at 1-2, *citing Liberty Cablevision,* 417 F.3d at 223; NCTA July 3, 2019 *Ex Parte* at 2 (asserting that the state of Maryland has begun to require franchised cable operators to enter into separate "resource sharing agreements" with the state's Department of Information Technology that impose duplicative fees and other requirements for continued access to rights-of-way).

[348] CAPA Reply at 20-21. *See also* NATOA *et al.* July 24, 2019 *Ex Parte* at 25-28 (asserting that the Act does not preclude local governments from exercising generally-applicable rights-of-way authority over a cable operator's provision of non-cable services).

[349] 47 U.S.C. § 522(5) (emphasis added).

[350] *Id.* As NCTA notes, a service provider may have status as a cable operator *either* because of its provision of cable service *or* because of its operation of a cable system. NCTA Mar. 13, 2019 *Ex Parte* at 12, n.64, *citing* 47 U.S.C. § 522(5). A service provider that is operating a cable system to provide broadband Internet access service thus is providing such service "solely because of" its status as a cable operator. 47 U.S.C. § 542(g)(1).

[351] *Id*.

[352] *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (holding that, where possible, every word in a statute should be given meaning).

[353] *See* NCTA Mar. 13, 2019 *Ex Parte* at 12-13. Although a "franchise fee" does not include "any tax, fee, or assessment of general applicability," we note that this exception excludes a tax, fee, or assessment "which is unduly discriminatory against cable operators or cable subscribers." 47 U.S.C. § 542(g)(2)(A). Even if "telecommunications" fees such as those at issue in *Eugene* could reasonably be characterized as fees of general applicability by virtue of their application to providers other than cable operators, we find that such fees would be

(continued….)

cable services, is within Congress' authority under the Commerce Clause.[408] Thus, because our authority derives from a proper exercise of Congressional power, the Tenth Amendment poses no obstacle to our preemption of state and local laws and other legal requirements.[409]

110. We also find no merit to arguments that the Commission's preemption of certain state and local requirements constitutes an improper "commandeering" of state governmental power.[410] The Supreme Court has recognized that "where Congress has the authority to regulate private activity under the Commerce Clause," Congress has the "power to offer States the choice of regulating that activity according to federal standards or having state law preempted by federal regulation."[411] Title VI provides that a franchising authority "may award" franchises "in accordance with this title."[412] It thus simply establishes limitations on the scope of that authority when and if exercised. Here, we are simply requiring that, should state and local governments decide to open their rights-of-way to providers of interstate communication services within the Commission's jurisdiction, they do so in accordance with federal standards. As noted, Congress in Section 636(c) expressly authorized Commission preemption of state and local laws and other legal requirements that conflict with federal standards.[413] Because the Commission has the constitutional authority to adopt such standards, and because those standards do not require that state or local governments take or decline to take any particular action, we conclude that our preemption decisions in this Order do not violate the Tenth Amendment.[414]

---

(Continued from previous page) ──────────────────────────────

"unduly discriminatory" – and thus constitute "franchise fees" -- as applied to franchised cable operators. This is because such fees are assessed on cable operators *in addition to* the five percent franchise fees such operators must pay for use of public rights-of-way. That is, cable operators must pay *twice* for access to rights-of-way (*i.e.*, one fee for cable service and a second fee for non-cable service), whereas non-cable providers must pay only once for such access (*i.e.*, for non-cable service). NCTA Mar. 13, 2019 *Ex Parte* at 13. We, therefore, conclude that interpreting the Act to preclude localities from assessing fees on cable operators' use of rights-of-way to provide non-cable services would be "competitively neutral and nondiscriminatory," contrary to the suggestion of some commenters. *See, e.g.*, NATOA *et al.* July 24, 2019 *Ex Parte* at 9.

[354] *See* NCTA Mar. 13, 2019 *Ex Parte* at 12-13.

[355] We thus disagree with assertions that Congress did not intend for franchise fees to cover cable operators' use of public property for the provision of services other than cable services. *See, e.g.*, AWC Reply at 9 ("Congress determined . . . that a fair compensation for the use of the rights-of-way for the purpose of providing cable service can be up to [five percent] of cable gross revenues. . . . [T]he right to occupy this limited and valuable public property for other purposes was never intended to be compensated by the provisions of the Cable Act.").

[356] S. Rep. No. 98-67, at 25 (1983) ("The committee feels it is necessary to impose such a franchise fee ceiling because . . . without a check on such fees, local governments may be tempted to solve their fiscal problems by what would amount to a discriminatory tax not levied on cable's competitors."). *See also* 129 Cong. Rec. S8254 (daily ed. June 13, 1983) (statement of Sen. Goldwater) (stating that the purpose of the cap was to prevent franchising authorities from "taxing private cable operators to death as a means of raising . . . revenues for other concerns").

[357] 47 U.S.C. § 542(b) (Supp. I 1992), *amended by* 47 U.S.C. § 542(b) (Supp. II 1996).

[358] The conference agreement adopted the House version of this provision. *See* H.R. Rep. No. 104-458, at 180 (1996) (Conf. Rep.).

[359] H.R. Rep. No. 204, 104th Cong., 1st Sess. 93 (1995) (emphasis added). We note that the Senate Report similarly clarifies that this amendment to section 622 "was intended to make clear that the franchise fee provision is not intended to reach revenues that a cable operator derives from providing new telecommunications services over its system that are different from the cable-related revenues operators have traditionally derived from their systems." S. Rep. 104-23, at 36 (1995).

[360] *See* CAPA Reply at 20-21.

[361] Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 5-6.

**Federal Communications Commission** FCC 19-80

### D. State Franchising Regulations

111. As proposed in the *Second FNPRM*, we find that the conclusions set forth in this Order, as well as the Commission's decisions in the *First Report and Order*[415] and *Second Report and Order*,[416] as clarified in the *Order on Reconsideration*,[417] apply to franchising actions taken at the state level and state regulations that impose requirements on local franchising. In the *First Report and Order*, the Commission declined to "address the reasonableness of demands made by state level franchising authorities" or to extend the "findings and regulations" adopted in its section 621 orders to actions taken at the state level.[418] It noted that many state franchising laws had only been in effect for a short time and that the Commission lacked a sufficient record regarding their effect.[419] In the *Order on Reconsideration*, the Commission indicated that if any interested parties believed the Commission should revisit the issue in the future, they could present the Commission with evidence that the findings in the *First Report and Order* and *Second Report and Order* "are of practical relevance to the franchising process at the state-level and therefore should be applied or extended accordingly."[420]

112. In the *Second FNPRM*, we again asked whether the Commission should apply the decisions in this proceeding to franchising actions and regulations taken at the state level.[421] As we noted, more than ten years have passed since the Commission first considered whether to apply its decisions interpreting section 621 to state-level franchising actions and state regulations. The decade of experience with the state-franchising process, along with comments responding to the questions related to this issue raised in the *Second FNPRM*, provide us with an adequate record regarding the effect of state involvement in the franchising process.

113. We now find that the better reading of the Cable Act's text and purpose is that that the

(Continued from previous page) ———————————————

[362] 47 U.S.C. § 541(d)(2).

[363] 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4700.

[364] NCTA July 25, 2019 *Ex Parte* at 5-6.

[365] 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4666.

[366] *Restoring Internet Freedom Order,* 33 FCC Rcd at 430, para. 199 (reaffirming the Commission's view that Internet access service is jurisdictionally interstate because a substantial portion of Internet traffic involves accessing interstate or foreign websites).

[367] The Commission recognized as much when it stated:

> [T]he Commission has independent authority to displace state and local regulations in accordance with the longstanding federal policy of nonregulation for information services. For more than a decade prior to the 1996 Act, the Commission consistently preempted state regulation of information services (which were then known as "enhanced services"). When Congress adopted the Commission's regulatory framework and its deregulatory approach to information services in the 1996 Act, it thus embraced our longstanding policy of preempting state laws that interfere with our federal policy of nonregulation.

*Restoring Internet Freedom Order, id.* at 431*,* para. 202, *citing Petition for Declaratory Ruling that Pulver.com's Free World Dialup Is Neither Telecommunications Nor a Telecommunications Service*, Memorandum Opinion and Order, 19 FCC Rcd 3307, 3316-23, paras. 15-25 (2004) (discussing the federal policy of nonregulation for information services). Because broadband Internet access service is jurisdictionally interstate whether classified as a telecommunications or an information service, regulatory authority over such service resides exclusively with the Commission.

[368] *See California v. FCC*, 39 F.3d 919 (9th Cir 1994); *Petition for Emergency Relief and Declaratory Ruling Filed by the BellSouth Corp*., 7 FCC Rcd 1619 (1992).

[369] We also reject claims that section 621(d)(1)'s grant to states of authority to require the filing of tariffs by cable operators for the provision of certain non-cable services reflects Congress's intent to permit state regulation of those services. Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 5. As explained in section III.B. above, that

(continued….)

rules and decisions adopted in this Order, as well as those adopted in the *First Report and Order* and *Second Report and Order*, should fully apply to state-level franchising actions and regulations. First, we see no statutory basis for distinguishing between state- and local-level franchising actions. Nor do we think such a distinction would further Congress's goals: unreasonable demands by state-level franchising authorities can impede competition and investment just as unreasonable demands by local authorities can. While we need not opine on the reasonableness of specific state actions raised by commenters, we find that there is evidence in the record that state franchising actions—alone or cumulatively with local franchising actions—in some cases impose burdens beyond what the Cable Act allows.[422] We see no reason—statutory or otherwise—why the Cable Act would prohibit these actions at the local level but permit them at the state level.

114. The Cable Act does not distinguish between state and local franchising authorities. Section 621(a) and the other cable franchising provisions of Title VI circumscribe the power of "franchising authorities" to regulate services provided over cable systems.[423] The Cable Act defines "franchising authority" as "any governmental entity empowered by Federal, State or local law to grant a franchise."[424] In other words, the provisions of Title VI that apply to "franchising authorities" apply equally to any entity "empowered by . . . law"—including state law—"to grant a franchise." Many states have left franchising to local authorities, making those authorities subject to the limits imposed under Title VI.[425] Twenty-three states, however, have empowered a state-level entity, such as a state public utility commission, to grant cable franchise authorizations, rendering them "franchising authorities" under Title VI.[426] Bolstering the conclusion that Congress intended the Cable Act to govern state-level action is section 636 of the Cable Act, which expressly preempts "any provision of law *of any State*, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority" that conflicts with the Cable Act.[427] Limiting the Commission's rulings to local-level action

---

(Continued from previous page) ─────────────

provision was intended only to permit states to require tariffs for services that they otherwise were authorized to regulate, such as telecommunications services that are purely intrastate. *See* 1984 Cable Act House Report, 1984 U.S.C.C.A.N. at 4698 ("A regulatory agency [under section 621(d)] may require a cable operator to file an informational tariff for a non-cable communications service only if the agency has jurisdiction over a common carrier's provision of such a service.").

[370] NATOA Mar. 15, 2019 *Ex Parte* at 2, *citing* H.R. Conf. Rep. No. 104-458, at 209 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 223 (emphasis added).

[371] As some LFA advocates note, Anne Arundel County *et al.* July 25, 2019 *Ex Parte* at 10, n.29, the Commission previously noted in passing that, while a cable operator is not required to pay cable franchise fees on revenues from non-cable services, this rule "does not apply to non-cable franchise fee requirements, such as any lawful fees related to the provision of telecommunications service." *Second Report and Order*, 22 FCC Rcd at 19638, para. 11, n.31. For the reasons explained below, we would deem an LFA's assessment of a cable operator twice for accessing public rights-of-way (once as a cable operator and again as a telecommunications provider) to be unlawful as not "fair and reasonable" nor "competitively neutral and nondiscriminatory." *See infra* note 372. *See also* 47 U.S.C. § 253(c). To the extent our earlier statement may suggest any broader application, we disavow it based on the record before us and the arguments made throughout this item.

[372] We disagree with LFA assertions that this interpretation is inconsistent with section 253 of the Act and the Commission's 2018 *Wireless Infrastructure Order*. Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 10, n.29, *citing Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment,* Declaratory Ruling and Third Report and Order, 33 FCC Rcd 9088, n. 130 (2018). Although section 253 permits states and localities to require "fair and reasonable" compensation from telecommunications providers on a

(continued….)

**Federal Communications Commission** FCC 19-80

would call for some plausible interpretation of these provisions; those opposing the extension of the Commission's rulings to state franchising authorities offer none. Accordingly, we find that the Cable Act does not distinguish between state- and local-level franchising actions, and that the Commission's rulings should therefore apply equally to both.

115.    In addition, we find unavailing claims in the record that the Commission should limit its decisions to local authorities for policy reasons. To the contrary, we find that extending the Commission's rulings to state level franchising actions and regulations furthers the goals of the Cable Act. Unreasonable barriers to entry imposed by any franchising authority—state or local—frustrate the goals of competition and deployment. In the *First Report and Order*, we found that removing regulatory obstacles posed by local franchising authorities would further these goals.[428] We now find that this policy rationale applies with equal force to franchising actions taken at the state level.

116.    We disagree that extending the Commission's rulings to state-level franchising and regulation, however, will eliminate the benefits of state-level action. We are not persuaded that extending the Commission's rulings to state-level actions would prevent—or even discourage—state-level franchising and regulation. Indeed, applying the Commission's rulings to state-level action will merely ensure that the same rules that apply to LFAs also apply at the state level.[429] This consistency is itself beneficial, ensuring that various statutory provisions—such as sections 621 and 622—are interpreted uniformly throughout the country. As one commenter notes, "state-level cable regulations may be modeled on the federal act, and so, allowing disparate interpretations of the same language could lead to confusion among consumers, regulators, and franchisees."[430]

117.    Nor should applying our interpretations of the Cable Act to state-level actions interfere with states' authority to enact general taxes and regulations. Some commenters express concern that the Commission's rulings would disturb state franchising laws that apply more broadly than the Cable Act.[431] While we decline here to opine on the application of the Cable Act to specific state laws, we note that

---

(Continued from previous page)

"competitively neutral and nondiscriminatory basis" for use of public rights-of-way, 47 U.S.C. § 253(c), as explained above, we find that imposing fees on cable operators beyond what Title VI allows is neither "fair and reasonable" nor "competitively neutral and nondiscriminatory." Moreover, although the Commission in the *Wireless Infrastructure Order* concluded, among other things, that fees to use the rights-of-way to deploy small cells for the provision of telecommunications must be cost-based and no greater than those charged to "similarly situated" entities for comparable uses of the rights-of-way, we do not believe that our approach today introduces any inconsistency. Rather, as NCTA notes, we merely recognize that under the Act, cable operators must compensate local governments for accessing public rights-of-way under a statutory framework different from that applicable to telecommunications providers, and that Congress did not intend for them to be assessed twice for the provision of cable service or the facilities used in the provision of such service. NCTA July 25, 2019 *Ex Parte* at 6-7. Any difference in approach, therefore, follows from different standards established by Congress in Sections II and VI of the Act.

[373] In the *Cable Modem Declaratory Ruling*, for example, the Commission stated:

> We note that section 622(b) provides that 'the franchise fees paid by a cable operator with respect to any cable system shall not exceed [five percent] of such cable operator's gross revenues derived . . . from the operation of the cable system to provide cable services.' Given that we have found cable modem service to be an information service, revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined.

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798, 4851, para. 105 (2002) (citations omitted) (*Cable Modem Declaratory Ruling*).

[374] In the *First Report and Order*, the Commission affirmed its 2002 interpretation of section 622(b):

> We clarify that a cable operator is not required to pay franchise fees on revenues from non-cable services. Section 622(b) provides that the 'franchise fees paid by a cable operator with respect to

(continued….)

**Federal Communications Commission**        **FCC 19-80**

these concerns are largely settled by section 622, which excludes "any tax, fee, or assessment of general applicability" from the definition of franchise fees.[432] Other provisions of the Act similarly make clear that the Act does not affect state authority regarding matters of public health, safety, and welfare, to the extent that states exercise that authority consistent with the express provisions of the Cable Act.[433]

118. Finally, some commenters assert that extending the Commission's rulings to state-level actions would "upend carefully balanced policy decisions by the states."[434] According to commenters, local governments might wish to refuse these benefits if they come at the expense of franchise fees—but they will be unable to do so where they are mandated by state law.[435]

119. We are not convinced that these concerns justify limiting the Commission's rulings to local-level actions. Again, our conclusion in this section will disturb existing state laws only to the extent that they conflict with the Cable Act and the Commission's rulings implementing the Act. While this may upset some preexisting legislative compromises, it will also root out state laws that impose demands and conditions that Congress and the Commission have found to be unreasonable. Further, ensuring that the Cable Act is applied uniformly between state and local franchising authorities is necessary to further the goals of the Act, and more importantly, is consistent with the language of the Act. As some commenters have noted, if the Commission does not apply these requirements to state franchises, states could pass laws circumventing the Cable Act's limitations on LFAs.[436] That result would thwart Congress's intent in imposing those limitations. For these reasons, we conclude that the benefits of extending the Commission's rulings and interpretations to state-level actions outweigh any burdens caused by upsetting existing state-level policy decisions.

## IV. PROCEDURAL MATTERS

120. *Final Regulatory Flexibility Act Analysis.* As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[437] the Commission has prepared a Final Regulatory Flexibility Act Analysis

---

(Continued from previous page) ————————————————

> any cable system shall not exceed [five percent] of such cable operator's gross revenues derived . . . from the operation of the cable system to provide *cable services'*. . . . The Commission [has] determined . . . that a franchise authority may not assess franchise fees on non-cable services, such as cable modem service. . . . Although [the *Cable Modem Declaratory Ruling*] related specifically to Internet access revenues, the same would be true for other 'non-cable' service revenues. Thus, Internet access services, including broadband data services, and any other non-cable services are not subject to 'cable services' fees.

*First Report and Order*, 22 FCC Rcd at 5146, para. 98 (emphasis in original) (citations omitted).

[375] *ACLU v. FCC*, 823 F.2d 1554, 1574 (D.C. Cir. 1987).

[376] *See, e.g.*, 47 U.S.C. § 541(b)(3)(B) ("A franchising authority may not impose any requirement under this subchapter that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator or an affiliate thereof"); *id.* § 541(D) (A franchising authority may not impose any requirement under this subchapter that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator or an affiliate thereof). *See also Montgomery County*, 863 F.3d at 492 ("The Act also makes clear that local franchising authorities can regulate so called 'Title II carriers' (basically, providers of phone services) only to the extent that Title II carriers provide cable services.").

[377] 47 U.S.C. § 544(b)(1).

[378] *See supra* paras. 72-76.

[379] We reject arguments that the Commission lacks authority to preempt state and local regulation of information services without asserting ancillary jurisdiction over information services. *See, e.g.*, Public Knowledge Comments

(continued….)

(Continued from previous page) ————————————————

at 1; Common Frequency Comments at 5 (claiming that if the Commission has no authority to regulate information services, then it has no ability to preempt conflicting state and local regulation). Because we are relying on express preemption authority under section 636(c), there is no reason for us to rely upon ancillary authority in this proceeding.

[380] 47 U.S.C. § 521(6).

[381] *Id.* § 521(4).

[382] *Id.* § 230(b)(2). "Interactive computer services" are defined, in relevant part, as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . . ." *Id.* § 230(f)(2).

[383] *See, e.g., Cable Modem Declaratory Ruling*, 17 FCC Rcd at 4850, para. 102; *Restoring Internet Freedom Order*, 33 FCC Rcd at 426-28, paras. 194-95. *See also Charter Advanced Services (MN), LLC v. Lange*, No. 17-2290 (8th Cir. filed Sept. 7, 2018) (noting that "[a]ny [local] regulation of an information service conflicts with the federal policy of nonregulation" and is therefore preempted).

[384] *See, e.g.*, NCTA Comments at 26-28; NCTA Reply, Appendix; NCTA Mar. 13, 2019 *Ex Parte* at 10; NCTA June 11, 2018 *Ex Parte* at 4-5.

[385] NCTA Comments at 26-28; Altice Reply at 14.

[386] *See, e.g.*, City of New York Reply at 2-3 (asserting that restricting LFA authority to regulate incumbent cable operators' provision of non-cable services will not facilitate broadband deployment). *See also* Anne Arundel County *et al.* Reply at Exh. 5; Anne Arundel County *et al.* July 24, 2019 *Ex Parte* and Atts. (submitting analyses purporting to show that rights-of-way fees and practices at the local level have a minor impact on cable operators' broadband deployment decisions). Although LFAs also submitted an engineering analysis of public rights-of-way processes, *id.,* because this study is from 2011 and does not address cable franchise fees, it has no bearing on our findings herein. NCTA July 25, 2019 *Ex Parte* at 11-12.

[387] Orszag/Shampine Analysis at 17.

[388] *Id.* at 13 (claiming that LFAs' imposition of fees on non-cable services would deter investment in new infrastructure and services regardless of whether cable operators can pass some or all of those costs through to consumers). *See also* Americans for Tax Reform May 8, 2019 *Ex Parte,* Att. (using a two-stage investment model to show how local authorities' extra-statutory exactions deter investment by incumbent and new entrant cable operators).

[389] *See, e.g.*, AWC Reply at 11-13.

[390] 47 U.S.C. § 1302. MMTC asserts, for example, that the adverse effects of such local regulations are likely to be felt most acutely by consumers, particularly small businesses and people in low income communities. MMTC Apr. 25, 2019 *Ex Parte* at 1. In particular, MMTC asserts that:

> [D]uplicative fees . . . are most burdensome to lower-income households that spend a far larger share of their income on broadband than wealthier families . . . . [and] small, minority businesses. . . . Increased broadband access costs can be especially problematic for the unemployed or underemployed who become shut out from the very tools they need to pursue new skills and opportunities.

*Id.* at 1-2.

[391] *See, e.g., Comcast Cable of Plano, Inc. v. City of Plano,* 315 S.W.3d 673, 681 (Tex. App. 2010); *City of Chicago v. Comcast Cable Holdings, LLC,* 231 Ill.2d 399, 412-413 (2008). *See also City of Minneapolis v. Time Warner Cable, Inc.*, No. CIV.05-994 ADM/AJB, 2005 WL 3036645, at *5-6 (D. Minn. Nov. 10, 2005); *City of Chicago v. AT&T Broadband, Inc.*, No. 02-C-7517, 2003 WL 22057905, at *6 (N.D. Ill. Sept. 4, 2003); *Parish of Jefferson v. Cox Communications La., LLC,* No. 02-3344, 2003 WL 21634440, at *4-8 (E.D. La. July 3, 2003). *See also* NCTA June 11, 2018 *Ex Parte* at 3, n.9.

[392] *See Eugene*, 375 P.3d 446. The regulations at issue in *Eugene* included that: (i) Comcast's franchise agreement for the provision of cable services over the city's public rights-of-way did not give it the right to provide cable

(continued….)

(Continued from previous page) ————————————————

modem service over those rights-of-way; (ii) the Communications Act did not give Comcast an independent right to provide cable modem service over the city's public rights-of-way; (iii) the Act did not preclude the city from assessing fees on revenues derived from Comcast's provision of cable modem service over public rights-of-way; and (iv) such fees did not constitute franchise fees under section 622(b) of the Act. *See id.* at 453-463.

[393] NCTA asserts that in the wake of *Eugene*, a multitude of cities in Oregon have adopted or reinterpreted ordinances to impose fees on gross revenues derived from the provision of broadband services, in addition to those already imposed under cable franchises. NCTA Comments at 26-27; NCTA Mar. 13, 2019 *Ex Parte* at 9, 11-12. NCTA notes that multiple communities in Ohio also have passed ordinances requiring that cable operators secure a "Certificate of Registration" in addition to a state-issued cable franchise before offering non-cable services, and that such certificates require payment of additional fees as a condition of occupying rights-of-way. NCTA Comments at 27. NCTA asserts further that such duplicative fees are imposed not only at the local level, but also at the state level. *Id.*

[394] Such regulation includes not only requirements imposed by a state or locality acting pursuant to the cable franchising provisions of Title VI, but also requirements imposed by a state or locality purportedly acting pursuant to any powers granted outside Title VI.

[395] 47 U.S.C. § 556(a).

[396] *See, e.g.*, MassAccess Reply at 11-12 (asserting that "[t]he authority and police powers vested in state and municipal governments encompass significantly more than those in the Cable Act. . . . [and] arise from a number of sources, including . . . municipal law, state law, common law, and [f]ederal statutes and regulations"); City of Philadelphia *et al.* Comments at 16-17 (claiming that local governments do not derive their authority over Title I and Title II services from federal law, but rather, sources such as state law, state constitutions, municipal charters, and state common law). *See also* Anne Arundel County *et al.* Comments at 37-39; Free Press Reply at 7; Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 5.

[397] *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 708 (1984).

[398] Given the robust scope that we retain in this Order for the operation of section 636(a), we reject the City of Eugene's assertion that we have not engaged in "meaningful discussion" of this provision. City of Eugene July 24, 2019 *Ex Parte* at 4.

[399] *See* NCTA Mar. 13, 2019 *Ex Parte* at 11.

[400] We note, for example, that section 253(a) of the Act prohibits state or local statutes, regulations, or other legal requirements that prohibit or have the effect of prohibiting the ability of any entity to provide "any interstate or *intrastate* telecommunications service." 47 U.S.C. § 253(a) (emphasis added).

[401] *See Restoring Internet Freedom Order,* 33 FCC Rcd at 428, para. 196.

[402] Anne Arundel County *et al.* Reply at 14-15.

[403] *Id.*

[404] U.S. Const. Amend. X.

[405] *Montgomery County, Md. v. FCC*, 811 F.3d 121, 127-129 (4th Cir. 2015).

[406] *See New York v. U.S.*, 505 U.S. 144, 156 (1992).

[407] *See id.* at 157-58.

[408] *MCI Telecommunications Corp. v. Bell Atlantic*, 271 F.3d 491, 503 (3rd. Cir. 2001) ("The Telecommunications Act of 1996 was clearly a congressional exercise of its Commerce Clause power.").

[409] *See Qwest Broadband Services, Inc. v. City of Boulder*, 151 F.Supp.2d 1236, 1245 ("[T]he inquiries under the Commerce Clause and the Tenth Amendment are mirror images, and a holding that a Congressional enactment does not violate the Commerce Clause is dispositive of a Tenth Amendment challenge) (citing *United States v. Baer,* 235 F.3d 561, 563 n.6 (10th Cir. 2000)).

[410] *See* Michigan Municipal League Comments at 25; Anne Arundel County *et al.* Comments at 51.

**Federal Communications Commission**        **FCC 19-80**

(Continued from previous page) ————————————————

[411] *See New York v. U.S.*, 505 U.S. at 167.

[412] 47 U.S.C. § 541(a)(1).

[413] *Id*. § 556(c).

[414] We also conclude that our actions do not violate the Fifth Amendment to the U.S. Constitution. *See, e.g.*, City of Eugene Sept. 19, 2018 *Ex Parte* at 30. The "takings" clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. First, our actions herein do not result in a Fifth Amendment taking. Courts have held that municipalities generally do not have a compensable "ownership" interest in public rights-of-way, but rather hold the public streets and sidewalks in trust for the public. *Liberty Cablevision*, 417 F.3d at 222. Moreover, even if there was a taking, Congress provided for "just compensation" through cable franchise fees. *See U.S. v. Riverside Bayview Homes*, 474 U.S. 121, 128 (1985) (the Fifth Amendment does not prohibit takings, only uncompensated ones). Section 622(h)(2) of the Act provides that a franchising authority may recover a franchise fee of up to five percent of a cable operator's annual gross revenues derived from the provision of cable service. 47 U.S.C. § 542(h)(2). Congress intended that the cable franchise fee serve as the consideration given in exchange for a cable operator's right to use public rights-of-way. *See 1984 Cable Act House Report*, 1984 U.S.C.C.A.N. at 4663 (recognizing the local government's authority to "assess the cable operator a fee for the operator's use of public ways" and establishing "the authority of a city to collect a franchise fee of up to [five percent] of an operator's annual gross revenues"). Our actions herein do not eviscerate the ability of local authorities to impose such franchise fees. Rather, our actions simply ensure that local authorities do not impose duplicative fees for the same use of rights-of-way by mixed use facilities of cable operators, contrary to express statutory provisions and policy goals set forth in the Act.

[415] In the *First Report and Order*, the Commission adopted time limits for LFAs to render a final decision on a new entrant's franchise application and established a remedy for applicants that do not receive a decision within the applicable time frame; concluded that it was unlawful for LFAs to refuse to grant a franchise to a new entrant on the basis of unreasonable build-out mandates; clarified which revenue-generating services should be included in a new entrant's franchise fee revenue base and which franchise-related costs should and should not be included within the statutory five percent franchise fee cap; concluded that LFAs may not make unreasonable demands of new entrants relating to PEG channels and I-Nets; adopted the mixed-use network ruling for new entrants; and preempted local franchising laws, regulations, and agreements to the extent they conflict with the rules adopted in that order. *First Report and Order*, 22 FCC Rcd at 5134-40, paras. 66-81; *id*. at 5143-44, paras. 89-90; *id*. at 5144-51, paras. 94-109; *id*. at 5151-54, paras. 110-120; *id*. at 5155-56, paras. 121-24; *id*. at 5157-64, paras. 125-38.

[416] In the *Second Report and Order*, the Commission extended to incumbent cable operators the rulings in the *First Report and Order* relating to franchise fees and mixed-use networks and the PEG and I-Net rulings that were deemed applicable to incumbent cable operators, *i.e.*, the findings that the non-capital costs of PEG requirements must be offset from the cable operator's franchise fee payments, that it not necessary to adopt standard terms for PEG channels, and that it is not *per se* unreasonable for LFAs to require the payment of ongoing costs to support PEG, so long as such support costs as applicable are subject to the franchise fee cap. *Second Report and Order*, 22 FCC Rcd at 19637-41, paras. 10-17.

[417] *Order on Reconsideration*, 30 FCC Rcd at 812-13, para. 7.

[418] *First Report and Order*, 22 FCC Rcd at 5102, n.2.

[419] *See id*.; *Order on Reconsideration*, 30 FCC Rcd at 812-13, para. 7.

[420] *Order on Reconsideration*, 30 FCC Rcd at 812-13, para 7.

[421] *Second FNPRM*, 33 FCC Rcd at 8971-72, para. 32. ("We seek comment on whether to apply the proposals and tentative conclusions set forth herein, as well as the Commission's decisions in the First Report and Order and Second Report and Order, as clarified in the Order on Reconsideration, to franchising actions taken at the state level and state regulations that impose requirements on local franchising.").

[422] *See, e.g.*, NCTA Comments at 62-64; Altice Reply at 5-6; NCTA Apr. 19, 2019 *Ex Parte* at 2.

[423] 47 U.S.C. § 541(a)(1) ("A *franchising authority* may award, in accordance with the provisions of this subchapter, 1 or more franchises within its jurisdiction; except that a *franchising authority* may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise." (emphases added)).

**Federal Communications Commission**                    **FCC 19-80**

(Continued from previous page) ——————————————
[424] *Id.* § 522(10).

[425] *See, e.g.*, Md. Code Ann., Local Gov't § 1-708(c) ("The governing body of a county or municipality may . . . grant a franchise for a cable television system that uses a public right-of-way . . . .").

[426] *See* Ark. Code Ann. § 23-19-203 (provider must elect either a local franchise or a state-issued certificate of franchise authority); Cal. Pub. Util. Code § 5840(a); Conn. Gen. Stat. Ann. § 16-331(a); Del. Code Ann. tit. 26, §§ 601 (state-issued franchises outside of municipalities), 608 (municipal franchises subject to PUC review); Fla. Stat. § 610.102; Ga. Code Ann. § 36-76-3 (provider must elect either a local franchise or a state-issued authorization); 220 Ill. Comp. Stat. Ann. § 5/21-301(a)(provider must elect either a local franchise or a state-issued authorization); Ind. Code § 8-1-34-16(a); Iowa Code § 477A.2; Kan. Stat. Ann. § 12-2023(a); Haw. Rev. Stat. § 440G-6; La. Rev. Stat. §§ 45:1364, 45:1377 (state is franchising authority except in home rule charter communities); Mich. Gen. Laws § 484.3305 (franchises are granted by local government, but only on uniform terms set by statute); Mo. Rev. Stat. § 67.2679.4; Nev. Rev. Stat. § 711.410; N.J. Stat. Ann. §§ 48:5A-9, 48:5A-15, 48:5A-16 (provider must elect either a local franchise or a state-issued certificate of franchise authority); N.C. Gen. Stat. Ann. § 66-351; Ohio Rev. Code Ann. § 1332.24(A)(2); S.C. Code §§ 58-12-300(5), 58-12-310; Tenn. Code Ann. § 7-59- 304(a) (provider must elect either a local franchise or a state-issued certificate of franchise authority); Tex. Util. Code Ann. § 66.001; Vt. Stat. Ann. tit. 30, § 502(b); Wis. Stat. Ann. § 66.0420(4).

[427] 47 U.S.C. § 556(c) (emphasis added). As we explain above, this preemption does not extend to state regulation of intrastate telecommunications services or regulation related to matters of public health, safety, and welfare that otherwise is consistent with the Act, and nothing in this Order is intended to disturb the traditional role that states have played in these regards. *See supra* para. 79 and *infra* para. 117.

[428] *First Report and Order*, 22 FCC Rcd at 5102, para. 1 ("We find that the current operation of the local franchising process in many jurisdictions constitutes an unreasonable barrier to entry that impedes the achievement of the interrelated federal goals of enhanced cable competition and accelerated broadband deployment.").

[429] For these reasons, we disagree with commenters who argue that applying the Commission's rules at the state level is contrary to the Cable Act's purpose of "assur[ing] that cable systems are responsive to the needs and interests of the local community." 47 U.S.C. § 521(2). The City of Philadelphia, for example, argues that extending the Commission's rules to state-level actions would "unduly restrict state and local governments from addressing local and hyperlocal cable-related issues." *See* City of Philadelphia *et al.* Comments at vii. For the reasons discussed above, we are not convinced that applying our rules to state franchising authorities will impede the ability of state and local authorities to address local issues. Rather, by doing so, we ensure that the goals of the Cable Act, as determined by Congress, including "encourag[ing] the growth and development of cable systems," are fully realized. 47 U.S.C. § 521(2).

[430] Comments of Verizon at 11-12.

[431] *See, e.g.*, Anne Arundel County *et al.* Comments at 45; City and County of San Francisco Comments at 8-9. For example, California's Digital Infrastructure and Video Competition Act (DIVCA) assesses an annual administrative fee and authorizes LFAs to assess on both cable operators and non-cable video franchise holders, up to a one-percent fee on gross revenues for PEG, in addition to a state franchise fee of five percent of gross revenues. Cal. Pub. Util. Code §§ 441 (providing for the annual determination of franchise fees), 5830(f), (h) (establishing that DIVCA applies to all "holders of a state franchise" that authorizes the "operation of any network in the right-of-way capable of providing video service to subscribers"). *See also* City and County of San Francisco Comments at 8-9. The Eastern District of California found that DIVCA was a law of "general applicability" for the purposes of section 622 in *Comcast of Sacramento*. 250 F. Supp. 3d at 624, *vacated and remanded Comcast of Sacramento I, LLC v. Sacramento Metro. Cable Television Comm'n*, No. 17-16847, 2019 WL 2018280, at *7 (9th Cir. May 8, 2019).

[432] *See, e.g.*, Anne Arundel County *et al.* Comments at 45 (quoting 47 U.S.C. § 542(g)(2)(A)).

[433] 47 U.S.C. § 556(a) ("Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter.").

[434] Anne Arundel County *et al.* Comments at 45-48. In Illinois, for example, state law requires that cable operators provide "line drops and free basic service to public buildings." *See* City Coalition Comments at 26 (citing 220 ILCS 5/22-501(f)). The Illinois statute defines a "service line drop" as "the point of connection between a premises and

(continued….)

(FRFA) relating to this Order.  The FRFA is set forth in the Appendix.

121.    *Paperwork Reduction Analysis*.  This document does not contain new or revised information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104-13 (44 U.S.C. §§ 3501-3520). In addition, therefore, it does not contain any new or modified "information burden for small business concerns with fewer than 25 employees" pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, 44 U.S.C. § 3506(c)(4).

122.    *Congressional Review Act*.  The Commission will send a copy of this Order to Congress and the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. § 801(a)(1)(A).

123.    *Additional Information*.  For additional information on this proceeding, contact Maria Mullarkey or Raelynn Remy of the Media Bureau, Policy Division, at Maria.Mullarkey@fcc.gov, Raelynn.Remy@fcc.gov or (202) 418-2120.

## V.    ORDERING CLAUSES

124.    Accordingly, **IT IS ORDERED** that, pursuant to the authority found in sections 1, 4(i), 201(b), 230, 303, 602, 621, 622, 624, and 636 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 201(b), 230, 303, 522, 541, 542, 544, and 556, this Third Report and Order **IS ADOPTED**.

125.    **IT IS FURTHER ORDERED** that the the Commission's rules **ARE HEREBY AMENDED** as set forth in Appendix A and such rule amendments shall be effective 30 days after publication in the *Federal Register*.

126.    **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Third Report and Order, including the Final Regulatory Flexibility Act Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

127.    **IT IS FURTHER ORDERED** that, pursuant to section 801(a)(1)(A) of the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A), the Commission **SHALL SEND** a copy of the Third Report and Order to Congress and the Government Accountability Office.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

(Continued from previous page) ———————————
the cable or video network that enables the premises to receive cable service or video service."  220 ILCS 5/22-501.

[435] *See id.*  Similarly, one commenter claims that DIVCA reflected a legislative compromise between cable operators and franchising authorities that would be upset if the Commission's rules were extended to state level actions.  Anne Arundel County *et al.* Comments at 46-47 ("For the Commission to import, wholesale, its determinations under Section 621 into the California state franchise would upset state policy and undermine the very goal of the Commission to ease entry by new entrants.").

[436] NCTA Reply at 29-30 & n.100.

[437] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. § 601, *et. seq.,* has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996).  The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

**Federal Communications Commission**     FCC 19-80

# APPENDIX A

## Final Rules

Part 76 of Title 47 of the U.S. Code of Federal Regulations is amended to read as follows:

PART 76 – MULTICHANNEL VIDEO AND CABLE TELEVISION SERVICE

1.     The authority citation for Part 76 continues to read as follows:

AUTHORITY:  47 U.S.C. 151, 152, 153, 154, 201, 230, 301, 302, 302a, 303, 303a, 307, 308, 309, 312, 315, 317, 325, 338, 339, 340, 341, 503, 521, 522, 531, 532, 534, 535, 536, 537, 541, 542, 543, 544, 544a, 545, 548, 549, 552, 554, 556, 558, 560, 561, 571, 572, 573.

2.     Revise Subpart C to read as follows:

Subpart C – Cable Franchising

3.     Add new Section 76.42 to read as follows:

**§ 76.42 – In-Kind Contributions.**

(a)     In-kind, cable-related contributions are "franchise fees" subject to the five percent cap set forth in 47 U.S.C. 542(b).  Such contributions, which count toward the five percent cap at their fair market value, include any non-monetary contributions related to the provision of cable service by a cable operator as a condition or requirement of a local franchise, including but not limited to:

(1)     Costs attributable to the provision of free or discounted cable service to public buildings, including buildings leased by or under control of the franchising authority;
(2)     Costs in support of public, educational, or governmental access facilities, with the exception of capital costs; and
(3)     Costs attributable to the construction of institutional networks.

(b)     In-kind, cable-related contributions do not include the costs of complying with build-out and customer service requirements.

4.     Add new Section 76.43 to read as follows:

**§ 76.43 – Mixed-Use Rule.**

A franchising authority may not regulate the provision of any services other than cable services offered over the cable system of a cable operator, with the exception of channel capacity on institutional networks.

**APPENDIX B**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Second Further Notice of Proposed Rulemaking (Second FNPRM) in this proceeding.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the Second FNPRM, including comment on the IRFA.  The Commission received one comment on the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

**A.        Need for, and Objectives of, the Report and Order**

2.        In the Report and Order, we interpret sections of the Communications Act of 1934, as amended (the Act) that govern how local franchising authorities (LFAs) may regulate cable operators and cable television services, with specific focus on issues remanded from the United States Court of Appeals for the Sixth Circuit (Sixth Circuit) in *Montgomery County, Md. et al. v. FCC* (*Montgomery County*).[4]  Section 621(a)(1) of the Act prohibits LFAs from unreasonably refusing to award competitive franchises for the provision of cable television services.[5]  To better define what constitutes "unreasonable" acts by an LFA, the Commission adopted rules implementing section 621(a)(1), including rules governing the treatment of certain costs and fees charged to cable operators by LFAs and LFAs' regulation of cable operators' "mixed-use" networks.[6]

3.        In *Montgomery County*, the court directed the Commission on remand to provide an explanation for its decision to treat cable-related, in-kind contributions charged to cable operators by LFAs as "franchise fees" subject to the statutory five percent cap on such fees set forth in section 622(g) of the Act.[7]  The court also directed the Commission to provide a statutory basis for its decision to extend its "mixed-use" ruling—which prohibits LFAs from regulating the provision of services other than cable services offered over cable systems used to provide both cable services and non-cable services—to incumbent cable operators that are not common carriers.[8]  This Order seeks to explain and establish the

---

[1] *See* 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).  The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

[2] *See Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Second Further Notice of Proposed Rulemaking, MB Docket No. 05-311, 33 FCC Rcd 8952, 8953-9 (2018) (*Second FNPRM*).

[3] *See* 5 U.S.C. § 604.

[4] *Montgomery County, Md. et al. v. FCC*, 863 F.3d 485 (6th Cir. 2017).

[5] 47 U.S.C. § 541(a)(1).

[6] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 5101 (2007) (*First Report and Order*), *aff'd sub nom. Alliance for Community Media et al. v. FCC*, 529 F.3d 763 (6th Cir. 2008) (*Alliance*), *cert. denied*, 557 U.S. 904 (2009); *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Second Report and Order, 22 FCC Rcd 19633 (2007) (*Second Report and Order*), *recon. Granted in part, denied in part*; *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, Order on Reconsideration, 30 FCC Rcd 810 (2015) (*Order on Reconsideration*); *Second FNPRM*, 33 FCC Rcd 8952 (2018).

[7] *Montgomery County*, 863 F.3d at 491-92.

[8] *Id*. at 493.

**Federal Communications Commission**                    **FCC 19-80**

statutory basis for the Commission's interpretation of the Act in order to better fulfill the Commission's goals of eliminating regulatory obstacles in the marketplace for cable services and encouraging broadband investment and deployment by cable operators.

4.         In this Order, we first conclude that cable-related, "in-kind" contributions required by a cable franchise agreement are franchise fees subject to the statutory five percent cap on franchise fees set forth in section 622 of the Act.[9]  We base this conclusion on the broad definition of franchise fee in section 622, which is not limited to monetary contributions.  We interpret the Act's limited exceptions to the definition of franchise fee, including an exemption for capital costs related to public, educational, and governmental (PEG) channels, such as equipment costs or those associated with building a facility.[10]  We also reaffirm that this rule applies to both new entrants and incumbent cable operators.  Second, we conclude that under the Act, LFAs may not regulate the provision of most non-cable services, including broadband Internet access service, offered over a cable system by an incumbent cable operator that is not a common carrier.  Finally, we conclude that Commission guidance concerning LFAs' regulation of cable operators should apply to state-level franchising actions and regulations that impose requirements on local franchising.

### B.         Legal Basis

5.         The authority for the action taken in this rulemaking is contained in Sections 1, 4(i), 201(b), 230, 303, 602, 621, 622, 624, and 636 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i), 201, 230, 303, 522, 541, 542, 544, and 556.

### C.         Summary of Significant Issues Raised by Public Comments in Response to the IRFA

6.         Only one commenter, the City of Newton Massachusetts, submitted a comment that specifically responded to the IRFA.[11]  The City of Newton suggests that a transition period of at least six years is needed to satisfy the Commission's Regulatory Flexibility Act obligation to minimize significant financial impacts on small communities and non-profit organizations. This City of Newton argues that this transition period is needed to allow time for affected parties to: (1) identify cable-related in kind contributions which count against the franchise fee cap; (2) reach agreement on the valuation of cable-related in-kind contributions; (3) resolve any disputes with respect to those issues; and (4) adjust their contractual commitments in light of any prospective reduction in franchise fee revenues (and the timing of those reductions).

### D.         Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

7.         The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules.[12]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[13]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[14]  A small business concern is one which:

---

[9] 47 U.S.C. § 542.

[10] *Id.*

[11] Letter from Ruthanne Fuller, Mayor and Issuing Authority, and Alan D. Mandl, Assistant City Solicitor, City of Newton, Massachusetts, to Chairman Pai and Commissioners Carr, O'Rielly and Rosenworcel, FCC, MB Docket No. 05-311, at 7 (filed Nov. 14, 2018) (City of Newton Letter); City of Newton Comments at 3-4.

[12] 5 U.S.C. § 603(b)(3).

[13] *Id.* § 601(6).

[14] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes

(continued….)

(1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[15]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

8.      *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe three broad groups of small entities that could be affected under these rules.[16]  First, while we do use industry specific size standards for small businesses in the regulatory flexibility analysis, according to data from the SBA's Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[17]  These types of small businesses represent 99.9% of all businesses in the United States which translates to 28.8 million businesses.[18]

9.      Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[19]  Nationwide, as of August 2016, there were approximately 356,494 small organizations based on registration and tax data filed by nonprofits with the Internal Revenue Service (IRS).[20]

10.      Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty-thousand."[21]  U.S. Census Bureau data from the 2012 Census of Governments[22] indicate that there were 90,056 local governmental jurisdictions consisting of General and Specific Purpose governments in the United States.[23]  Of this number there were 37,132 General Purpose governments (county,[24] municipal and town or township[25]) with populations of less than 50,000 and 12,184 Special Purpose governments (independent school districts[26] and special districts[27]) with populations of less than 50,000.  The 2012 U.S. Census Bureau data for the types of governments in the local government category show that most of these governments have populations of less than 50,000.[28]  Based on these data, we estimate that at least 49,316 local government jurisdictions fall in the category of

---

(Continued from previous page) ———————————————

one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  5 U.S.C. § 601(3).

[15] 15 U.S.C. § 632.

[16] *See* 5 U.S.C. § 601(3)-(6).

[17] *See* SBA, Office of Advocacy, "Frequently Asked Questions, Question 1 – What is a small business?" https://www.sba.gov/sites/default/files/advocacy/SB-FAQ-2016_WEB.pdf (June 2016).

[18] *See* SBA, Office of Advocacy, "Frequently Asked Questions, Question 2 – How many small businesses are there in the U.S.?" https://www.sba.gov/sites/default/files/advocacy/SB-FAQ-2016_WEB.pdf (June 2016).

[19] 5 U.S.C. § 601(4).

[20] Data from the Urban Institute, National Center for Charitable Statistics (NCCS) reporting on nonprofit organizations registered with the IRS was used to estimate the number of small organizations.  Reports generated using the NCCS online database indicated that as of August 2016 there were 356,494 registered nonprofits with total revenues of less than $100,000.  Of this number, 326,897 entities filed tax returns with 65,113 registered nonprofits reporting total revenues of $50,000 or less.  *See* https://nccs.urban.org/sites/all/nccs-archive/html//tablewiz/tw.php where the report showing this data can be generated by selecting the following data fields: Show: "Registered Nonprofit Organizations"; By: "Total Revenue Level (years 1995, Aug. to 2016, Aug.)"; and For: "2016, Aug.".

[21] 5 U.S.C. § 601(5).

[22] *See* 13 U.S.C. § 161.  The Census of Governments is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Program Description Census of Government. https://factfinder.census.gov/faces/affhelp/jsf/pages/metadata.xhtml?lang=en&type=program&id=program.en.COG#

[23] *See* U.S. Census Bureau, 2012 Census of Governments, Local Governments by Type and State: 2012 - United States-States.

(continued….)

"small government jurisdictions."[29]

11.     *Wired Telecommunications Carriers*. The U.S. Census Bureau defines this industry as "establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired communications networks. Transmission facilities may be based on a single technology or a combination of technologies. Establishments in this industry use the wired telecommunications network facilities that they operate to provide a variety of services, such as wired telephony services, including VoIP services, wired (cable) audio and video programming distribution, and wired broadband Internet services. By exception, establishments providing satellite television distribution services using facilities and infrastructure that they operate are included in this industry."[30] The SBA has developed a small business size standard for Wired Telecommunications Carriers, which consists of all such companies having 1,500 or fewer employees.[31] U.S. Census data for 2012 show there were 3,117 firms that operated that year.[32] Of this total, 3,083 operated with fewer than 1,000 employees.[33] Thus, under this size standard, the majority of firms in this industry can be considered small.

12.     *Cable Companies and Systems (Rate Regulation Standard)*. The Commission has developed its own small business size standards for cable rate regulation. Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers nationwide.[34] Industry data indicate that of 4,600 cable operators nationwide, all but nine are small under this size standard.[35] In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[36] Industry data indicate that of 4,600 systems nationwide, 3,900 have fewer than 15,000 subscribers, based on the same records.[37] Thus, under this second size standard, the Commission believes that most cable systems are small.

13.     *Cable System Operators*. The Act also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer

(Continued from previous page) ————

https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG02.US01&prod Type=table. Local governmental jurisdictions are classified in two categories – General purpose (county, municipal, and town or township) and Special purpose (special districts and independent school districts).

[24] *See id.*, County Governments by Population-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG06.US01&prod Type=table. There were 2,114 county governments with populations of less than 50,000.

[25] *See id.*, Subcounty General-Purpose Governments by Population-Size Group and State: 2012-United States-States. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG07.US01&prod Type=table. There were 18,811 municipal and 16,207 town/township governments with populations of less than 50,000.

[26] *See id.*, Elementary and Secondary School Systems by Enrollment-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG11.US01&prod Type=table. There were 12,184 independent school districts with enrollment populations of less than 50,000.

[27] *See id.*, Special District Governments by Function and State: 2012 - United States-States. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG09.US01&prod Type=table. The U.S. Census Bureau data did not provide a population breakout for special district governments.

[28] *See id.*, County Governments by Population-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG06.US01&prod Type=table; Subcounty General-Purpose Governments by Population-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG07.US01&prod Type=table; and Elementary and Secondary School Systems by Enrollment-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=COG_2012_ORG11.US01&prod

(continued….)

than one-percent of all subscribers in the United States and is not affiliated with any; entity or entities whose gross annual revenues in the aggregate exceed $250,000."[38]  There are approximately 52,403,705 cable subscribers in the United States today.[39]  Accordingly, an operator serving fewer than 524,037 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total revenues of all its affiliates, do not exceed $250 million in the aggregate.[40]  Based on the available data, we find that all but nine independent cable operators are affiliated with entities whose gross annual revenues exceed $250 million.[41]  Although it seems certain that some of these cable system operators are affiliated with entities whose gross annual revenues exceed $250 million, we note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[42] and therefore we are unable to estimate more accurately the number of cable system operators that would qualify as small under the definition in the Communications Act.

14.     *Open Video Services*.  Open Video Service (OVS) systems provide subscription services[43] and the OVS framework is one of four statutorily recognized options for the provision of video programming services by local exchange carriers.[44]  The OVS framework provides opportunities for the distribution of video programming other than through cable systems.  Because OVS operators provide subscription services, OVS falls within the SBA small business size standard covering cable services or "Wired Telecommunications Carriers."[45]  The SBA has developed a small business size standard for this category which covers all such firms having 1,500 or fewer employees.[46]  According to the 2012 U.S. Census, there were 3,117 firms considered Wired Telecommunications Carriers in 2012, of which 3,083 operated with fewer than 1,000 employees.[47]  Based on these data, most of these firms can be considered small.  In addition, we note that the Commission has certified approximately 45 OVS operators to serve 116 areas, although most of these operators are not yet providing service.[48]  Broadband Service Providers (BSPs) are currently the only significant holders of OVS certifications or local OVS franchises.[49]  At least

---

(Continued from previous page) ————————————————

Type=table.  While U.S. Census Bureau data did not provide a population breakout for special district governments, if the population of less than 50,000 for this category of local government is consistent with the other types of local governments, the majority of the 38,266 special district governments have populations of less than 50,000.

[29] *Id.*

[30] *See* 13 CFR § 120.201.  The U.S Census Bureau uses the NAICS code 517110 for the Wired Telecommunications Carrier category.  *See* https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t#none.

[31] *Id.* § 201.121.

[32] *See* U.S. Census Bureau, *2012 Economic Census of the United States*, Table No. EC1251SSSZ5, *Information: Subject Series - Estab & Firm Size: Employment Size of Firms: 2012*. (517110 Wired Telecommunications Carriers).  https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517110.

[33] *Id.*

[34] 47 CFR § 76.901(e).  The Commission determined that this size standard equates approximately to a size standard of $100 million or less in annual revenues.  *Implementations of Sections of the 1992 Cable Act: Rate Regulation*, Sixth Report and Order and Eleventh Order on Reconsideration, 10 FCC Rcd 7393, 7408 (1995).

[35] The number of active, registered cable systems comes from the Commission's Cable Operations and Licensing System (COALS) database on August 15, 2015.  *See* FCC, Cable Operations and Licensing Systems (COALS).  www.fcc.gov/coals (last visited June 21, 2019).

[36] 47 CFR § 76.901(c).

[37] *See* FCC, Cable Operations and Licensing Systems (COALS).  www.fcc.gov/coals.

one OVS operator, Affiliates of Residential Communications Network, Inc. (RCN), has sufficient revenues to ensure they do not qualify as a small business entity. However, the Commission does not have financial or employment information for the other entities which are not yet operational. Thus, the Commission concludes that up to 44 OVS operators (those remaining) could potentially qualify as small businesses that may be affected by the rules and policies adopted herein.

   E.    **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

   15.    The rules adopted in this Order will impose no additional reporting or recordkeeping requirements. We expect the compliance requirements—namely, modifying and renewing cable franchise agreements to comport with the law—will have only a *de minimis* effect on small entities. As ACA explains, "most franchising authorities understand the limits of their authority and do not impose unlawful requirements on [small cable operators]."[50] LFAs will continue to review and make decisions on applications for cable franchises as they already do, and any modifications to the local franchising process resulting from these rules will further streamline that process. The rules will streamline the local franchising process by providing guidance as to: the appropriate treatment of cable-related, in-kind contributions demanded by LFAs for purposes of the statutory five percent franchise fee cap, what constitutes "cable-related, in-kind contributions," and how such contributions are to be valued. The rules will also streamline the local franchising process by making clear that LFAs may not use their video franchising authority to regulate the provision of certain non-cable services offered over cable systems by incumbent cable operators. The same can be said of franchising at the state level. The rules will help streamline the franchising process by ensuring that applicable statutory provisions are interpreted uniformly throughout the country.

(Continued from previous page) ———————————————

[38] 47 U.S.C. § 543(m)(2). *See also* 47 CFR § 76.901(f).

[39] *See* SNL Kagan at https://www.snl.com/interactivex/MultichannelIndustryBenchmarks.aspx.

[40] 47 CFR § 76.901(f); *See FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice, 16 FCC Rcd 2225 (Cable Services Bur. 2001).

[41] *See* SNL Kagan at https://www.snl.com/interactivex/TopCableMSOs.aspx.

[42] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules.

[43] *See* 47 U.S.C. § 573.

[44] *Id*. § 571(a)(3)-(4). *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Thirteenth Annual Report, 24 FCC Rcd 542, 606, Para. 135 (2009) (*13th Annual Report*).

[45] 13 CFR § 201.121. The U.S Census Bureau uses the NAICS code 517110 for the Wired Telecommunications Carrier category. *See* https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t#none.

[46] *Id*.

[47] *See* U.S. Census Bureau, *2012 Economic Census of the United States*, Table No. EC1251SSSZ5, *Information: Subject Series – Estab & Firm Size: Employment Size of Firms: 2012* (517110 Wired Telecommunications Carriers). https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517110.

[48] A list of OVS certifications may be found at https://www.fcc.gov/general/current-filings-certification-open-video-systems#block-menu-block-4.

[49] *See 13th Annual Report*, 24 FCC Rcd at 606-07, para. 135. BSPs are newer firms that are building state-of-the-art facilities-based networks to provide video, voice, and data services over a single network.

[50] Letter from Ross Lieberman, Senior Vice President, Government Affairs ACA Connects–America's Communications Association, to Marlene Dortch, Secretary, FCC, at 1 (July 25, 2019).

**Federal Communications Commission** FCC 19-80

F. **Steps Taken to Minimize Significant Economic Impact on Small Entities and Significant Alternatives Considered**

16. The RFA requires an agency to describe any significant alternatives it has considered in reaching its proposed approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance, rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities."[51]

17. To the extent that these rules are matters of statutory interpretation, we find that the adopted rules are statutorily mandated and therefore no meaningful alternatives exist.[52] Moreover, as noted above, the rules are expected to have only a *de minimis* effect on small entities. The rules will also streamline the local franchising process by providing additional guidance to LFAs.

18. Treating cable-related, in-kind contributions as "franchise fees" subject to the statutory five percent franchise fee cap will benefit small cable operators by ensuring that LFAs do not circumvent the statutory five percent cap by demanding, for example, unlimited free or discounted services. This in turn will help to ensure that local franchising requirements do not deter small cable operators from investing in new services and facilities. Similarly, applying these rules at the state level helps to ensure that such deterrence does not come from state-level franchising requirements either. Finally, applying the Commission's mixed-use rule to all incumbent cable operators helps to ensure that all small cable operators may compete on a level playing field because incumbent cable operators will now be subject to the same rule that applies to competitive cable operators. We disagree with the City of Newton's argument that we should afford small entities six years to implement these changes—the issues that City of Newton raises are matters of statutory interpretation, and the Communications Act does not provide for the implementation period that the City of Newton requests.

G. **Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

19. None.

H. **Report to Congress**

20. The Commission will send a copy of the Report and Order, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[53] In addition, the Commission will send a copy of the Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration. The Report and Order and FRFA (or summaries thereof) will also be published in the Federal Register.[54]

---

[51] 5 U.S.C. § 603(c)(1)-(4).

[52] For this reason, we disagree with NATOA *et al.* that our actions will affect service to senior citizens, or to schools, libraries, and other public buildings and that this analysis is inadequate. *See* Letter from Joseph Van Eaton *et al.*, Counsel to Anne Arundel County, *et al.* to Marlene H. Dortch, Secretary, FCC at 2 (July 24, 2019). This argument is essentially that the statutory cap does not afford local governments enough money to serve their constituents, and we do not have the authority to amend the statute.

[53] *See id.* § 801(a)(1)(A).

[54] *See id.* § 604(b).

Federal Communications Commission                                    FCC 19-80

# STATEMENT OF
# CHAIRMAN AJIT PAI

Re:  *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992,* MB Docket No. 05-311.

As Scott Turow famously said in *One L: The Turbulent True Story of a First Year at Harvard Law School*, reading law is "something like stirring concrete with [your] eyelashes."  And in few areas of law is the stirring more difficult than statutory interpretation.  The canons of statutory construction are not plot points in John Grisham thrillers, and I doubt they will feature in next year's *Legally Blonde 3*.  But as an agency charged with implementing the laws passed by Congress, statutory construction is fundamental to the Commission's work.

Thankfully, some issues of statutory interpretation are more straightforward than others.  For example, today we decide that "in-kind" contributions made by cable operators for the non-capital costs of public, educational, and government (PEG) access channels count against the five percent cap on franchise fees set forth in Section 622 of the Communications Act (the Act).[1]  I understand that many PEG operators are unhappy with this outcome.  But it is the inevitable result of the statute passed by Congress.

Here's why.  The statute plainly defines a "franchise fee" to include "*any tax, fee, or assessment of any kind.*"[2]  It then sets forth two exceptions to that definition related to PEG channels.  For franchises in effect back in 1984, when the statute was passed, there is a broad exemption for "payments which are required by the franchise to be made by the cable operator during the term of such franchise for, or in support or the use of, public, educational, or government access facilities."[3]  But for franchises granted later, the exemption is much narrower, covering only "capital costs which are required by the franchise to be incurred by the cable operator for public, educational, or governmental access facilities."[4]

This legal framework tells us two things.  First, given these specific exemptions, the five percent cap (and associated franchise fee definition) does not include a general exemption from cable-related, in-kind contributions.  Congress could have—but did not—create one.  And the specific exemptions would be unnecessary if there were such a general exemption.  The Supreme Court has made clear that it is "'reluctan[t] to treat statutory terms as surplusage' in any setting."[5]  So are we.

Second, with respect to post-1984 franchises, capital costs are the only PEG costs that are exempt from the definition of franchise fees.  Understandably, PEG operators and many local governments in this proceeding would like to benefit from the broader exclusion.  But that's not what the statute says.  The broader exemption by its plain terms only applies to franchises in existence back in 1984.  Congress was clearly aware of the distinction between existing and post-1984 franchises when it established these exemptions, and we don't have the authority to rewrite the statute to expand the narrower, post-1984 one.  This is Statutory Interpretation 101.

---

[1] 47 U.S.C. § 542(b).

[2] 47 U.S.C. § 542(g)(1) (emphasis added).

[3] 47 U.S.C. § 542(g)(2)(B).

[4] 47 U.S.C. § 542(g)(2)(C).

[5] *Duncan v. Walker*, 533 U.S. 167, 174 (2001), quoting *Babbitt v. Sweet Home Chapter, Communities for Great Ore.*, 515 U.S. 687, 698 (1995).

To be sure, all of the issues of statutory construction addressed in this item aren't as easy as this one. But in each instance, we carefully parse the statute and arrive at the right result. For example, we correctly affirm that local franchising authorities (LFAs) may not regulate the provision of most non-cable services, including broadband Internet access service, offered over a cable system. And we find that the Act preempts any state or local regulation of a cable operator's non-cable services that would impose obligations on franchised cable operators beyond what Title VI of the Act allows. Obviously, some local governments that are eager to keep biting the regulatory apple object to this outcome. But the question of preemption is squarely addressed by the statute. Section 636(c) of the Act explicitly provides that "any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this Act *shall* be deemed to be preempted and superseded."[6]

Now, let us suppose—and I know it seems improbable, but bear with me here—that some are not convinced by legal arguments and simply want to allow contributions the statute explicitly forbids, and permit regulations that it explicitly does not permit. The solution is simple: change the law. The job of administrative agencies like ours is not to rewrite laws set forth by Congress. It is to implement those laws. As the Supreme Court has opined, "[u]nder our system of government, Congress makes laws and the President, acting at times through agencies . . . , 'faithfully execute[s]' them. The power of executing the laws . . . does not include a power to revise clear statutory terms."[7]

Looking beyond the law, today's *Third Report and Order* is good for American consumers. That's because costs imposed by LFAs through in-kind contributions and fees imposed on broadband Internet access service get passed on to consumers. LFAs have not cracked the secret to a free lunch. Moreover, every dollar paid in excessive fees is a dollar that by definition cannot and will not be invested in upgrading and expanding networks. This discourages the deployment of new services like faster home broadband or better Wi-Fi or Internet of Things networks. So, by simply insisting that LFAs comply with the law, we will reduce costs for consumers and expedite the deployment of next-generation services. Good law *and* good policy.

Thank you to the dedicated staff who worked on this important item: from the Media Bureau, Michelle Carey, Martha Heller, Maria Mullarkey, Brendan Murray, Raelynn Remy, and Holly Saurer; and from the Office of General Counsel, Susan Aaron, Michael Carlson, Maureen Flood, Thomas Johnson, and Bill Richardson. When it comes to stirring the concrete of statutory construction, you bring a cement mixer to the task rather than eyelashes.

---

[6] 47 U.S.C. § 556(c) (emphasis added).

[7] *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 327 (2014).

**Federal Communications Commission**                    **FCC 19-80**

## STATEMENT OF
## COMMISSIONER MICHAEL O'RIELLY

Re:  *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992,* MB Docket No. 05-311.

As I've stated many times since we began the media modernization effort, the video marketplace is changing dramatically, and each step we have taken to update anachronistic and clunky regulations makes it slightly easier for regulated industries to compete with their unregulated competitors.  Though much work remains, I look forward to continuing the effort.  At the same time, and as we see in the background of today's item, it is unsurprising that other stakeholders, such as franchise authorities, also feel their own pressures due to the changing market dynamics, whether budgetary or political.  They too seek ways to either continue their past practices unabated or seek ways to maximize returns on their regulatory roles.  However, Title VI of the Communications Act places important restraints on their reach, and unauthorized expansion of the statute is flatly wrong and must be held in check.  The courts have agreed, and I am pleased that today we make strides toward answering the Sixth Circuit, by addressing three main areas raised in or affected by its remand.

First, the Order rightly counts cable-related "in-kind" contributions against the statutory cap. Failing to do so would effectively render the statute's restraints meaningless, or nearly so.  Critics may argue that local franchise authorities have the weaker position when dealing at arm's length with video providers, but the record and experience show otherwise.  There are numerous examples of where video providers lack the ability to say no to "voluntary" waivers of the five percent cap, having no recourse but to agree to all manner of in-kind contributions, ranging from providing all the necessary equipment to produce PEG programming in New York City, to supplying transport lines to cover ice cream socials in Minnesota.  There are many examples in the record, but the point is: failure to agree to such terms could result in jeopardizing the franchise, and that is a risk many companies simply cannot afford to take.  The Commission's role is to interpret and enforce the statute based on the record, and today we appropriately define cable-related in-kind contributions to prevent end-runs around the statutory cap.

Second, the Order also correctly preempts state-level franchise authorities who would seek to obliterate the statutory boundaries that are in place.  Unfair and unreasonable fees and contributions beyond five percent of gross revenues for cable services conflict with the law, whether the franchisor is a state or local actor.  The statute itself explicitly refuses to restrict states from exercising jurisdiction over cable services.  In fact, about half of all states have authorized state-level franchise authorities.  There is no good legal or policy reason for restraining the activities of local franchisors while allowing state authorities to continue unbounded, and I thank the Chairman for including this matter in the NPRM so that we could go to Order today on it.

Third, there are two issues regarding PEG contributions that could receive further attention as the record more fully develops.  While I would have preferred a narrower definition of "capital costs," limiting such contributions to construction-related costs for PEG facilities, the item does acknowledge today that the current record has room to grow, leaving us the option to revisit this matter in the future. Similarly, we clearly acknowledge the need to resolve the PEG channel capacity cost question and expressly commit to doing so within the next year.  This is a vital endeavor, so I thank the Chairman for working with me on this matter and look forward to the admittedly complex and rigorous undertaking.

Separately, and perhaps most significantly, the item properly rejects the ability of state or local governments to impose franchise fees on non-cable services.  Inappropriate court determinations, such as the Eugene, Oregon, franchise case, have wrongly tried to open the door to the imposition of such fees on other services offered by what have traditionally been called cable operators.  However, the statute is quite clear on the matter and the item appropriately clarifies that franchises authorities can only regulate

**Federal Communications Commission**                                    **FCC 19-80**

cable services.  Today's action closes off potential revenues for franchise authorities from non-cable services, which is the right statutory reading.  Further, allowing these entities to usurp the statute by imposing fees on the offering of broadband services would ignore the resulting harm to consumers.  For instance, Congress has recognized multiple times that allowing governmental fees and taxes does affect Internet adoption rates.  Given that almost everyone recognizes the importance of broadband availability, deterring its use would be at best, counterproductive.  Moreover, without such a limitation, there appears to be no outer limit to the types of non-cable services for which a cable operator could be forced to pay fees.  Today, it's broadband in the cross-hairs, but tomorrow it could be cloud services or over-the-top video services, for example.

Finally, I'll end with two points regarding the judicial and legislative implications of today's item.  On the matter of applying today's Order to existing franchise agreements, I worry that we are punting too much of the burden to the overworked courts and would be better served by delineating a clear process under the Commission's purview.  However, I support the efforts of my colleague Commissioner Carr to make Section 636 controlling, which will at a minimum provide a clearer starting point for negotiations.  I would also note that I support my colleague's effort to clarify that the provisions of this Order cannot be waived.  We will be closely watching to ensure that no franchise authorities seek to make an end run around the reforms contained in this Order by demanding that franchisees waive any of the provisions.  Regarding the need for legislation, I hope that Congress will take note of our effort today and consider launching an ambitious, but much needed, review of Title VI in its entirety.  We are bringing the regulations more in line with the statute today, but the whole ecosystem would be well-served by a wholesale rewrite of the statute and an acknowledgement of the current market realities.

But, this item shouldn't and won't be the end of our work to eliminate outdated rules and scale back inappropriate actions by state and local franchise authorities.  For our media modernization initiative, I will be submitting soon a new round of ideas for the Chairman's consideration.  On a larger scale, I am hard at work on a blog outlining the fundamental overhaul needed to address our outdated franchising regime and the need to further curtail "creatively harmful" efforts by franchise authorities.

I approve.

Federal Communications Commission                                    FCC 19-80

## STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re: *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992,* MB Docket No. 05-311.

If you tax something, you get less of it. Yet politicians around the country have been treating Americans' cable and broadband bills as a piggy bank to line government coffers. Those illegal taxes only raise our costs, make it harder to access the Internet, and curb competition. Today, we vote to end this outlier conduct.

Doing so is not only required by federal law. It's the right thing to do. Policymakers at all levels of government should be making it easier and less expensive to build out broadband infrastructure. That is why this FCC has been eliminating regulatory costs and cutting red tape. It's so that next-gen networks can be built, increasing competition and choice.

Regulatory reform matters—and not just in some abstract or theoretical sense. We know it from our own experience.

Take this Commission's actions to get the government out of the way so the private sector can build 5G. We modernized the federal historic and environmental rules that apply to small cells. We addressed outlier conduct at the state and local level by tackling high fees and long delays in the permitting process. Combined, those two decisions cut about $3.6 billion in red tape that had slowed down broadband builds and limited competition.

In fact, those and other FCC reforms are already delivering results. Internet speeds are up nearly 40 percent. Americans saw more fiber broadband built to their homes last year than ever before. The number of small cells put up increased from 13,000 in 2017 to more than 60,000 in 2018. Investment in broadband networks is back on the rise. And the U.S. now has the world's largest 5G deployment.

We know the opportunity that broadband enables—from creating jobs to improving access to high-quality healthcare and education. That's why, as policymakers and regulators, we must always view broadband as an opportunity for consumers—not tax collectors.

That brings us to today's Order. Congress recognized decades ago that excessive taxes and in-kind demands, which have the same effect, could threaten innovative services and lead to higher prices. That's why Congress capped franchise fees at five percent of cable revenue. Congress wanted to encourage voice and Internet service offered over cable systems by shielding those services from taxes and regulations.

The Commission knows well that outlier fees and restrictions limit buildout. We saw that with small cells, where cities like New York and San Jose leveraged their monopolies over the rights of way to demand exorbitant fees and concessions wholly unrelated to the cost of rights of ways. And we're seeing a similar dynamic here with cable franchising.

Some local franchising authorities have taken advantage of their roles as regulators to force providers to offer free service to municipal liquor stores and government-owned golf courses. Others have imposed broadband and voice taxes on top of existing franchise fees. And others have required providers to obtain entirely separate franchises to provide Wi-Fi and cellular backhaul even though they're already authorized under existing franchise laws.

This abusive behavior has consequences. Money that could otherwise be spent on network

deployments and upgrades is instead diverted to the government's own pockets.  Ultimately, consumers take the hit—whether it's a higher-priced cable bill or decreased investment and competition in their communities.  An economic analysis in our record shows that without reform, illegal taxes will reduce consumer welfare by $40 billion by 2023.

So I'm glad we take these steps today to crack down on bad actors who seek to tax broadband and thus provide less access and competition for all of us.  I'm also glad my colleagues agreed to some edits that have strengthened this item to further protect consumers from harm.

First, we now make clear that illegal franchise terms are *per se* preempted under the statute and by this Order, which will help bring franchises into compliance more quickly.  Consumers shouldn't have to pay higher prices while protracted negotiations take place.  Their cable bills should simply reflect the law.  Second, we make clear that Wi-Fi and wireless services provided over the cable system are exempt from duplicative fees, which will encourage providers to invest more in these 5G-ready services.  Third, we affirm that franchising authorities may not ask cable operators to voluntarily waive these regulatory reforms as a negotiating tactic or to perform an end-run around the statutory franchise fee cap.  And finally, we ensure that in-kind contributions requested by franchise authorities are calculated at their fair market value, because consumers shouldn't have to pay more for cable services than the governments who represent them.

These and other edits I requested help ensure consumers are protected from higher prices and that more money is spent on the investments needed to bring more broadband to more Americans.  So I want to thank my colleagues for expanding the relief that we provide in this decision.  I also want to thank the Media Bureau for its work on the item.  It has my support.

**Federal Communications Commission**                    **FCC 19-80**

## STATEMENT OF
## COMMISSIONER JESSICA ROSENWORCEL,
### DISSENTING

Re: *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992,* MB Docket No. 05-311.

Do just a bit of research on the state of local journalism in this country and you will see stark headlines with words like "decline," "shrink," and "crisis."

These headlines are not fake news. According to the Associated Press, more than 1,400 cities and towns across the United States have lost a newspaper during the last decade and a half. This trend extends beyond newspapers. Over roughly the last decade, newsroom employment—the reporters, editors, photographers, and videographers who work day-in and day-out to publish, broadcast, and report local news in this country have declined by 25 percent.

This downsizing deserves attention. While national news is on many of our screens, local journalism is disappearing. This has consequences. The loss of a local outlet means there is no one to report on the day's events. Coverage of the school board doesn't take place. Highlights from the local football game go unreported. Investigations into property assessments and local corruption fall by the wayside. But these are the facts that keep us informed as citizens and provide us with the news we need to help make decisions about our lives, our communities, and our democracy.

I think this context matters—and this context is important for today's decision. Because this agency should seize opportunities to reinvigorate local newsgathering and community coverage. In fact, that has traditionally been a hallmark of Federal Communications Commission media policy. But on that score, today's decision misses the mark. That's because it cuts at public, educational, and governmental channels across the country. It goes beyond placing reasonable limits on contributions subject to the statutory franchise fee and jeopardizes the day-to-day costs, like staff and overhead, required to run such stations.

I'm not the only one with this concern. Take a look at the record. We've heard from thousands of communities across the country worried we are cutting the operations of so many local channels. I am saddened that this agency refuses to listen.

I think their pleas fell on deaf ears because this agency has convinced itself that by making these changes, we will see more broadband. They insist that funding these local stations and related efforts damages the ability of our nation's broadband providers to extend their networks to communities without high-speed service. But comb through the text of this decision. You will not find a single commitment made to providing more broadband service in remote communities. There is no enforceable obligation to expand broadband capacity. There is no agreement that any savings from today's action is pushed into new network deployment. I fear this absence speaks volumes.

That's because in the final analysis, this decision is part of a broader trend at this agency. Washington is cutting local authorities out of the picture when it comes to infrastructure. You see it here, in the way we limit local public, educational, and governmental channels and public safety services like I-Nets. You see it in the way we cut local officials out of decisions about wireless facilities deployed in their own backyards. You see it the way that just last month we preempted a local law designed to increase broadband competition in a city where residents were crying out for more choices for internet access.

I don't think this is the way to govern. I believe the way we are proceeding is at odds with our

81

**Federal Communications Commission** **FCC 19-80**

long legal history and tradition of dual sovereignty in the United States. I think instead of speeding our way to the digital future, it is slowing us down, increasing our division and diminishing the dignity of local institutions. I dissent.

# STATEMENT OF
## COMMISSIONER GEOFFREY STARKS,
### DISSENTING

Re:  *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992,* MB Docket No. 05-311.

One of our primary responsibilities at the Commission is to ensure that spectrum, a scarce public resource that underscores our broadcasting industry and our wireless communications, is distributed equitably and in the public interest.  However, spectrum is not the only public resource integral to the deployment of our communications networks. Access to public real estate and property is similarly critical.  Specifically, public rights-of-way managed by states and municipalities fuel the build-out of our networks.  Providers need access to this resource to dig trenches to lay conduit and reach homes.

For many decades, state, municipal, or local governing bodies have been recognized as the arbiters of the use of this valuable public resource.  This recognition formed the basis of the Cable Act,[1] which spawned our local franchising rules and allowed providers to come freely to local franchising authorities to negotiate the use of public rights-of-way.  Historically, LFAs have sought and cable providers have agreed to a fee for the use of this public property, along with other public interest terms. In return, providers have been able to run profitable businesses, acquiring new customers and reaping hundreds of billions of dollars in revenue.

I dissent from today's item because it threatens the ability of states and municipalities to manage their local affairs through an improper reading of the statute.  The expansive and unprecedented reading of the term "franchise fee" in today's item significantly devalues the use of public rights-of-way and could, within months, threaten settled and longstanding franchise agreements across the country.  In doing so, it puts at risk the careful balance developed over many decades between the interests of providers and the local communities that they serve.

Thousands of federal, state, and local leaders have submitted substantive comments in our docket, pointing out how our action today will frustrate other important goals of the statute, and target certain terms negotiated into franchise agreements that are of great importance to local communities.[2]  From free or discounted services to schools or government buildings, to institutional networks, or I-Nets, which are viewed as critical infrastructure by many cities and relied upon to support government functions and public safety communications, much is at stake.  Additionally, the item itself recognizes that it will shake the very foundation of another statutory priority, the provision of public, educational, or governmental, or PEG, stations, which the item notes provide critical and unique local service to communities across the country.[3]

---

[1] Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779 (1984).

[2] *See, e.g.*, Letter from Sen. E. Markey *et al.*, to Ajit Pai, Chairman, FCC (July 29, 2019); Letter from Sen. K. Gillibrand and Sen. C. Schumer, to Ajit Pai, Chairman, FCC (July 25, 2019); Letter from Sen. C. Van Hollen, to Ajit Pai, Chairman, FCC (June 12, 2019); Letter from Rep. Y. Clarke, to Ajit Pai, Chairman, FCC (May 9, 2019); Letter from Sen. M. Hirono, to Ajit Pai, Chairman, FCC (Dec. 18, 2018); Letter from Rep. G. Moore, to Ajit Pai, Chairman, FCC, at 2 (Dec. 14, 2018); Letter from Rep. E. Engel, to Ajit Pai, Chairman, FCC (Dec. 13, 2018); Reply Comments of CAPA et al. at 9; Comments of King County, Washington, at 9; City Coalition Comments at 17-18; Comments of NATOA *et al.* at 10.

[3] *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992,* MB Docket No. 05-311, Draft Third Report and Order, para. 50 (adopted Aug. 1, 2019) (*Third Report and Order*).

**Federal Communications Commission**                    **FCC 19-80**

Perhaps the most significant departure in today's item is the expansive new reading of the term "franchise fee" for the purposes of the statutory cap on LFAs' collection of such fees. The term will now broadly include "cable-related, in-kind contributions."[4] This new interpretation of the statute will upend decades of settled regulatory determinations and innumerable franchise agreements currently in place across the country, and cause a seismic shift in the relationship between LFAs and providers, maximizing providers' leverage and minimizing the ability of LFAs to secure adequate service to their local communities.

The Commission's unilateral decision to avoid the words and intent of our statute and expand the definition of "franchise fee" in this proceeding is puzzling. As numerous commenters have extensively noted, and I agree, our mandate seems clear.[5] Section 622 of the Act caps franchise fees at five percent of a cable operator's gross revenues from the provisioning of cable services.[6] The term "franchise fee" is given a relatively straightforward definition in the statute: "any tax, fee, or assessment of any kind."[7] And, if the plain meaning of the words used raised any question about whether we are talking about money or some other type of contribution, the legislative history included a strikingly clear clarification: "[i]n general, this section defines as a franchise fee only monetary payments made by the cable operator and does not include as a 'fee' any franchise requirements for the provision of services, facilities or equipment."[8] On this issue, it is exceedingly clear – we are talking about money.

It is true that the Sixth Circuit returned this issue to us on procedural grounds with dicta considering whether the term "franchise fee" can include "noncash exactions" in narrow instances.[9] However, in almost the same breath the Court noted, notwithstanding its brief exploration of the definitions of the words at issue, "[t]hat the term 'franchise fee' can include noncash exactions, of course, does not mean that it necessarily *does* include every one of them."[10] The item's reliance on that brief discussion to support today's line-drawing exercise, in the face of a clearly worded statute and clearly stated congressional intent, is inappropriate.[11]

What does this really mean for communities across the country? It means that freely negotiated franchise terms, agreed to by cable providers in addition to franchise fees, in arm's length negotiations with LFAs all across the country, will almost immediately be treated differently now than they have for 35 years. And as a result, the value of local public rights-of-way will be immediately diminished limiting the ability of local authorities to raise revenue and support important programs. At its core, this means that difficult choices will need to be made by local leaders, contrary to the public interest, due to the Commission's misreading of the statute. For instance:

- The City of Medford, Massachusetts told us that they will need to decide whether to "divert resources away from core municipal and school services to maintain existing PEG programming,

---

[4] *Third Report and Order* at paras. 13-15.

[5] *See, e.g.,* NATOA *et al.* July 24, 2019 *Ex Parte* at 2; Anne Arundel County *et al.* July 24, 2019 *Ex Parte* at 8; Comments of City of Philadelphia *et al.* at 22 (Nov. 14, 2018); Comments of Charles County, Maryland, at 7 (Nov. 14, 2018); Reply Comments of Anne Arundel County, Maryland *et al.*, at 6 (Dec. 14, 2018).

[6] 47 U.S.C. § 542.

[7] *Id.* § 542(g)(1).

[8] 1984 U.S.C.C.A.N. 4751, 4753; H.R. Rep. No. 98-934 at 65 (1984) (emphasis added).

[9] *Montgomery County, Md. et al. v. FCC*, 863 F.3d 485, 490-91 (6th Cir. 2017).

[10] *Id.* (emphasis in original).

[11] *Id.*

suffer a dramatic reduction in the scope of PEG channels, or lose them altogether."[12]

- Durango, Colorado worries that reductions in funding will likely mean its PEG channels will be cut altogether, leaving the city without a way to warn citizens when a disaster strikes. PEG channels were used to alert citizens when 3 million gallons of mining sludge leaked into a major river which flows through the middle of the town. A PEG station's drone was used to obtain video and track the progress of the spill by local emergency management officials. Later, PEG channels were used to advise of evacuations and road closures when a massive wildfire broke out nine miles north of the city. Reductions in funding will likely mean PEG channels will be cut all together, leaving the city without a way to warn citizens when a disaster strikes.[13]

- I was in New York City earlier this week meeting with city officials and was told that they worry greatly about the impact of today's item on the future of the city's I-Net, a network that has become so integral to city services that it will be nearly impossible to replace. FDNY uses the I-Net for "critical public safety communications" among other things, and every city agency is plugged into it in some fashion.[14]

Our record is clear: the services negotiated in local franchising agreements are incredibly important, and reflect the significant value associated with permission to use public rights-of-way. When it comes to PEG channels, I can't say it any better than the item already does: "A significant number of comments in the record stressed [the benefits of PEG stations], which include providing access to the legislative process of the local governments, reporting on local issues, providing a forum for local candidates for office, and providing a platform for local communities—including minority communities."[15] Free or discounted service to cash-strapped schools, provision of critical I-Nets, discounts to vulnerable communities – all of these franchise terms advance the public interest and are a small imposition given the value received by providers in franchise negotiations. Our action today is unnecessary, unsupported by law or precedent, and risks causing grave harm to local communities.

    In short, today's item jeopardizes the public interest and threatens to significantly alter the ability of state and local governments to determine how best to serve their communities. This item will undoubtedly end up back in litigation, and I believe the court will find that the majority's decision is at odds with clear congressional direction. I dissent.

---

[12] Letter from Stephanie M. Burke, Mayor, City of Medford, MA, to Ajit Pai, Chairman, FCC (July 25, 2019).

[13] Association of Washington Cities *et al.* April 3, 2019 *Ex Parte*.

[14] City of New York July 25, 2019 *Ex Parte* at 1.

[15] *Third Report and Order* at para 50.

CERTIFICATE OF SERVICE

I hereby certify that I have on this 30th day of August, 2019, caused the

foregoing documents to be served upon each person listed below in the manner

indicated, in accordance with Fed. R. App. P. 15(c), 28 U.S.C. § 2112(a), and 47

C.F.R. § 1.13(a):

*By First Class Mail and Electronic Mail*     *By First Class Mail*

Thomas M. Johnson, Jr.
General Counsel
Federal Communications Commission
445 12th Street, SW
Room 8-A741
Washington, D.C.  20554
LitigationNotice@fcc.gov

The Honorable William Barr
Attorney General of the United States
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530

*s/ Tillman L. Lay*
Tillman L. Lay

Law Offices of:
    Spiegel & McDiarmid LLP
    1875 Eye Street, NW
    Suite 700
    Washington, DC  20006
    (202) 879-4000